UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE GUARDIAN NEWS, INC. and SELIM ZHERKA,<br><br>          Plaintiffs,<br><br>    -against-<br><br>PHILIP AMICONE, individually,<br>EDMUND HARTNETT, individually,<br>JOHN A. LISZEWSKI, individually,<br>CITY OF YONKERS, New York,<br>PAUL WOOD, individually, POLICE<br>OFFICERS JOHN DOE'S #1 to # 20,<br>Individually, and SANITATION WORKERS<br>#1 to # 20,<br><br>          Defendants. | **ECF Case**<br><br>07 Civ. 07078 (CLB) |

**DEFENDANTS' PERMANENT INJUNCTION HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THACHER PROFFITT & WOOD LLP
*Attorneys for Defendants*
50 Main Street
White Plains, New York  10606
(914) 421-4100

Defendants Philip Amicone, Edmund Hartnett, John A. Liszewski, City of Yonkers (the "City"), Paul Wood, Police Officers John Doe's #1 to #20 and Sanitation Workers #1 to #20 (collectively, "Defendants"), by and through their attorneys, Thacher Proffitt & Wood LLP, respectfully submit this Memorandum of Law in opposition to the claims of Plaintiffs The Guardian News, Inc. (the "Guardian") and Selim Zherka ("Mr. Zherka"; the Guardian and Mr. Zherka are collectively referred to herein as "Plaintiffs") seeking a <u>permanent injunction</u> barring Defendants from: (1) confiscating any newspaper boxes[1] placed by the Guardian on city-owned property in the City for distribution of <u>The Westchester Guardian</u> (the "Newspaper"); (2) confiscating any copies of the Newspaper intended to be distributed on city-owned premises within the City; (3) threatening employees of the Guardian with arrest/incarceration for distributing the Newspaper within the City; (4) threatening Mr. Zherka with arrest/incarceration for distributing the Newspaper within the City; (5) issuing to Guardian employees and Mr. Zherka appearance tickets charging them with violating the Yonkers City Charter (the "City Charter") for distributing the Newspaper; and (6) directing

---

[1]     Plaintiffs mistakenly refer to its newspaper <u>boxes</u> as merely newsracks. Plaintiffs' newspaper <u>boxes</u> are far more substantial in size than wire newsracks.

Defendants to forthwith return to Plaintiffs all of the confiscated newspaper boxes and newspapers.[2]

## CASE SUMMARY

This case is <u>not</u> about Plaintiffs' First Amendment right to distribute its Newspaper, this case is about the <u>methods</u> utilized by Plaintiffs to distribute the Newspaper — the how and where Plaintiffs decided to distribute the Newspaper. The relevant facts concerning the <u>methods</u> Plaintiffs chose to distribute the Newspaper can be summarized as follows:

## I.   PLAINTIFFS' ATTORNEY NOTIFIED OF CITY CODE PROVISIONS (NEWSPAPER BOXES)

- In May 2007, the Yonkers City Corporation Counsel notified Plaintiffs' counsel, in writing, by facsimile, of Yonkers City Code Chapter 33 which regulates the placement of newspaper boxes in the City.

## II.   CITY HALL METHODS

### A.   Guardian Newspaper Boxes Placed Inside City Hall

- Guardian employees placed newspaper boxes <u>inside</u> City Hall.

---

[2]     Plaintiffs originally sought compensatory and punitive damages in their complaint dated August 9, 2007 (the "Complaint") against the Defendants.  However, Plaintiffs have withdrawn their damages claim in this action with prejudice.

- Guardian employees were directed that newspaper boxes are not permitted <u>inside</u> City Hall.

- No other Newspaper boxes are placed <u>inside</u> City Hall.

- Guardian employees ignored directives that newspaper boxes are not permitted <u>inside</u> City Hall.

- Guardian newspaper boxes removed from <u>inside</u> City Hall.

- Guardian permitted to place the Newspaper for distribution on security desk <u>inside</u> City Hall similar to all other newspapers/periodicals.

**B.  Distribution By Hand Of Newspaper By Guardian Employees <u>Inside and Around City Hall and the Cacace Justice Center</u>**

- Guardian employees distributed the Newspaper by hand <u>inside</u> City Hall and near entrances to City Hall and Cacace Justice Center (which houses the City Courts and Yonkers Police Department).

- Guardian employees directed to cease distributing the Newspaper by hand <u>inside</u> City Hall and near entrances to City Hall and the Cacace Justice Center.

- Guardian employees ignored directives and, as a result, Guardian employees were issued summonses for distributing the Newspaper by

hand <u>inside</u> City Hall and near entrances to City Hall and the Cacace

Justice Center.

## III.   STREETS — SUMMONSES FOR DISTRIBUTION <u>BY HAND OF THE NEWSPAPER IN STREETS</u>

- Guardian employees distributed the Newspaper by hand in the streets.

- A limited number of Guardian employees directed to cease distributing the Newspaper by hand in the streets in the City in violation of state and local law.

- Guardian employees issued summonses for distributing the Newspaper by hand in the streets after disobeying directives.

## IV.   SIDEWALKS — REMOVAL OF NEWSPAPER BOXES HAPHAZARDLY PLACED IN RIGHTS-OF-WAY AND BLOCKING <u>PEDESTRIAN TRAFFIC</u>

- Between June 6, 2007 and July 19, 2007, the Guardian purchased 128 new blue newspaper boxes.

- In mid-July to early August 2007, Plaintiffs' employees haphazardly placed an additional 20+ new blue newspaper boxes on busy City sidewalks in City rights-of-way.

- Department of Public Works Employees removed the haphazardly placed blue newspaper boxes in City rights-of-ways.

- A total of 35 blue newspaper boxes were removed because they were blocking the rights-of-way and pedestrian traffic.

- The blue newspaper boxes were returned to the Guardian on August 23, 2007.

## PRELIMINARY STATEMENT

Parsing through the rhetoric of Plaintiffs' baseless allegations, this case is really about Mr. Zherka's attempt at sensationalism and political intimidation in an effort to bring attention to the Guardian and the Newspaper and to influence the 2007 Mayoral election in the City. It is no secret that Mr. Zherka is not a fan of the City's current and future administration, including its now twice elected Mayor. The Guardian and companies controlled by Mr. Zherka actually contributed substantial sums of money to a candidate running against the incumbent Mayor.

Plaintiffs allege that the City engaged in a "coordinated action" against the Guardian and its employees to suppress its First Amendment right; nothing could be further from the truth. In fact, the only "coordinated action" was that orchestrated and staged by Mr. Zherka and his employees after Plaintiffs' attorney had been notified in May 2007 of the Yonkers City Code provisions that regulate the placement of newspaper boxes on City rights-of-way.[3]

As part of its staged blitzkrieg, in June-July 2007, despite a lack of evidence that there had been a spike in readership, the Guardian purchased 128 new Guardian newspaper boxes. Thereafter, in and around mid-July to early August 2007, Mr. Zherka, with the assistance of Guardian employees, began to

---

[3] In May 2007, the Guardian sued the City claiming that the Yonkers City Code violated the First Amendment because it prohibited the placement of newspaper boxes in the City. The Yonkers Corporation Counsel forwarded, in writing, Plaintiffs' counsel Yonkers City Code, Chapter 33, which permits, but regulates the placement of newspaper boxes and requested that Plaintiffs' counsel dismiss the lawsuit filed against the City which it did.

intentionally, improperly, illegally and haphazardly place numerous additional newspaper boxes throughout the City, including at City Hall, <u>where no newspaper boxes are permitted and no newspaper boxes were/are placed</u>, bringing undue attention to the Guardian and the placement of its newspaper boxes.  Mr. Zherka, with the assistance of Guardian employees, also began to intentionally and unsuitably distribute the Newspaper by hand in and around City Hall and the Cacace Justice Center (City Courthouse and Police Headquarters) blocking pedestrian traffic and causing potentially unsafe conditions.  Guardian employees also began to distribute the Newspaper in Yonkers City streets in violation of New York State Vehicle and Traffic Law § 1157 *et seq*. and the City Code, causing potentially dangerous traffic conditions.   Guardian employees were issued summonses for said activity pursuant to Yonkers City Code §§ 100-35 and 103.49.

The City responded to the improper haphazard proliferation of Guardian newspaper boxes which were placed in the City rights-of-way, cluttering many street corners and impeding pedestrian traffic.  The City removed the newspaper boxes that were improperly placed within the City (leaving the properly placed ones) and shortly thereafter, returned them to Plaintiffs, who have since re-placed them as per this Court's September 21, 2007 Order.[4]  The City also reasonably

---

[4]      On September 25, 2007, the City forwarded a letter to the Court and Plaintiffs' counsel objecting to the placement of two newspaper boxes adjacent to the entrances to City Hall near the stairway and the north entrance.  The City contends that these newspaper boxes should

responded to the distribution of the Newspaper in and around City Hall and the Cacace Justice Center and in the City streets.[5]

Mr. Zherka's "coordinated action" directly set the foundation for the City's reaction, resulting in the publicity and attention that Mr. Zherka desired to try to influence the 2007 City Mayoral election.

The City realizes Plaintiffs' fundamental right to publish and disseminate the Newspaper.  Importantly, however, this case is <u>not</u> about the Guardian's right to distribute the Newspaper in the City, but rather, is about the <u>method</u> in which the Guardian chooses to distribute the Newspaper.  The former is protected by the First Amendment.  The latter is not.

## A.    A Permanent Injunction Hearing Is Not Necessary: The Complaint Should Be Dismissed As Moot

This Court should <u>not</u> hold a hearing on this matter, but rather decide the remaining questions of law and dismiss this action in its entirety because the relief requested in Plaintiffs' Complaint is moot.  <u>Tawwab v. Metz</u>, 554 F.2d 22, 23 (2d. Cir. 1977) (complaint dismissed as moot because the challenged policy was changed precluding the alleged wrongful behavior from reoccurring).

---

be removed and relocated.  The City has not removed these newspaper boxes pending this Court's direction.

[5]    It is indeed reasonable for the federal government to prohibit the placement of newspaper boxes inside a federal courthouse and prohibit the distribution of a newspaper by hand within a certain perimeter of a federal courthouse.

On September 21, 2007, this Court issued an order, <u>suggested by and consented to by Defendants</u>, granting Plaintiffs a Temporary Restraining Order ("TRO").  In issuing the TRO, this Court granted, in large part, Plaintiffs' requested relief.  This Court did:

(i)    limit the Guardian's distribution of the Newspaper in City Hall and on City Hall steps to be in the same manner which other newspapers or periodicals are distributed (<u>i.e.</u>, no newspaper boxes to be placed in City Hall and no distribution of newspapers on City Hall steps);[6] and

(ii)    prohibit Guardian employees from distributing the Newspaper in the street.

The fact that this Court has issued a TRO and Defendants have agreed to its terms and conditions makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." <u>Tawwab v. Metz</u>, 554 F.2d at 24, <u>quoting</u> <u>United States v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. 199, 203 (1968).[7]  In order for the alleged wrongdoing to reoccur, the City would necessarily have to ignore and violate a federal court order.  Furthermore, a statement by the government "that it does not intend to violate the claimed rights of the plaintiff can suffice to make the case moot."  <u>Becket v. Marks</u>, 358 F.Supp.

---

[6]    All free newspapers and periodicals are permitted to be distributed in City Hall by placing them on the security desk at the north entrance to City Hall.

[7]    In fact, there have been no complaints from Plaintiffs that the City is taking any steps to violate this Court's September 21, 2007 Order.

1180, 1184, (S.D.N.Y. 1973), <u>citing</u> <u>Cherry v. Postmaster General</u>, 332 F.Supp. 785 (S.D.N.Y. 1971), <u>aff'd</u>, 460 F.2d 1063 (2d. Cir. 1972).

It is the burden of Plaintiffs to show that there still remains some cognizable danger that the alleged violations will occur again.  <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953).  Plaintiffs cannot meet this burden because the alleged violations will not occur again as per the Court's order and the City's consent.

Accordingly, the Complaint should be dismissed as moot.

**B.    <u>Plaintiffs Will *Not* Meet The Standard For A Permanent Injunction</u>**

Plaintiffs clearly will not meet the standard for a permanent injunction. Specifically, Plaintiffs have failed to demonstrate that they will succeed on the merits of their claims.  Plaintiffs' rights were <u>not</u> violated by Defendants.  Indeed, Defendants merely instituted limited reasonable time, place and manner restrictions on the placement of the Guardian's newspaper boxes throughout the City.  The City also instituted reasonable time, place and manner restrictions on Plaintiffs' dissemination of the Newspaper in the City by hand.  In instituting reasonable time, place and manner restrictions on the <u>methods</u> of Plaintiffs distribution of the Newspaper, Defendants enforced provisions of the Yonkers City

Code, which Plaintiffs have not challenged herein.[8]  A permanent injunction will prevent Defendants from enforcing its laws and regulations compromising the health, safety and welfare of the residents of the City.

In addition, those of the Defendants sued in their individual capacities are entitled to qualified immunity against Plaintiffs' claims and the City is entitled to sovereign immunity.

Further, Plaintiffs have failed to establish the requisite municipal policy or custom in order to find the City and Sanitation Workers # 1 to # 20 liable.[9]

Finally, as set forth herein, there would be no irreparable harm to Plaintiffs in the absence of a permanent injunction.  The Guardian's newspaper boxes are located throughout the City.  In addition, Plaintiffs can distribute the Newspaper in the City, provided they comply with the Yonkers City Code and all other applicable state and federal laws.  In fact, to this very day, the Guardian is distributed throughout the City on a daily basis.

Accordingly, Plaintiffs' motion for a permanent injunction should be denied.

---

[8]    Notably, the Complaint fails to allege a facial challenge to any provision of the Yonkers City Code or any other rule or regulation.

[9]    Sanitation Workers #1 to #20 are not sued in their individual capacities.

## PROPOSED FINDINGS OF FACT[10]

### A.     Background

1.      The Newspaper is a weekly political publication (distributed on Wednesday of each week) aimed at publishing opinions, editorials and statements about public officials, political candidates, police departments and local governments in Westchester County.

2.      The Newspaper's owner/publisher is Mr. Zherka who is also an owner of strip/gentleman's clubs, night clubs and low income housing.

3.      The Newspaper's Editor-In-Chief is Richard Blassberg.

4.      The Newspaper was first published on August 17, 2006.

5.      From September 2006 to the present, the Guardian has distributed tens of thousands of copies of the Newspaper throughout the City.

### B.     The September 21, 2006 Edition of the Newspaper

6.      On September 21, 2006, the Newspaper ran a front page negative article on the Yonkers Police Department, including a photograph of a Yonkers Police Department badge with a red circle around it and line through it.

7.      The article was highly critical of the Yonkers Police Department alleging police brutality.

---

[10]      Due to the expedited nature of this hearing, Defendants have not been able to obtain the deposition transcripts.  As a result, Defendants are unable to provide the Court with deposition cites at this time.

**C.**     **The October 5, 2006 Edition of the Newspaper**

8.     On October 5, 2006, the Newspaper ran another front page negative article on the Yonkers Police Department alleging, <u>inter alia</u>, police brutality and corruption.

**D.**     **The Guardian Files Suit Against the City of Yonkers (May 2007) — Withdraws Same**

9.     On or about May 14, 2007, the Guardian filed a lawsuit in the Federal District Court, Southern District of New York against the City alleging that the Yonkers City Code (the "City Code") completely banned the placement of newspaper boxes throughout the City in violation of the First Amendment (the "First Lawsuit").

10.     On or about May 24, 2007, the Yonkers Corporation Counsel, *via* Assistant Corporation Counsel, Raymond P. Schmidt, Esq., forwarded to Plaintiffs' counsel, by facsimile, Yonkers City Code Chapter 33 entitled "<u>Newsracks</u>".

11.     Mr. Schmidt requested that Plaintiffs' counsel review the law which permits the siting of newsracks and newspaper boxes in the City subject to certain regulations, including, prohibiting the placement of a newspaper box in such a manner as to endanger the safety of person or property or interfere with or impede the flow of pedestrian traffic.  <u>See</u> City Code § 33-4B.

12.    Mr. Schmidt also requested that Plaintiffs' counsel consider withdrawing the First Lawsuit.

13.    Thereafter, Plaintiffs' counsel withdrew the First Lawsuit.

**E.    The Distribution Of The Newspaper *Via* Newspaper Boxes *(August 2006-July 2007)***

14.    From August 17, 2006 to July 2007, the Guardian distributed the Newspaper *via* blue newspaper boxes located on sidewalks in various municipalities in Westchester County, including approximately 45 newspaper boxes in the City.[11]

**F.    The Distribution Of The Newspaper In City Hall And On City Streets *(July 2007-August 2007)***

15.    Between June 6, 2007 and July 19, 2007, the Guardian purchased 128 new/additional blue newspaper boxes.

16.    In or about July 2007 through August 2007, the Guardian placed, in a haphazard manner, a myriad of these new/additional Guardian newspaper boxes in various locations in the City, including in City Hall and on City sidewalks blocking pedestrian traffic/rights of way in violation of City Code Chapter 33.

17.    A number of these new/additional newspaper boxes were placed in locations where other newspaper boxes were not located.

---

[11]    All Guardian newspaper boxes are identical.

14

18.    Beginning in approximately July 2007 to the present, the Guardian also retained a number of teenagers and other employees, paying them $8 an hour in cash, to distribute the Newspaper by hand: (i) in City Hall; (ii) at City Hall entrances and steps; (iii) at entrances near the Cacace Justice Center (the "Cacace Center"); (iv) on City streets; and (v) on City sidewalks.

19.    City Hall is the governmental hub of the City where the majority of City business is conducted.  City Hall houses the Office of the Yonkers City Mayor, the Office of the Yonkers City Counsel, the Office of the Yonkers City Corporation Counsel and other governmental offices.

20.    The Cacace Center is the judicial hub of the City and houses the Yonkers City Court as well as the Yonkers City Police Headquarters.

21.    The Cacace Center also houses incarcerated prisoners awaiting court appearances.

22.    In order to enter the Cacace Center, the public must enter through security and a magnetometer.

    (i)    *July 9, 2007 (City Hall)*

23.    On July 9, 2007, Mr. Zherka, pretending to be working for his boss at the Guardian, and Dominica O'Neill (*aka* Sunday) (hereinafter "Sunday"), came to

City Hall with a blue Guardian newspaper box and attempted to place said newspaper box (with newspapers) <u>inside</u> City Hall near the north entrance.[12]

24.    P.O. Paul Wood, who is assigned to City Hall along with P.O. Joseph Galinski, informed Mr. Zherka that he <u>could</u> leave copies of the Newspaper, similar to all other newspapers and periodicals, on the security desk at City Hall, but that he <u>could not</u> leave the newspaper box because it was an obstruction and potential safety/security hazard.[13]

25.    No newspaper box is permitted in City Hall.

26.    Mr. Zherka informed P.O. Wood that: (i) he (Zherka) had to leave the Guardian newspaper box at City Hall at the direction of his "boss"; (ii) he had to take a picture of the Guardian newspaper box; and (iii) P.O. Wood could throw the Guardian newspaper box away after he left.

27.    Ignoring P.O. Wood's direction, Mr. Zherka proceeded to leave City Hall and left the Guardian newspaper box <u>inside</u> City Hall near the north entrance.

---

[12]    Mr. Zherka did <u>not</u> identify himself and did <u>not</u> indicate that he was the owner/publisher of the Guardian. Rather, Mr. Zherka, without giving his name, indicated that he was an employee of the Guardian and was placing the Guardian newspaper box in City Hall on behalf of his "boss". During his deposition, Mr. Zherka admitted that he was <u>lying</u> when he indicated that he was at City Hall to place a newspaper box there at the direction of his boss.

[13]    In the past, some free newspapers and some free periodicals were placed on a <u>wire</u> newsrack located inside City Hall near the east entrance. Months before July 2007, however, said <u>wire</u> newsrack, not newspaper box, broke and was not replaced. In July 2007 there was also a <u>wire</u> newsrack near the east entrance that was used predominantly for City news. This wire newsrack was removed in July 2007 and has not been replaced.

28.    Sunday videotaped Mr. Zherka's interaction with P.O. Wood at City Hall and the placement of the Guardian newspaper box <u>inside</u> City Hall.

29.    P.O. Wood and/or a City Hall custodian removed the newspapers in the Guardian newspaper box and placed them on the security desk.

30.    The City Hall custodian then removed the Guardian newspaper box from <u>inside</u> the north entrance to City Hall and placed it in a secure area on the 5th floor of City Hall for safekeeping.

       *(ii)*    <u>*July 11, 2007 (City Hall)*</u>

31.    On July 11, 2007, Mr. Zherka appeared at City Hall again with Sunday and two Guardian employees, Michael Guevera and Cesar Castillo.

32.    Sunday was again videotaping Mr. Zherka.

33.    This time, Mr. Zherka came with <u>two</u> Guardian newspaper boxes and attempted to again place the boxes <u>inside</u> City Hall, one <u>inside</u> the north entrance and one <u>inside</u> the east entrance.

34.    Mr. Zherka was again instructed by the police that he could <u>not</u> place newspaper boxes <u>inside</u> City Hall, but that he could leave copies of the Newspaper at the City Hall security desk similar to all other newspapers and periodicals.

35.    Mr. Zherka refused, and disobeying the police officer's directions, left two newspaper boxes <u>inside</u> City Hall.

36.    Both newspaper boxes were placed outside City Hall by the City to be picked up by Mr. Zherka and the newspapers located in the newspaper box were placed on the security desk.

37.    Mr. Zherka also instructed Mr. Guevera and Mr. Castillo to distribute the Newspaper by hand, <u>inside</u> City Hall.

38.    Mr. Castillo was stationed inside the north entrance to City Hall and Mr. Guevera was stationed inside the east entrance to City Hall.  Both Mr. Castillo and Mr. Guevera handed out the Newspaper directly in front of each respective entrance blocking pedestrian traffic.

39.    P.O. Wood and P.O. Galinski directed Mr. Castillo and Mr. Guevera to cease distributing the Newspaper <u>inside</u> City Hall or they each would receive a summons.

40.    Both Mr. Castillo and Mr. Guevera disobeyed the police officers' directions, continued distributing the Newspaper <u>inside</u> City Hall and were issued summonses for violations of the City Code.

41.    Thereafter, both Mr. Castillo and Mr. Guevera were again directed to cease distributing the Newspaper <u>inside</u> City Hall and asked to leave City Hall.

42.    Both Mr. Castillo and Mr. Guevera complied with these instructions.

(iii)    *July 12, 2007 (8 South Broadway)*

43.    On July 12, 2007, P.O. Richard Alaimo and P.O. Thomas Cleary observed Gene Smith, a contractor of the Guardian ("Mr. Smith"), carry and place a blue newspaper box (a Guardian newspaper box) in front of a bus stop at 8 South Broadway in a heavily traveled (bus traffic and pedestrian traffic) area of Getty Square.

44.    According to P.O. Alaimo and P.O. Cleary, no newspaper box was located in front of 8 South Broadway prior to Mr. Smith placing the Guardian newspaper box at said location.

45.    Before July 12, 2007, P.O. Alaimo and P.O. Cleary did not receive a directive from any superior to remove any newspaper boxes.

46.    The placement of a Guardian newspaper box in front of a bus stop at 8 South Broadway was an obstruction to pedestrian traffic and impeded individuals seeking to enter/exit the bus.[14]

47.    While P.O. Alaimo was attempting to determine whether Mr. Smith had a permit to place the newspaper box in front of 8 South Broadway, Mr. Smith made a telephone call and stated to P.O. Alaimo, "give me a summons".

---

[14]    Sometime after this incident, Deputy Chief Charles Gardner ("Chief Gardner") met P.O. Alaimo at 8 South Broadway. At this meeting, P.O. Alaimo informed Chief Gardner of the exact location that Mr. Smith placed the blue newspaper box. In Chief Gardner's opinion, Mr. Smith's placement of a newspaper box at this location was an obstruction to pedestrian traffic.

48.    P.O. Alaimo directed Mr. Smith to remove the newspaper box, but he refused.

49.    Accordingly, P.O. Alaimo issued Mr. Smith a summons under Yonkers City Code § 103.94 "Obstructing Pedestrian Traffic".

50.    P.O. Alaimo and P.O. Cleary removed the newspaper box and P.O. Alaimo vouchered it as evidence and prepared a police report of the incident.

51.    Similar to this incident on July 12, 2007, a few years ago, P.O. Alaimo removed two (2) periodical boxes placed on City streets because they blocked pedestrian traffic.

(iv)    _July 17, 2007 (City Hall)_

52.    On July 17, 2007, Mr. Zherka appeared at City Hall again with Sunday who again was present with a videotape recorder.

53.    Mr. Zherka was again directed by the police that he could not place newspaper boxes inside City Hall, but that he could leave copies of the Newspaper at the City Hall security desk similar to all other newspapers and periodicals.

54.    Mr. Zherka, again disobeying P.O. Wood's directive, left a single blue Guardian newspaper box inside the north entrance to City Hall.

55.    The newspapers located in the newspaper box were removed and placed on the security desk in City Hall and the newspaper box was vouchered for safekeeping.

(v)    *July 31, 2007 (The Cacace Center)*

56.    On July 31, 2007, Richard Guzman and Nicole Pacheco, employees of the Guardian, were distributing the Newspaper by hand in front of the Cacace Center (Police Headquarters, City Courthouse with Detention Facilities).

57.    New York State Court Officers, who have <u>no</u> affiliation with the City of Yonkers, directed Mr. Guzman and Ms. Pacheco to cease distributing the Newspaper in front of the Cacace Center for security reasons.

58.    Mr. Guzman and Ms. Pacheco refused to comply with the New York State Court Officer's directives.

59.    P.O. Daniel Barahona after consulting with a Sergeant, directed Mr. Guzman and Ms. Pacheco to cease distributing the Newspaper at this specific location.

60.    Mr. Guzman and Ms. Pacheco ignored P.O. Barahona's order and continued distributing the Newspaper.

61.    P.O. Barahona again directed that Mr. Guzman and Ms. Pacheco cease distributing the Newspaper in front of the Cacace Center for safety and security reasons.

62.    Mr. Guzman and Ms. Pacheco again ignored P.O. Barahona's order and continued distributing the Newspaper.

63.    P.O. Barahona issued Mr. Guzman and Ms. Pacheco a summons for distributing the Newspaper directly in front of the Cacace Center and directed Mr. Guzman and Ms. Pacheco to cease said activity.

64.    After receiving their summonses, Mr. Guzman and Ms. Pacheco finally complied with P.O. Barahona's directive and left the Cacace Center with copies of the Newspaper.

65.    P.O. Barahona would not have issued Mr. Guzman and Ms. Pachceo summonses if they were further away from the Cacace Center (e.g., on the sidewalk abutting Yonkers Avenue).

(vi)    _August 1, 2007_

66.    On August 1, 2007, Mr. Zherka, Sunday and Ms. Maribel Ayala ("Ms. Ayala"), all Guardian employees, were distributing the Newspaper by hand directly in front of City Hall entrances and on City Hall steps (north and east entrances).

67.    P.O. Wood directed Mr. Zherka, Sunday and Ms. Ayala to cease distributing the Newspaper by hand directly in front of City Hall entrances and City Hall steps.

68.    True to form, Mr. Zherka, Sunday and Ms. Ayala refused to abide by P.O. Wood's directive and continued handing out the Newspaper at these specific locations.

69.     These limited areas directly in front of City Hall and the City Hall steps often have motor vehicles drive past for City Hall business.

70.     On one occasion, Mr. Zherka was almost struck by a passing motor vehicle.

71.     P.O. Wood issued Mr. Zherka, Sunday and Ms. Ayala summonses for distributing the Newspaper directly in front of City Hall entrances and steps.[15]

(vii)   *August 2, 2007* — The Guardian Informs The City That Six
                (6) Newspaper Boxes Have Been Removed

72.     On Wednesday, August 1, 2007, Mr. Smith delivered newspapers to Guardian newspaper boxes throughout the City other than these six locations.

73.     On Thursday, August 2, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to John Liszewki, Commissioner of Public Works for the City of Yonkers ("Commissioner Liszewski"), informing him that six (6) Guardian newspaper boxes have been confiscated by the City (three (3) from City Hall, one (1) from the Cacace Center and two (2) from South Broadway).

74.     This is the first time that the Guardian complained, in writing, that the City removed any Guardian newspaper boxes.

---

[15]     Guardian employees are indeed permitted to distribute the Newspaper on the sidewalks of City streets.  However, the specific locations where Mr. Zherka, Sunday and Ms. Ayala (and other Guardian employees) distributed the Newspaper, directly in front of City Hall, causes potential safety problems to those distributing the Newspaper and persons visiting City Hall and was the reason for P.O. Wood's directives and issuance of summonses.

75.    On August 2, 2007, with no evidence to support his baseless and conclusory allegations, Mr. Zherka with Sunday appeared at City Hall complaining that his newspaper boxes were improperly removed from City Hall and that his newspapers on the security desk were being thrown away.

76.    Sunday was again videotaping Mr. Zherka.

77.    Mr. Zherka marched to the Mayor's office, and in a rant, demanded to see the Mayor.

78.    Mr. Zherka refused to leave until he was able to see the Mayor.

79.    City Hall staff instructed Mr. Zherka that he was <u>not</u> permitted to videotape inside the Mayor's office and that he would have to make an appointment to see the Mayor.

80.    Mr. Zherka would not leave claiming he had a First Amendment right to film the Mayor's office and stated that he was being thrown out of the Mayor's office.

81.    The facts demonstrate that P.O. Wood instructed Mr. Zherka to leave the Mayor's office.

82.    Mr. Zherka eventually left City Hall.

(viii) *August 6, 2007*

83.    Richard Guzman, Mr. Zherka, Sunday and Michael Estrada, all employees of the Guardian, were distributing the Newspaper by hand <u>directly in front</u> of City Hall entrances and City Hall steps (north and east entrances).

84.    P.O. Wood directed Mr. Guzman, Mr. Zherka, Sunday and Mr. Estrada to cease distributing the Newspaper by hand <u>directly in front</u> of City Hall entrances and City Hall steps.

85.    Mr. Guzman, Mr. Zherka, Sunday and Mr. Estrada refused to comply with P.O. Wood's directive and continued handing out the Newspaper at these specific locations.

86.    These areas, directly in front of City Hall and the City Hall steps, often have motor vehicles drive past for City Hall business.

87.    P.O. Wood issued Mr. Guzman, Mr. Zherka, Sunday and Mr. Estrada summonses for distributing the Newspaper directly in front of City Hall entrances and steps.

88.    On August 6, 2007, many employees of the Guardian were distributing the Guardian on Yonkers Avenue, in the street and on the sidewalk.

89.    These employees were not given summonses.

(ix)    *August 7, 2007* -    The Guardian Informs The City That Five
                              (5) Newspaper Boxes Have Been Removed

90.    On Tuesday, August 7, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to Commissioner Liszewki informing him that five (5) additional Guardian newspaper boxes have been confiscated by the City.

(x)    *August 7, 2007*

91.    On August 7, 2007, Guardian employees also continued to hand out the Newspaper in the street at the corner of Yonkers and Central Avenue.

92.    These Guardian employees were directed by various police officers to cease distributing the Newspaper in the street for safety reasons.

93.    These Guardian employees refused, disobeying police directives.

94.    No Guardian employee was issued a summons.

95.    Sunday videotaped the incident.

(xi)    *August 9, 2007*

96.    On August 9, 2007, Guardian employees also continued to hand out the Newspaper in the street at the corner of Yonkers and Central Avenue.

97.    These Guardian employees were directed by various police officers to cease distributing the Newspaper in the street for safety reasons.

98.    These Guardian employees refused, disobeying police directives.

99.    Kllapija Maumer and Christian Salazar, Guardian employees, were issued summons for distributing the Newspaper in the street.

(xii)    *August 9, 2007 —* Federal Court Filing

100.    Also on August 9, 2007, Plaintiffs filed the instant lawsuit against the City and its employees.

(xiii)    *August 10, 2007* — The Guardian Informs The City That Fifty Six (56) Newspaper Boxes Have Been Removed

101.    On Friday, August 10, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to Commissioner Liszewki informing him that fifty-six (56) Guardian newspaper boxes have been confiscated by the City.

**G.    The City Is Contacted About "Blue" Newspaper Boxes Blocking Pedestrian Traffic**

102.    In or about early August 2007, Commissioner Liszewski's office received a telephone call from a Yonkers City resident complaining about the placement of new blue newspaper boxes appearing throughout the City, blocking pedestrian traffic.

103.    In or about early August 2007, Commissioner Liszewski was contacted by one of the secretaries working in the Mayor's office informing him that complaints from Yonkers City residents had been received about the placement of new blue newspaper boxes appearing throughout the City, blocking pedestrian traffic.

104.    Commissioner Liszewski on his own initiative ordered that his employees investigate the situation and remove any blue boxes "blocking the right

of way" for safety concerns.   See August 11, 2007 Report of Commissioner Liszewski's call to Department Dispatcher.

105.   Commissioner Liszewski did not know that these newspaper boxes were Guardian newspaper boxes before ordering that blue newspaper boxes blocking the rights-of-way be removed.

106.   In or about early August 2007, employees of the City Department of Public Works (the "DPW"), removed blue newspaper boxes on City sidewalks blocking the right-of-way.   See Yonkers City Code Chapter 33.

107.   DPW removed thirty-five (35) blue newspaper boxes from City sidewalks which were blocking pedestrian traffic and rights-of- way.

108.   DPW stored these 35 blue newspaper boxes in the DPW facility at 255 Lake Avenue.

**H.    August 21-23, 2007**

109.   On or about August 21, 2007, the City's special counsel forwarded a letter to Plaintiffs' counsel informing him that thirty-three Guardian newspaper boxes were being stored by the City and that a Guardian representative should contact Commissioner Liszewski to retrieve these boxes.[16]

---

[16]    DPW actually stored 35 newspaper boxes, not 33.  Plaintiffs' counsel was also informed on numerous occasions that the Yonkers Police Department was in possession of three additional Guardian newspaper boxes and that they were available to be picked up at any time.

110. The August 21, 2007 letter also instructed Plaintiffs' counsel that the placement of Guardian newspaper boxes must comply with the City Code.

111. On or about August 21, 2007, Chief Gardner also issued an order to All Commands stating that, <u>inter alia</u>: (i) no summons is to be issued to anyone for distributing newspapers on the sidewalk; and (ii) anyone distributing newspapers in the street should be ordered to cease said activity, and if they refuse, to issue them a summons for Failure to Obey a Police Officer.

112. On August 23, 2007, Mr. Zherka picked up the 35 Guardian newspaper boxes from the City DPW facility at 255 Lake Street.

113. On August 23, 2007, a Yonkers City Corporation Counsel Investigator observed a number of Guardian newspaper boxes on sidewalks throughout the City.

## <u>LEGAL STANDARDS</u>

### A.    <u>MOOTNESS</u>

A claim becomes moot when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." <u>Tawwab v. Metz</u>, 554 F.2d at 24, <u>quoting</u> <u>United States v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. at 203.  A statement by the government "that it does not intend to violate the claimed rights of the plaintiff can suffice to make the case moot." <u>Becket v. Marks</u>, 358 F.Supp. 1180, 1184, (S.D.N.Y. 1973), <u>citing</u> <u>Cherry v. Postmaster General</u>, 332 F.Supp. 785 (S.D.N.Y. 1971), <u>aff'd</u> 460 F.2d 1063 (2d. Cir. 1972).

Point I in the Conclusions of Law, <u>infra</u>, addresses this legal standard in this case and demonstrates why the instant matter is moot.

### B.    <u>PERMANENT INJUNCTION</u>

Plaintiffs request a permanent injunction enjoining Defendants from violating their First and Fourteenth Amendment Rights.  In order for an injunction to be made on a permanent basis, as the Plaintiffs are requesting here, an even greater showing is necessary than for a preliminary injunction. <u>See</u> <u>Bobrowsky v. Curran</u>, 333 F.Supp.2d 159, 162 (S.D.N.Y. 2004).   To obtain a preliminary injunction, a party must establish: (1) irreparable harm in the absence of the injunction; and (2) either (a) a likelihood of success on the merits, or (b) a balance of hardships tipping decidedly toward the party seeking the injunctive relief. <u>See</u>

Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992); Bobrowsky, 333 F.Supp.2d at 162.   Specifically, to obtain a permanent injunction, a plaintiff must actually succeed on the merits of the case.  See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 (1987); Lusk v. Village of Cold Spring, 418 F.Supp.2d 314, 318 (S.D.N.Y. 2005), rev'd in part on different grounds, 475 F.3d 480 (2d Cir. 2007).

In order for a party to meet the first prong of the standard, the "potential injury … justify [ing] the granting of injunctive relief … must be irreparable; that is, it must be the kind of injury for which an award of money cannot compensate." Sperry Int'l Trade, Inc. v. Government of Israel, 670 F.2d 8, 12 (2d Cir. 1982). Most courts have held that in seeking to obtain a preliminary injunction, irreparable injury is shown when an alleged deprivation of a constitutional right is involved.   Beyond that, in order to prevail on their request for a permanent injunction, the Plaintiffs must actually succeed on the merits of their First Amendment and/or Fourteenth Amendment claims alleged against the Defendants. See Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996).

As will be demonstrated in the Conclusions of Law, infra, the legal barriers to the Plaintiffs' constitutional claims preclude the consideration of a permanent injunction, warranting dismissal of this action.

C.    **FIRST AMENDMENT ANALYSIS**

Although the right of access to a public forum (such as public streets, highways, sidewalks, and parks) for the exercise of free speech is fundamental, that right is not limitless or absolute.  See Central American Refugee Center-Carecen v. City of Glen Cove, 753 F.Supp. 437, 440 (E.D.N.Y. 1990) (an ordinance prohibiting solicitation of employment from a vehicle or by a pedestrian on a public street did not violate plaintiffs' First Amendment right of free expression); Frisby v. Schultz, 487 U.S. 474, 479-80 (1988); Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799 (1985) ("[e]ven protected speech is not equally permissible in all places and at all times.").

It is well settled that the First Amendment does not guarantee unlimited access to government property for expressive activity.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992).

Further, it is well established that "reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests." Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir. 1980); Olivieri v. Ward, 766 F.2d 690, 693 (2d Cir. 1985) (police department's plan to close a sidewalk in front of a cathedral during demonstrator's scheduled march was a reasonable time, place and manner restriction).

In the instant matter, the City may regulate the placement of newspapers boxes and the distribution of the Newspaper by hand on and in public property within the City, provided that the regulation is: (1) content-neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leaves open ample alternative channels for communication. Olivieri v. Ward, 766 F.2d at 693 (2d Cir. 1985).

## 1.     Content-Neutral

The principal inquiry for determining whether a law is content based is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  Ward v. Rock Against Racism, 491 U.S. 781 (1989); Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d. Cir.2005), cert. denied, 546 U.S. 815 (2005).

## 2.     Narrowly Tailored To Further A Substantial Governmental Interest

The requirement of narrow tailoring of a regulation is met if the regulation promotes a substantial government interest that would be achieved less effectively without the regulation.  Ward v. Rock Against Racism, 491 U.S. 781 (1989). "Furthermore, if the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns

some less-restrictive alternative to the regulation." Carew-Reid v. Metropolitan Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990).

The Supreme Court has recognized the strong interest of state and local governments in preserving the quality of community life. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Mastrovincenzo v. City of New York, 435 F.3d 78, 99 (2d Cir. 2006) (New York City's licensing requirements for street vendors was a valid, content-neutral speech restriction because, inter alia, it aimed to keep the public streets free of congestion for the convenience and safety of its citizens); United for Peace and Justice v. City of New York, 243 F.Supp.2d 19, 26 (S.D.N.Y. 2003) ("Any event involving a large number of people presents a risk to safety and security. This risk can be reduced to a reasonable one through planning, security measures and policing").

### 3.    Availability Of Ample Alternative Channels Of Communication

"Content-neutral time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." City of Renton, 475 U.S. at 47. Moreover, the First Amendment does not guarantee to the Plaintiffs "access to every or even the best channels or locations for their expression." Carew-Reid, 903 F.2d at 914, citing Members of City Council of Los Angeles v Taxpayers for Vincent, 466 U.S. 789, 804 (1984); Concerned Jewish Youth v.

McGuire, 621 F.2d 471, 476 (2d Cir. 1980) (the city policy restrictions "impose only a minimal inhibition on the ability of [plaintiff] to communicate its ideas" in light of the many alternative channels available).

Points II, III, V and VI in the Conclusions of Law, infra, sets forth why there is no First Amendment violation in the instant case.

## D.    EQUAL PROTECTION — SELECTIVE ENFORCEMENT

Plaintiffs' allegations can only be interpreted as a selective enforcement argument.  The Plaintiffs contend that the City and its officials and employees treated its publication, critical of the City, unfairly and differently than it treated publications favorable to the City.  (Complaint ¶¶ 17, 18).

In order to establish a violation of equal protection based on selective enforcement, a plaintiff must show: (1) that plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure the plaintiff.  Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004), quoting Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999).  The plaintiffs' allegations must satisfy both prongs.  Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494 (2d Cir. 2001).  To prevail on an

equal protection/selective enforcement claim, a plaintiff must prove intentional discrimination.  Kelly v. Rice, 375 F.Supp.2d 203, 210 (S.D.N.Y. 2005).

Point IV, V and VI in the Conclusions of Law, infra, demonstrates why there is no Equal Protection violation in the instant case.

## CONCLUSIONS OF LAW

### Point I

### THE RELIEF REQUESTED IN THE COMPLAINT IS MOOT

The fact that this Court has issued a TRO and Defendants have agreed to its terms and conditions, makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Tawwab v. Metz, 554 F.2d at 24, quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. at 203.  In order for the alleged wrongdoing to reoccur, the City would necessarily have to ignore and violate a federal court order.  Furthermore, a statement by the government "that it does not intend to violate the claimed rights of the plaintiff can suffice to make the case moot."   Becket v. Marks, 358 F.Supp. 1180, 1184, (S.D.N.Y. 1973), citing Cherry v. Postmaster General, 332 F.Supp. 785 (S.D.N.Y. 1971), aff'd 460 F.2d 1063 (2d. Cir. 1972).

It is the burden of Plaintiffs to show that there still remains some cognizable danger that the alleged violations will occur again.  United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).  Plaintiffs cannot meet this burden because the alleged violations will not occur again.

Accordingly, the Complaint should be dismissed as moot.

<u>**Point II**</u>

**THE CITY'S ACTIONS IN AND AROUND CITY HALL WERE PROPER
<u>AND DID NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS</u>**

**A.     The City May Prohibit
         <u>Newspaper Boxes *Inside* City Hall</u>**

Plaintiffs contend that they should be able to place newspaper boxes <u>inside</u>

City Hall.  Plaintiffs, however, ignore the City's ability and right to restrict such

placement both as a reasonable time, place and manner restriction and because of

safety and security reasons.

The First Amendment "does not guarantee the right to communicate one's

views at all times and places or in any manner that may be desired."  <u>Gannett

Satellite Information Network, Inc. v. Metropolitan Transp. Auth.</u>, 745 F.2d 767,

772 (2d Cir. 1984), <u>quoting</u> <u>Heffron v. International Soc'y for Krishna

Consciousness, Inc.</u>, 452 U.S. 640, 647 (1981).   Accordingly, a newspaper

publisher does not have the unfettered ability to distribute its newspaper where,

when and how it chooses.  <u>City of Lakewood v. Plain Dealer Pub. Co.</u>, 486 U.S.

750 (1988) (White, J., dissenting), <u>quoting</u> <u>Breard v. City of Alexandria</u>, 341 U.S.

622, 642 (1955).

In <u>Gannett Satellite Information Network, Inc.</u>, the Second Circuit held that

the Metropolitan Transportation Authority (the "MTA") could restrict Gannett's

right to distribute its newspapers through newspapers in MTA stations. It
discussed the restriction of such right as follows:

> [t]he extent to which MTA may restrict Gannett's right to
> depends upon how the station's public areas are
> characterized for the purposes of First Amendment
> analysis. Public property is divided into three categories
> for this analysis, each of which is governed by different
> First Amendment standards. 'At one end of the spectrum
> are streets and parks which have immemorially been held
> in trust for the use of the public, and, time out of mind,
> have been used for purposes of assembly, communicating
> thoughts between citizens, and discussing public
> questions. A second category consists of public property
> which the state has opened for use by the public as a
> place for expressive activity. The third is '[p]ublic
> property which is not by tradition or designation a forum
> for public communication.'

Gannett Satellite Information Network, Inc., 745 F.2d at 772-773 (internal citations

omitted), quoting Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S.

37, 45-46 (1983).

The Second Circuit determined that the public areas of the MTA stations

were in the third category, which could "still serve as a forum for First Amendment

expression if the expression is appropriate for the property and is not 'incompatible

with the normal activity of a particular place at a particular time.'" Gannett

Satellite Information Network, Inc., 745 F.2d at 773 (internal citations omitted),

quoting Grayned v. City of Rockford, 408 U.S. 104, 1116 (1972). The Second

Circuit held that:

> [e]ven though MTA stations are appropriate forums for newspaper sales, MTA may impose reasonable time, place and manner restrictions on newspaper placement. '[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels, for communication of the information.'

Gannett Satellite Information Network, Inc., 745 F.2d at 773 (internal citations omitted), quoting Perry Education Ass'n, 460 U.S. at 49.

In Jacobsen v. United States Postal Service, 993 F.2d 649 (9th Cir. 1993), the court held that the government could move a newspaper for public safety reasons.

In the instant matter, City Hall is similar to the MTA stations at issue in Gannett Satellite Information Network, Inc. Indeed, City Hall is public property which is not, by tradition or designation, a forum for public communication. City Hall does not serve as a forum for unlimited First Amendment expression through newspaper boxes because such boxes are incompatible with the normal activity of City Hall at a particular time. Id.

Specifically, newspaper boxes present safety and security concerns. See Affidavit of Charles Gardner submitted in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction ("Gardner Aff.") at ¶18. As a result, all newspaper boxes are prohibited in City Hall, however, the placement of newspapers in City Hall, including the Newspaper, has never been prohibited. Id.

Such *limited* prohibition on the placement of newspaper boxes inside City Hall is reasonable and rational and based upon significant governmental interests to ensure that the health, safety and welfare of the residents of the City are not compromised.  The removal of the Guardian's newspaper boxes from City Hall and placing the Newspaper on the security desk, therefore, was entirely proper.[17]

Even assuming arguendo that City Hall is an appropriate forum for First Amendment expression through newspaper boxes, the City may impose reasonable time, place and manner restrictions on their placement.  Gannett Satellite Information Network, Inc.  The City has imposed such content neutral restrictions by permitting all newspapers and similar material to be left inside City Hall at the security desk, rather than inside a newspaper box.  See Gardner Aff. at ¶¶ 18-20.  Moreover, the Guardian can place newspaper boxes (and in fact does to this day) on sidewalks throughout the City, including in close proximity to City Hall.  See Heffron v. Int'l Soc. For Krishna Consciousness, 452 U.S. at 654-655.  This amply allows the Guardian alternative means to distribute the Newspaper without the safety and security concerns associated with newspaper boxes inside City Hall.

---

[17] It is anticipated that Plaintiffs may produce evidence that a wire newsrack, not a newspaper box, was located in City Hall and that, as a result, Defendants were singling out the Guardian.  *First*, a newsrack and a newspaper box are not equivalent.  *Second*, since July 2007, no wire newsracks (like newspaper boxes) are permitted in City Hall.  Indeed, all free newspapers and periodicals are placed on the security desk at the north entrance of City Hall.

**B.     The City May Properly Restrict The Distribution Of The Newspaper Inside City Hall And On And Around The Steps Of City Hall And The <u>Cacace Center</u>**

The City may impose reasonable time, place and manner restrictions on the distribution of the Newspaper.  <u>Gannett Satellite Information Network, Inc</u>.

In this case, the City restricts the hand distribution of <u>all</u> newspapers <u>inside</u> City Hall, on the steps of City Hall and the immediate surrounding areas (in close proximity to steps and entrances).   This is a very limited restriction on the Guardian's ability to distribute the Newspaper.[18]   The restriction is content neutral, is narrowly tailored and provides ample alternative channels for the Guardian to distribute the Newspaper, <u>to wit</u>, virtually every other public forum throughout the City.   City Hall and its steps and in front of the Cacace Center are but two buildings and two limited areas, in an otherwise vast City which provides many alternative opportunities for the Guardian to distribute the Newspaper — which the Guardian takes advantage of daily to this very day.

Underlying the City's policy limiting the handing out items such as the Newspaper on the steps of City Hall and the Cacace Center and the immediate surrounding areas is to avoid interruption with governmental business, to avoid safety concerns and to avoid potential security risks.   As such, these limited

---

[18]     The City also has similar restrictions in place directly outside Police Headquarters and the Courthouse which are located in the Cacace Center.  For the reasons stated herein, this limited restriction is likewise permissible.

regulations " … serve[s] purposes unrelated to the content of expression" and therefore "is deemed neutral even if it has an incidental effect on some speakers or messages but not others." Housing Works, Inc. v. Kerik, 283 F.3d 471, 487 (2d Cir. 2002), quoting Rock Against Racism, 491 U.S. at 791.

The City's regulation limiting the distribution of all newspapers, including the Newspaper, inside City Hall, on the steps of City Hall and in front of the Cacace Center, and the immediate surrounding areas, is a permissible reasonable time, place and manner restriction on publishers', including the Guardian's, First Amendment rights.

## Point III

### THE CITY'S ACTIONS, ISSUING A LIMITED NUMBER OF SUMMONSES TO INDIVIDUALS DISTRIBUTING THE NEWSPAPER *IN THE STREET* AND REMOVING NEWSPAPER BOXES FOR SAFEKEEPING, WERE PROPER

### A.    The City's Issuance Of Summonses And Removal Of Newspaper Boxes For Safekeeping Were Content Neutral

As an initial matter, Plaintiffs fail to facially challenge any City regulation or ordinance, nor do they reference any such regulation and ordinance in the Complaint. At most, the alleged actions of the City and its officials and employees

attempt to merely regulate "the places where some speech may occur."  Hill v. Colorado, 530 U.S. 703, 719-720 (2000); see also Housing Works, Inc.[19]

The limited actions of the City — the removal of newspaper boxes haphazardly placed throughout the City blocking the City's rights-of-way and the issuance of a very limited number of summonses to Guardian employees distributing the Newspaper in City streets and not on the sidewalks, in violation of both the City Code and New York State's Vehicle and Traffic Law — were content neutral.  In fact, any allegation to the contrary is belied by the actual facts of this case.

The facts are that as far back as September 21, 2006, the Newspaper began publishing articles critical of the City and its officials and employees.  If the City's actions were improperly motivated and content based, the City would have removed newspapers boxes from City sidewalks in September or October, 2006. However, Guardian newspaper boxes were not removed (and subsequently returned to Plaintiffs and placed back on City property) until nearly a year later in August 2007.  While it is true a limited number of newspaper boxes were removed from City Hall in early July 2007, the first newspaper box was not removed from a City sidewalk until July 12, 2007 when Mr. Smith placed a newspaper box which blocked pedestrian traffic at a busy bus stop in Getty Square.  Importantly, other

---

[19]    As set forth throughout this submission, Plaintiffs continue to place newspaper boxes and distribute the Newspaper daily in various areas throughout the City to this very day.

than this isolated incident on July 12, 2007, newspaper boxes were not removed from City sidewalks until early August 2007. This is so even though negative stories were run about the City and the Mayor in September/October 2006 and July 5-12, 2007.

Notably, the newspaper boxes were removed only after Mr. Zherka himself brought attention to his publication and the scrutiny of the Yonkers Police Department DPW, by cluttering the City with additional newspaper boxes and parading around the City and City Hall videotaping City employees. The facts demonstrate that Guardian newspaper boxes, in mid July to early August were placed haphazardly throughout the City, potentially blocking pedestrian traffic and were removed for safety concerns.

Moreover, Guardian employees were directed not to hand out the newspapers in the street for safety reasons.

Accordingly, the facts demonstrate that the City's removal of newspaper boxes and issuance of summonses to Guardian employees were content neutral.

**B**.    **The City's Actions Were Narrowly Tailored**

The City removed Guardian newspaper boxes for safekeeping and issued Guardian employees summonses. (<u>See</u> Complaint at ¶¶15-16). However, Plaintiffs fail to point out that summonses were issued to a very limited number of Guardian employees who (i) distributed the Newspaper <u>inside</u> City Hall and on or

immediately around the steps of City Hall and immediately outside the Cacace Center; (ii) distributed the Newspaper in the City streets and not on the sidewalks; and (iii) installed a newspaper box in front of a bus stop.  See Gardner Aff. at ¶ 12, Ex. F.  In addition, as instructed by Commissioner Liszewski, Guardian newspaper boxes that were removed and subsequently returned to Plaintiffs were those impermissibly and potentially dangerously blocking the City's rights-of-way. These are narrowly tailored actions.

By requesting the Court to permanently enjoin Defendants from "interfering" with Plaintiffs' distribution and/or dissemination of the Newspaper within the City, Plaintiffs are essentially contending that they should be able to place newspaper boxes and distribute the Newspaper anywhere they please within the City.  Such contention is contrary to law.

In Jacobsen v. United States Postal Service, 993 F.2d 649 (9th Cir. 1993), the Ninth Circuit held that (1) newspaper boxes could be removed from municipal sidewalks that were public fora for safety reasons; and (2) ingress-egress sidewalks on federal land outside post offices were nonpublic fora from which newspapers could be removed.  The Ninth Circuit determined that there was adequate justification for moving plaintiff's newspaper, which was situated in the middle of the sidewalk, to an area out of the way of foot traffic.  Id.  The court reasoned that

there was heavy traffic in that area at various times during the day and a person could have bumped into it rather easily.

Newspaper boxes were removed and returned which were haphazardly placed throughout the City in mid-July and early August, blocking City rights-of-way and pedestrian traffic in violation of City Code § 33-4B.

Summonses were issued to Guardian employees (other than the before mentioned summonses issued inside City Hall, directly outside City Hall and the Cacace Center) for those employees who impermissibly and potentially dangerously distributed the Newspaper on City streets and not on the sidewalks. These isolated actions were narrowly tailored, reasonable and rational, and based on the City's interest to ensure that the health, safety and welfare of the residents of the City (as well as the employees themselves) were not compromised.

Accordingly, the facts demonstrate that the City's removal of newspaper boxes and issuance of summonses to Guardian employees were narrowly tailored.

## C.    The City's Actions Provided Ample Alternative Channels Of Communication For The Guardian

The City's actions in restricting (i) the placement of newspaper boxes to prevent the blocking of City rights-of-ways; and (ii) the distribution of the Newspaper in and around City Hall and the Cacace Center and in the street undoubtedly leave Plaintiffs with ample alternative channels to disburse the Newspaper.  The best evidence of this is that despite Plaintiffs' claims that they are

47

being "chilled" in their exercise of their First Amendment rights, newspaper boxes, to this very day, are on the public sidewalks throughout the City and Guardian employees distribute the Newspaper daily, to this very day, throughout the City. Indeed, the evidence demonstrates that tens of thousands copies of the Newspaper (if not more) have been distributed in the City.   The City did no more than necessary to promote its governmental interests in keeping rights-of-way unobstructed (and City Hall/Cacace Center/streets safe), and the City's efforts to accomplish these goals left open ample alternative channels for the Plaintiffs.

The First Amendment does not preclude the City's efforts to regulate the Newspaper's distribution, be it by hand or in newspaper boxes, to ensure public safety for its residents and to ensure free and unobstructed rights-of-way.   In furtherance of these interests, the City has taken limited action (removing newspaper boxes improperly placed in rights-of-way and returning them to the Plaintiffs, and issuing limited summonses) aimed at controlling the placement of newspaper boxes and the distribution of the Newspaper throughout the City.

Again, the City is not attempting to prevent Plaintiffs' right to distribute the Newspaper (an admitted right protected by the First Amendment) rather the City is merely properly regulating the method of the distribution, i.e., the placement of newspaper boxes so as to not block rights-of-way and prohibiting the distribution of the Newspaper on City streets (a right not protected by the First Amendment).

## Point IV

## PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS

**A.    Plaintiffs Fail To State A Claim Of Selective
Enforcement In Violation Of The Equal Protection Clause**

### 1.    Plaintiffs Fail to Prove Selective Treatment

To support their selective enforcement claim, Plaintiffs are required to allege
and prove through factual instances that they were similarly situated to persons of a
different group, but were nonetheless treated differently.    See Neilson v.
D'Angelis, 409 F.3d 100 (2d Cir. 2005); Latrieste Restaurant v. Village of Port
Chester, 188 F.3d 65, 69 (2d Cir. 1999); Omni Group Farms, Inc. v. County of
Cayuga, 766 F.Supp. 69, 71 (N.D.N.Y. 1991).    The test for determining whether
persons similarly situated were selectively treated is whether a prudent person,
looking objectively at the incidents, would think them roughly equivalent.    Lisa's
Party City, 185 F.3d at 16.    Because selective enforcement implies that a selection
has taken place, conclusory allegations of selective enforcement are insufficient to
state a claim.    See Johnson ex rel. Johnson v. Columbia University, 2003 WL
22743675, at *2 (S.D.N.Y. 2003), citing Albert v. Carovano, 851 F.2d 561, 573
(2d Cir. 1988).    Indeed, "mere failure to prosecute other offenders is not a basis for
a finding of denial of equal protection."    LeClair v. Saunders, 627 F.2d 606, 611
(2d Cir. 1980).    The Second Circuit has clearly established that "equal protection
does not require that all evils of the same genus be eradicated or none at all."

Zahra v. Town of Southold, 48 F.3d 674, 684 (2d Cir. 1995), citing LeClair, 627 F.2d at 608.

Plaintiffs' claim of selective enforcement fails as it cannot meet the threshold requirement of differential treatment. The entirety of the allegations set forth in the Complaint in support of Plaintiffs' claim of selective enforcement is as follows:

17.    By way of contract publications favorable to Amicone and the City … were permitted … to be dispensed from inter alia:

a.    A newspaper, located on a stairway in City Hall, and
b.    A counter at a security desk in City Hall, as manned by a uniformed Police Officer.

18.    Also, by way of contrast persons distributing publications favorable … were permitted. . .to place those periodicals:

a.    In the stairway newspaper …
b.    On the security desk counter …

(See Complaint ¶¶ 17, 18.)

First, Plaintiffs mistakenly equate a wire newsrack with a newspaper box. They are not the same. A wire newsrack is simply an open wire rack in which no door or enclosure is present. A newspaper box is what the name implies – an enclosed structure closed on all four sides. For obvious security reasons, especially post September 11, 2001, newspaper boxes are properly banned inside City Hall.

*Second*, as set forth supra, the Newspaper is allowed to be left at the security desk in City Hall.  This is indeed the same and equal treatment, and not selective, that is afforded other periodicals and publications that wish to be disseminated in City Hall.

*Third*, Plaintiffs' allegation that summonses were selectively issued only as and against employees of the Guardian News for distributing the Newspaper is wholly unsupported.  In order for Plaintiffs' selective enforcement claim to meet the legal standard, Plaintiffs need to allege that other persons distributing newspapers or other periodicals in violation of the City Code, or in the street, or on the steps of City Hall, or immediately outside the Cacace Center, were not issued summonses.  Plaintiffs did not allege this, nor can they.

*Finally*, P.O. Alaimo indicated that in the past he removed two free periodical boxes (non-Guardian) from the sidewalks in the City that were blocking pedestrian traffic.

Accordingly, Plaintiffs' Fourteenth Amendment claim, brought as a selective enforcement claim, must fail.

## 2.    **Plaintiffs Fail To Allege Or Prove Impermissible Considerations**

Even if Plaintiffs have sufficiently pled and proved selective treatment, which they do not, Plaintiffs' equal protection claim would still fail because Plaintiffs have not demonstrated that Defendants' treatment of Plaintiffs was

motivated by "impermissible considerations." Lisa's Party City, 185 F.3d at 16-17. The second prong of the analysis for selective enforcement requires proof of impermissible motivation for disparate treatment. Bizzaro v. Miranda, 394 F.3d 82, 87-88 (2d Cir. 2005). A plaintiff advancing a selective enforcement claim "must demonstrate that a discriminatory purpose was a 'motivating factor' in the government decision." Estate of Rosenbaum by Plotkin v. City of New York, 975 F.Supp. 206, 223 (E.D.N.Y. 1997), quoting Village of Arlington Heights. v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265 (1977). To show a discriminatory purpose, it is not enough that a decision-maker chose a course of action in spite of its adverse effects on a group. See Personal Adm'r of Mass. v. Feeney, 442 U.S. 256, 278-79 (1979) (foreseeable impact on protected class is not enough to prove intent to discriminate); Southside Fair Hous. Committee v. City of New York, 928 F.2d 1336, 1352 (2d Cir. 1991) (awareness of disparate impact does not prove discriminatory intent); Overhoff v. Ginsburg Dev., LLC, 143 F.Supp.2d 379 (S.D.N.Y. 2001).

Plaintiffs fail to submit any evidence whatsoever that establishes that the City and its officials and employees were motivated by invidious discriminatory practices, rather than by the best interests of the community. What the evidence will clearly establish is that the City, and its officials and employees were motivated, if at all, by legitimate and lawful considerations, i.e., to ensure the

safety, health and general welfare of its residents. Offering only the most conclusory statements in the Complaint and deficient facts, Plaintiffs have failed to meet either prong necessary to plead a selective enforcement equal protection claim. Accordingly, Plaintiffs' Equal Protection claim must be dismissed.

## **Point V**

### **THE DEFENDANTS ARE ENTITLED TO QUALIFIED/SOVEREIGN IMMUNITY**

Plaintiffs sued most of Defendants in their individual capacities. Defendants sued in their individual capacities, however, are entitled to qualified immunity with respect to Plaintiffs' claims against them. The City and Sanitation Workers # 1 through # 20 are entitled to sovereign immunity.

Qualified immunity:

> protects government officials from civil liability when performing discretionary duties 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'

Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Kerman v. City of New York, 374 F.3d 93 (2d Cir. 1994).

In order to determine whether qualified immunity applies "the threshold inquiry is whether the plaintiff's version of the facts 'show[s] the officer's conduct violated a constitutional right.'" Demoret, 451 F.3d at 148, quoting Saucier v.

<u>Katz</u>, 533 U.S. 194, 201 (2001).   If a plaintiff is unable to demonstrate the threshold inquiry, the analysis stops.  <u>Demoret</u>.

If the initial threshold is met, the inquiry turns to whether the right was clearly established.  <u>Demoret</u>.  A defendant is:

> entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law.  In other words, government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time.

<u>Id.</u> at 148-149 (internal citations omitted).

It is clear that Defendants are entitled to qualified/sovereign immunity because, as discussed above, Plaintiffs have not demonstrated that Defendants violated their constitutional rights.    Moreover, Defendants' actions were objectively reasonable.

In any event, Defendants were acting under their authority in enforcing the Yonkers City Code, which was at the time was and still is in effect.  Notably, in this case, Plaintiffs have not challenged the constitutionality of the City Code.  It, therefore, was objectively reasonable for Defendants to believe that their actions were lawful at the time.

Accordingly, Defendants are entitled to qualified/sovereign immunity.

## Point VI

## PLAINTIFFS HAVE FAILED TO STATE A CLAIM PURSUANT TO 42 U.S.C. § 1983 AGAINST THE CITY/SANITATION WORKERS

### A.    Plaintiffs Fail to Meet the Standard Under *Monell*

As a threshold requirement, the first inquiry is whether a plaintiff has indeed been deprived of a constitutional right.    Baker v. McCollan, 443 U.S. 137, 140 (1979).  "If there has been no such deprivation, the state of mind of the defendant is wholly immaterial."  Id.  As shown by the foregoing, Plaintiffs have failed to establish that the Village has violated either the Plaintiffs' First Amendment or Fourteenth Amendment Constitutional rights.  Therefore, Plaintiffs' claims must fail and the action must be dismissed in its entirety.

To state a claim under 42 U.S.C. § 1983, a complaint must aver that a person acting under color of state law committed acts that deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States. See Parratt v. Taylor, 451 U.S. 527, 535 (1984), overruled by Daniels v. Williams, 474 U.S. 327 (1986) (on other grounds).  The City and Sanitation Workers # 1 to #20 can be held liable only if it is shown that the alleged unconstitutional action was taken pursuant to an officially adopted policy or custom.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91 (1978).

To establish the existence of a municipal policy or custom, the plaintiff must prove: (1) the existence of a formal policy officially endorsed by the municipality;

(2) a failure by policymakers to properly train or supervise their subordinates as to display a deliberate indifference to the rights of those within its jurisdiction; (3) actions taken or decisions made by municipal officials with final decision making authority; or (4) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials. See Prowisor v. Bon-Ton, Inc., 426 F.Supp.2d 165 (S.D.N.Y. 2006); Maneely v. City of Newburgh, 256 F. Supp.2d 204, 212 (S.D.N.Y. 2003).

Even assuming arguendo that Plaintiffs have alleged incidents of unconstitutional activity and that they established the existence of a constitutional violation in this matter, which they have not, Plaintiffs must demonstrate "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." See City of Canton v. Harris, 489 U.S. 378, 385 (1989), abrogated by Farmer v. Brennan, 511 U.S. 825 (1994) (on other grounds). Plaintiffs must show that the municipal policy was the "moving force behind the constitutional violation." Id. at 389. Conclusory allegations of a pattern or policy of unconstitutional behavior are insufficient to assert or prove a § 1983 claim. Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir. 1998).

As shown herein, the Complaint is devoid of any evidentiary demonstrations of the existence of a municipal policy or custom such as would satisfy Plaintiffs' burden. Indeed, the City's officials merely directed subordinates to: (i) remove

blue boxes blocking the <u>right of way</u> in violation of Yonkers City Code § 33-4B; (ii) issue summonses to individuals handing out newspapers in and around City Hall and the Cacace Center and direct said individuals to cease said activity; and (iii) issue summonses to individuals handing out newspapers in the street and direct said individuals to cease said activity.  These orders are not violative of the First Amendment, but rather, reasonable time, place and manner restrictions.

Accordingly, Plaintiffs have failed to state a claim against the City and Sanitation Workers # 1 to #20.

**B.**    <u>**Plaintiffs Have Failed To Establish Municipal Liability Under**</u> ***Monell***

The Plaintiffs have failed to demonstrate that the City had any custom, policy, practice, or undertook any actions designed to target the Guardian and its employees.  The only act of the City that could possibly be alleged to have <u>directly</u> affected Plaintiffs was a phone call to the Sanitation Department from the Commissioner of the Department of Public Works, John Liszewski, informing sanitation workers to remove Guardian newspaper boxes "blocking the right of way."  The mere fact that the City removed Guardian newspaper boxes improperly placed in the City rights-of-way (and returned them to the Guardian shortly thereafter) and issued a very limited number of summonses does not possibly amount to a policy sufficient to satisfy Plaintiffs' burden under <u>Monell</u>.  In fact, it could hardly be argued that a policy existed when only approximately fourteen summonses were issued to Guardian employees when Guardian employees readily admit to distributing the Newspaper on a daily basis throughout the City.  The facts simply do not support a claim under <u>Monell</u>.

Accordingly, Plaintiffs' claims against the City and Sanitation Workers # 1 to #20 should be dismissed in their entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully requested that the Court dismiss

Plaintiffs' Complaint seeking a permanent injunction and grant the City reasonable

attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Dated: White Plains, New York
            November 13, 2007

                                    Respectfully Submitted,

                                    THACHER PROFFITT & WOOD LLP


                                    By:    s/ Kevin J. Plunkett
                                           Kevin J. Plunkett
                                           Darius P. Chafizadeh
                                           *Attorney for Defendants*
                                           50 Main Street
                                           White Plains, New York 10606
                                           (914) 421-4100

Of Counsel:
Andrew B. Zinman