UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

THE GUARDIAN NEWS, INC. and SELIM
ZHERKA,

                              Plaintiffs,

        -against-

PHILIP AMICONE, individually,                      07 Civ. 7078 (CLB)
EDMUND HARTNETT, individually,
JOHN A. LISZEWSKI, individually
CITY OF YONKERS, New York,
PAUL WOOD, individually, POLICE
OFFICERS JOHN DOE'S #1 to #20,
individually, and SANITATION WORKERS
#1 to #20,

                              Defendants.

------------------------------------------------------------x

# PLAINTIFFS' POST HEARING
# MEMORANDUM OF LAW

### Preliminary Statement

This memorandum of law is submitted on behalf of Plaintiffs in accordance with

the post-hearing briefing schedule agreed to by the parties, with the Court's permission.

### The Code Provision At Issue

To the extent relevant, Yonkers City Code Section 100-35 provides:

> "No person shall distribute [or] hand out. . .any. . .printed matter within
>
> any park or upon any public place."

(Exhibit 89).

<u>The Material Evidence Adduced at the Hearing</u>

***<u>Plaintiffs' Direct Case</u>***

On direct examination **SELIM ZHERKA** testified that he is the "president and sole shareholder of the Guardian News [Inc.] which owns the Westchester Guardian" (Tr. 12, hereinafter "Guardian").

In August of 2006 the Guardian commenced distribution in Yonkers and from that point in time throughout June 2007 there were no problems with respect to its dissemination [Tr. 13-14; Exhibit 1 (each edition of the Guardian published from August 2006 through June 2007)]. However with the editions of the newspaper published commencing July 5, 2007, both the copies of the publication as well as the metal newsracks from which they were distributed began "disappearing throughout Yonkers" (Tr. 16-22; Exhibits 2-8).

As a result replacement newsracks were installed and Mr. Zherka along with "a few. . .kids" who were helping that summer began distributing copies of the Guardian by hand at, amongst other locations, Yonkers City Hall (Tr. 23).

On August 1, 2007, while engaged in that activity a Police Officer assigned to City Hall directed Zherka to stop the distribution, advising that one "can't hand out newspapers on public property" (Tr. 24; Exhibit H). The Officer then issued to Zherka a summons for violating Section 100-35 of the City Code (Exhibit 86).

On another occasion when he was walking up the steps leading to the eastern entrance to City Hall Zherka was confronted by another Police Officer who advised: "[Y]ou know I have to give you a[nother] summons" - - even though neither Zherka nor

his female companion had handed out anything (Tr. 25). That summons was issued as well (Exhibit 85).

During this same period of time Zherka installed a newsrack in an alcove on the stairs leading to the Mayor's office in City Hall (Tr. 29; Exhibit 14, top left photo; Exhibit 94), directly opposite a wire newsrack (used to distribution of different newspapers) that was installed in another alcove on the same set of stairs (Tr. 29; Exhibit 14, bottom right photograph).

On August 23, 2007, Plaintiff entered 255 Lake Street in Yonkers, where the City's Department of Public Works had stored some thirty-five confiscated newsracks (Tr. 35). Some were dented, others scratched, and some were inoperable (Tr. 36). Additionally a number of the newsracks still contained within them copies of the Guardian that had been distributed subsequent to July 5, 2007 (Tr. 36; Exhibits 2, 3). Each of those editions had front page headlines critical of Amicone or favorable to his then campaign adversary in the on-going mayoralty race (Exhibits 2-8).

On cross-examination Zherka explained that the disappearance of the Guardian editions and the Guardian newsracks "boils down to [an issue about] free speech" (Tr. 40). And as to the editions dated July 5th and July 12th of 2007, that is when the front pages of the Guardian for the first time "were critical of the [M]ayor". That is also the point in time "when the [Guardian] news racks started disappearing" (Tr. 49).

Not only did Yonkers' police direct Zherka to cease handing out the Guardian, so also did personnel in the Mayor's office including John Fleming (Tr. 57).

On another occasion when the young persons distributed the Guardian outside the Cacace Justice Center in Yonkers, court officers came out of that building and advised

3

them that they "cannot distribute [the Guardian] by hand at that location" (Tr. 60). When Zherka advised the officers that "it's free speech, it's guaranteed under the First Amendment", the court officers returned to the Cacace building (Tr. 60).

As to whether, prior to commencing the distribution of the Guardian by means of newsracks in August of 2006 Zherka had made inquiry about any city code provisions governing "newsracks", he explained that he did not because he: "know[s] what the Constitution says" (Tr. 67-8).

On direct examination **EDMUND FITZGERALD** testified that he is employed as a "Law Case Examiner" in the officer of Corporation Counsel for the City of New Yonkers (Tr. 73-4). In that capacity and at the request of Frank Rubino, Corporation Counsel, Fitzgerald photographed Guardian newsracks throughout the City during August and September of 2007 (Tr. 74-80). One such photograph was taken by him inside the Public Works facility at 255 Lake Street. It shows thirty-five confiscated Guardian newsracks (Exhibit 116). Not one such newsracks was physically situated in the "middle of a sidewalk" (Tr. 80).

On direct examination **JOHN LISZEWSKI** testified that he is the Commissioner of Public Works for the City of Yonkers. During 2006 the employees in his Department did not remove and/or confiscate any Guardian newsracks (Tr. 86). With respect to 2007 and prior to July 1st of that year, he gave no directive to confiscate any Guardian newsrack boxes (Tr. 89).

Commencing in July or August of 2007 Liszewski gave orders to confiscate "any blue box which turned out to be Guardian boxes [*sic.*]that was blocking the City right of way". As a result thirty-five boxes were seized by his Department (Tr. 89; Exhibit 116).

4

Despite the confiscation, he had not one photograph of any newsrack blocking any right of way (Tr. 90). These seizures followed complaints registered with the Mayor's office (Tr. 92) and that of Liszewski including one e-mail received by the Commissioner from the Director of the City's BID which specifically targeted the "Guardian News boxes" (Tr. 91; Exhibit 121).

Liszewski even received a personal complaint from Mayor Amicone regarding two Guardian boxes that had been installed at the Will Library on Central Avenue in Yonkers (Tr. 104). As the Mayor put it: "[T]here were two more of those blue boxes" (Tr. 105).

On cross-examination Liszewski testified in the negative in response to the following question: "Is there any order that you gave to any of your people in early August of 2007 based on any contents of any newspaper" (Tr. 110).

As for the Guardian newsracks at City Hall, the Department of Public Works had no responsibility since that location was within the jurisdiction of the City's General Services Administration (Tr. 111). Liszewski  claimed to have personally observed one Guardian newsrack blocking a right of way at 20 South Broadway, chained to a bus stop pole (Tr. 113).

On redirect examination he identified that newsrack as depicted in Exhibit 123 (top right picture). It's location, as chained to the bus stop pole, was between that pole and a street light pole (Tr. 116).

On direct examination **CHARLES GARDNER** testified that he is the First Deputy Chief of the Yonkers Police Department (Tr. 120). During 2006 the City's police

did not confiscate a single Guardian newsrack (Tr. 120-1). In 2007, prior to July 1st, there similarly were no confiscations by the police of any such newsracks (Tr. 121).

On July 17, 2007, Gardner was contacted by either Corporation Counsel Rubino or Assistant Corporation Counsel Larry Porcari who informed him that individuals inside City hall were "distributing printed material in violation of the City Code" (Tr. 121). As a result Gardner contacted the Fourth Precinct, where City Hall is located, and later learned that summons were issued to those individuals for violating the portion of Section 100-35 of the Code (Tr. 122) which states: "No person shall distribute, hand out or cast about any card, circular, pamphlet or printed matter within any park or upon any public place" (Tr. 124). The printed material, he later also learned, was the Guardian (Tr. 122; Exhibit NN).

On direct examination **DANIEL BARAHONA** testified that he is a Yonkers Police Officer who, prior to July 31, 2007, had neither read Section 100-35 nor received any training with respect to it (Tr. 138-9).

On that date he issued two summonses for violations of that code provision on the basis of instructions given him by a Sergeant (Tr. 139). In that connection he gave one summons to Richard Guzman (Exhibit 80; Tr. 140) because he was "handing out newspapers to passersby in front of the courthouse" (Tr.140-1). On that same day he issued to Nicole Pacheco a summons (Tr. 142; Exhibit 75) solely by reason of "her handing out [Guardian] newspapers to passersby" (Tr. 143). Both Guzman and Pacheco left the area after receiving their respective tickets (Tr. 144).

On cross-examination Barahona testified that at the time he issued the two summonses he had no idea "of the contents of what was in the newspapers" (Tr. 145).

On direct examination **ROBERT GRECO** testified that he is the City's Public Works Coordinator (Tr. 147). On Friday August 10, 2007, he learned from Liszewski that there was a Guardian newsrack on the steps of the Will Library and that it "needed to be removed (Tr. 148-9). In that connection although Liszewski identified the newsrack as a "blue box", everyone in his Department "knew that they were Guardian news rack boxes" (Tr. 149). Based on Liszewski's instruction Greco in turn directed David Mason (Manager of the Street Cleaning Department) to have the so-called "alert man" remove the box (Tr. 149; *see* Exhibit T).

The following Saturday Greco received a call from Liszewski who reported that there were some newsrack boxes blocking the right of way on Yonkers Avenue and that they also "had to be removed" (Tr. 151; Exhibit 91, first page). At no time did Greco observe any Guardian newsrack blocking a right of way (Tr. 151-2). Nor for that matter did he obtain photographs of any newsrack blocking the right of way nor any reports from any subordinate regarding any such blockage (Tr. 154).

On direct examination **PAUL WOOD** testified that he is a Police Officer in the City of Yonkers (Tr. 155). Prior to July 1, 2007, he never received any training with respect to Code Section 100-35 (Tr. 156). He never issued a summons to anyone for violating that code section prior to that date.

Subsequent to July 1, 2007, he issued seven or eight such summonses because he observed people "handing out newspapers [the Guardian] in a public place. . .[i]n front of City Hall" (Tr. 156, 158). Prior to issuing those tickets Wood spoke with Sergeant McCormack of the Fourth Precinct who alerted Wood to the existence of Section 100-35

(Tr. 158-68; Exhibits 74, 76, 77, 78, 79, 82, 85). Guardian newsracks, according to Wood presented a 9/11 "terrorist potential threat" (Tr. 169).

On cross-examination Wood testified that he did not care "what the contents of the [Guardian] publication were" and he did not issue any summons because of the newspaper's content (Tr. 177-8).

On re-direct examination he testified that he has never seen any written policy regarding the placement of newsracks inside City Hall (Tr. 180). Nevertheless he advised Mr. Zherka that Guardian newsracks were barred from City Hall because of a "threat that was perceived" (Tr. 181).

On direct examination **DAVID SIMPSON** testified that he is the City's Director of Communications and as such deals with the press and media to "field reporters' questions and explain City policies" (Tr. 190). In that capacity late in the summer of 2007 he advised representatives of News 12 and Gannett Suburban Newspapers that the Guardian "is not a newspaper" (Tr. 190). He has discussed the Guardian with Mayor Amicone (Tr. 192) and he advised Tracy Everson of News 12 that the Guardian newsracks "were propaganda machines" - - after learning about the filing of the instant lawsuit (Tr. 192-3).

Following inquiries from the media, Simpson contacted Commissioner Liszewski who confirmed that his Department has "confiscated the Westchester Guardian News boxes" (Tr. 193-4, 197). Liszewski further advised Simpson that the confiscated boxes had been taken to a City facility to be picked up by their owner (Tr. 195).

As to City policies, Simpson was not aware of anything in writing relating to the placement of newsracks inside City Hall (Tr. 196). Nor for that matter had he seen

anything in writing imposing "any conditions that delimit when and where and how newsracks can be placed inside City Hall" (Tr. 196).

Simpson discussed the Guardian with Yonkers Deputy Mayor (Tr. 198).

On cross-examination Simpson testified that Mr. Zherka and a female associate entered the secretarial area of the Mayor's office "unannounced" and with a video camera at which time Zherka was instructed that "filming wasn't permitted" (Tr. 201-3).

On re-direct examination Simpson conceded that whenever News 12 comes to interview Mayor Amicone "they're allowed to photograph anything they want with a camera without a permit" - - "Because they're the news media" (Tr. 204).

On direct examination **DAVID MASON** testified that he is the Manager of Public Works for the City. During the summer of 2007 his office location was 255 Lake Avenue (Tr. 206).

During 2006 he never directed any subordinates in his Department to confiscate blue newsracks (Tr. 206). Prior to June 30, 2007, he never directed anyone to confiscate any such newsracks (Tr. 2006).

The very first time he issued any such directive was in July or August of 2007 after receiving a call from Robert Greco who told him "to have the men pick up the blue, the free blue newspaper boxes" (Tr. 207). The only newsracks thereafter seized by his staff belonged to the Guardian (Tr. 208; Exhibits X, Y). Thirty-five confiscated Guardian newsracks were subsequently stored in the Lake Street garage (Tr. 211).

On direct examination **JOSEPH GALINSKI** testified that he is a Yonkers Police Officer and in 2006 he did not issue a single summons for a violation of Section 100-35

of the City Code (Tr. 213-14). In 2007, prior to June 30th, he also issued not one such summons.

In July of 2007 Galinski issued the first such summons because he observed a "male distributing the Guardian newspaper at City Hall in Yonkers" (Tr. 214-15, 216). Indeed it was the "act of handing out the Guardian" that motivated Galinski to issue the summons (Tr. 216-17; Exhibit 81).

On direct examination **ROBERT STANLEY** testified that he is a Custodian employed by the City in its General Services Administration. He is assigned in that connection to City Hall (Tr. 221-2). During July or August of 2007 he removed Guardian newsracks from City Hall because "there is absolutely no other, as far as vending machines, there's absolutely no other machines inside of City Hall" (Tr. 222). Following his removal of the newsracks he personally notified the Deputy Mayor, Mr. Regan, that he had done so. Regan in turn advised Stanley that what he had done was "fine" (Tr. 225-6).

On direct examination **RICHARD MADAFFARI** testified that he is a Yonkers Police Officer. On August 9, 2007, he issued a summons pursuant to Section 100-35 to a person standing on the corner of Yonkers and Central Avenues "[d]istributing newspapers without a permit" (Tr. 231). His sole motivation in doing so was his observation of that person "handing out newspapers" (Tr. 231).

On direct examination **EILEEN AHEARN** testified that she is a Yonkers Police Officer. She did not recall issuing any summons, either before or after July 1, 2007, for violations of Section 100-35 (Tr. 235-6). In fact, however, on August 9, 2007, she issued

such a summons to Muamer Kllapija (Tr. 236; Exhibit 83) because he was "attempting to distribute newspapers to motorists" (Tr. 236).

On direct examination **MARIBEL AYALA** testified that she is employed by Selim Zherka and during the summer of 2007 she handed out copies of the Guardian in the City of Yonkers (Tr. 239). She did so only on one occasion, in front of City Hall (Tr. 239). At the time she was doing so, a uniformed Police Officer issued her a summons and advised her that if she did not stop distributing the newspaper she was "going to be arrested" (Exhibit 74). Due to threat of arrest, she ceased handing out the Guardian (Tr. 241).

On cross-examination she reiterated that once she was issued the summons she stopped handing out the Guardian (Tr. 242).

On direct examination **STEVEN PEREZ** testified that in July of 2007 while handing out copies of the Guardian near City Hall, two uniformed Police Officers directed that he stop doing so since "it wasn't allowed on the property". Perez obeyed that directive, left City Hall and proceeded to the Yonkers Raceway to distribute the Guardian (Tr. 246).

At the Raceway a Police Office assigned to the Police Department's Canine Unit (as recorded on a cell phone camera) approached him, confiscated five bundles of Guardian newspapers that Perez had intended to disseminate, "threatened to beat" Perez and another individual ["I'm going to bash your heads in if you guys don't stop handing out newspapers"], and placed the newspapers in his police vehicle (246-7). As a result Perez and a co-worker had no further newspapers to distribute so both returned to New Rochelle (Tr. 247).

On direct examination **MICHAEL ESTRADA** testified that during July and August of 2007 on only one occasion he distributed copies of the Guardian on the east side of City Hall. He was approached by two uniformed Police Officers who told him to "get off the City Hall grounds or. . .be arrested or given a summons" (Tr. 249; Exhibit 79). He was given a summons, stopped distributing the newspaper and left in order to avoid arrest (Tr. 250).

On direct examination **ROBERT GUZMAN** testified that during the summer of 2007 on two occasions he distributed the Guardian, the first time at the Cacace Justice Center and the second time "in front of City Hall" (Tr. 255-7; Exhibits 78, 79). At the Justice Center a Police Officer ordered to stop distribution of the Guardian "because [he] didn't have a permit" (Tr. 256). Guzman continued handing out the newspaper and then received a summons along with a warning that if he "didn't stop handing out newspapers, [he] was going to get arrested" (Tr. 256).

At City Hall while handing out the Guardian a Police Officer told him to stop or he would be issued a summons. The officer added that Guzman "was a pawn in the game that Sam [Zherka] was playing" (Tr. 257). He then gave Guzman a summons and told him he would be arrested if he did not stop handing out the Guardian (Tr. 257). Because Guzman "didn't want to get arrested" he stopped distribution of the Guardian (Tr. 257). At the time he did so he still had one bundle of newspapers to give out (Tr. 258).

On cross-examination Guzman explained that he proceeded to distribute the Guardian at City Hall after receiving the summons at the Cacace building because he "had a right to hand out papers. . .It's part of the First Amendment" (Tr. 262-3).

On direct examination **DOMENICA O'NEILL** testified that during the summer of 2007 she handed out copies of the Guardian on two occasions. On one occasion when she was with Mr. Zherka and Ms. Ayala a Police Officer advised her that she could not hand out the newspaper on public property. He then issued a summons to her (Exhibit 75) for doing so (Tr. 266). Since the officer told her that if she then continued handing out the Guardian she would be arrested, she stopped doing so (Tr. 267).

On a second occasion she and Mr. Zherka were walking up the steps to the east entrance to City Hall - - before either of them handed out a single copy of the Guardian - - when a Police Officer advised them: "You know I'm going to have to write you a summons" (Tr. 267-8; Exhibit 76). Because the officer advised that he would arrest them if they attempted to hand out any copies of the Guardian, they descended the stairs (accompanied by the policeman) and left to avoid arrest. Put differently, "there was no choice but to leave" (Tr. 268-9).

Recalled as a witness **SELIM ZHERKA** testified that on August 23, 2007, while at the Lake Street Public Works facility he video recorded the events (Tr. 275; Exhibit 125). In that connection he observed, inside the confiscated Guardian newsrack boxes, copies of the Guardian editions that referenced Mayor Amicone as a "huge flop" (Exhibit BB), Dennis Robertson (Amicone's opponent in the mayoralty race), and *inter alia* a "Tale of Two Cities" (Tr. 275; *see* Exhibits 2, 3, 4, 5, 6, 7, and 8).

*Defendants' Direct Case, Taken Out of Order on Consent (Tr. 282)*

On direct examination **RICHARD ALAIMO** testified that he is a Yonkers Police Officer assigned to patrol Getty Square (Tr. 283). On July 12, 2007, while on duty he

witnessed an individual (later identified as Gene Smith) place a "blue box of some sort" on the corner of New Main Street and South Broadway (Tr. 285-6). Alaimo told Smith that he could not leave the box at that location as it was "unsafe". The individual advised Alaimo: "Just issue me a summons". Alaimo did so (Tr. 286; Exhibit D).

*Plaintiffs' Direct Case, Continued*

On direct examination **JASON GONZALEZ** testified that during July and August of 2007 he handed out copies of the Guardian on Central Park Avenue and Yonkers Avenue in the City of Yonkers (Tr. 299). In that connection he had two encounters with police (Tr. 300).

The first incident occurred when Gonzalez and Steven Perez were handing out the Guardian newspapers and a Police Officer told him to stop doing so "in the street" -- even though he was not in the street (Tr. 300). The officer wrote him a summons but did not give him the ticket (Tr. 301).

On the second occasion an officer assigned to the City's Canine Unit approached Gonzalez and Perez and advised:

"You need to stop handing out these fucking newspapers"

(Tr. 302). The officer confiscated four bundles (seventy-five copies each) of the Guardian and placed them in his police vehicle (Tr. 302). After doing that the officer addressed Gonzalez and Perez as "fucking punks", and while pulling on black gloves threatened to "bash [their] heads in" (Tr. 303). Having no additional copies of the Guardian and fearful of arrest the two did not distribute any additional papers (Tr. 304).

On direct examination **MICHAEL GUEVARA** testified that during the summer of 2007 he on one occasion distributed copies of the Guardian at City Hall. He entered the building handing out copies of the newspaper and while he was walking down the stairs he was approached by a man with a moustache who was wearing a brown jacket, and brown pants. The man showed Guevara a gold badge and asked: "Would you like to get booked for handing [out] a newspaper?" (Tr. 310). Believing that, by reason of that threat, he was going to be arrested, Guevara exited the building (Tr. 310). That individual was later identified by Guevara in City Court as Assistant Corporation Counsel Lawrence Porcari (Tr. 311).

On direct examination **MUAMER KLLAPIJA** testified that on more than two occasions during the summer of 2007 he handed out copies of the Guardian; he also observed employees of the City's Department of Public Works removing Guardian newsracks at the Yonkers Raceway (Tr. 317-8). In that connection he photographed the removal of the boxes with his camera phone (Tr. 318; Exhibit 90). The very first picture he took, as contained in Exhibit 90, is of the passenger side door of a Public Works truck showing the corporate seal of the City of Yonkers (Tr. 319-20). As he was taking the pictures the Public Works employees heckled: "Stop taking pictures. You guys are going to lose. It's not worth it what you guys are doing. So can you please stop fucking taking pictures" (Tr. 320-1). Kllapija was issued a summons for handing out the newspapers (Tr. 321).

On cross-examination Kllapija explained that while the officer who issued the summons wrote that he was "walking into the roadway approaching vehicles handing out

newspapers" in fact he handed them out to motorists while he stood on the sidewalk (Tr. 323).

On direct examination **CESAR CASTILLO** testified that during the summer of 2007 he from time to time handed out copies of the Guardian. On one such occasion he was approached by a Police Officer and told that if he "didn't stop handing out newspapers" he would either "get a ticket or be arrested" (Tr. 325). He received a summons and then stopped distributing the Guardian because he "didn't want to go in jail" (Tr. 326).

On direct examination **CRISTIAN SALAZAR** testified that twice during the summer of 2007 he handed out copies of the Guardian. On one of those occasions while he was distributing the newspaper on Yonkers Avenue, he was issued a summons (Exhibit 84) by a Police Officer who advised that the next time Salazar distributed the Guardian he would be arrested (Tr. 332). Since he did not want to be arrested, Salazar stopped handing out the Guardian (Tr. 332).

## POINT I

## SECTION 100-35 OF THE CITY
## CODE IS BOTH FACIALLY AND
## AS APPLIED, FIRST AMENDMENT
## VIOLATIVE

Without any exception and/or limitation Yonkers City Code Section 100-35 imposes a sweeping and absolute prohibition against the distribution of "any printed matter within any [City] park or upon any public place" within the City of Yonkers. It thus has been applied, as in the case at bar, to totally banish from public fora within the City, the Westchester Guardian - - along with its ideas, concerns and editorial commentary critical of the incumbent City administration. In that connection it has also been used as a weapon to silence, by subjecting to prosecution and incarceration, citizens whose only "offense" was to non-disruptively hand out to willing readers copies of that periodical. As such Section 100-35 is manifestly unconstitutional.

The First Amendment's guarantees as to both freedom of the press and the right of free speech simply cannot be subjected to such an outright ban imposed unilaterally by those offended by a periodical's content. Rather, as well-settled case law makes patent, a governmental intrusion upon those rights must be conditioned upon objective time, place and manner limitations. City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 769-70 (1988)(It is apparent that the face of the ordinance itself contains no express limits on the mayor's discretion. . .To allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal"); Lusk v. Village of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007)("A law requiring prior administrative approval of speech falls within the prior restraint rubric" and "prior restraints on speech and publication [are] the most serious and the least tolerable infringement on First Amendment rights"); Field

Day, LLC v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006)("A statute may

unconstitutionally restrict speech in one of two primary ways. First a statute may restrict

speech based on the content of that speech. Such content-based restrictions are almost

always unconstitutional); Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir.

2005); National Council of Arab Americans and Act Now to Stop War & End Racism

Coalition v. City of New York, 2007 WL 655602, *5 (S.D.N.Y. 2007)("A prior restraint,

i.e., 'any regulation that gives public official the power to deny use of a forum in advance

of actual expression. . .is not unconstitutional per se, but it bears a heavy presumption

against its constitutional validity").


## POINT II

### SINCE THE DEFENDANTS' ASSAULT
### UPON THE WESTCHESTSER GUARDIAN
### WAS CLEARLY CONTENT BASED, THEIR
### CONDUCT VIOLATED THE FIRST
### AMENDMENT

The Westchester Guardian began publication and distribution within the City of

Yonkers in August of 2006 by means of newsrack boxes that were chained, with other

publishers' newsracks, to fixtures (bus stop sign posts, telephone poles, fences) along

but not blocking public rights-of-way.  From that date until June 30, 2007, none of the

Guardian's boxes were confiscated by the Defendants; no copies of any of its editions

were seized by the Defendants; and no one distributing the Guardian or installing

its newsracks was issued a summons, threatened with arrest, threatened with a

physical assault, and/or subjected to criminal prosecution and potential jail time by

the Defendants.

Of course during the period August 2006 until June 30, 2007, the Westchester Guardian did not publish any news articles and/or editorials critical of Philip Amicone, the incumbent Mayor of the City of Yonkers. Indeed at no time during that interval of time was Amicone the subject of any front page headline, story and/or editorial in the Guardian (Exhibit 1).

However during Amicone's 2007 campaign for re-election and commencing with its July 5, 2007, edition and continuing through September 2007, the Guardian began advocating Amicone's defeat - - sharply criticizing systemic corruption within his Administration, condemning his unwillingness to take corrective action with respect to allegations of widespread police brutality in the City's Police Department, and *inter alia* highlighting his failure to indulge in remedial action to ease the City taxpayers' burden.

That advocacy included numerous front page headlines regarding Amicone, his political cronies, and the Democratic candidate seeking to defeat Amicone in his re-election bid. It also included editorials critical of Amicone and political advertisements both supportive of his campaign rival and critical of the incumbent (Exhibits 2-8).

That change in the substantive content of the Guardian's speech precipitated an immediate and causally related change in Defendants' conduct with respect to the newspaper.

The newsracks which until that time were mere containers for the distribution of a weekly publication morphed into "propaganda machines" denounced by the City's Director of Communications, David Simpson (Tr. 192-3). And in that connection the Guardian, as perceived by Simpson, simply ceased to be "a newspaper" (Tr. 190).

Thus commencing in July of 2007 Guardian newsrack boxes began to disappear

from the City's sidewalks - - confiscated, along with all copies of the then current edition

of the Guardian by employees of the City's Department of Public Works who heckled

Guardian employees handing out the periodical: "You guys are going to lose. It's not

worth it what you guys are doing" (Trl 320-1).

Those boxes were replaced by the Guardian's publisher/owner only to again be

confiscated along with the copies of the then current edition of the newspaper, by the

Department of Public Works.

Appreciating that the Defendants were targeting for suppression the Guardian

because of its content, Selim Zherka directed the placement of Guardian newsracks inside

Yonkers City Hall which had absolutely no rules and/or regulations concerning the

placement of those boxes in that building.

By way of response, the City's General Services Department confiscated at least one

Guardian propaganda machine.

The City's Police Department seized other Guardian newsrack boxes from City Hall

under the same circumstance - - labeling the innocuous containers as 9/11 terrorist threats.

Against this background of orchestrated censorship, Mr. Zherka hired a number of

youths and instructed them to non-disruptively hand out to willing recipients copies of

the Guardian inside City Hall, outside the east entrance to City Hall in its adjoining park,

outside the north entrance to City Hall, and on public sidewalks throughout the City. In that

connection Mr. Zherka engaged in the same conduct.

Defendants then took immediate and further causally related, retaliatory action.

They thus targeted - - with the self-evident objective of suppressing the Guardian's

free speech and impairing its right to freedom of the press - - those youths and Mr.

Zherka, personally for the obvious goal of chilling each of them in their exercise of First

Amendment protected rights and suppressing distribution of the Guardian entirely within the City of Yonkers.

Each was issued summonses. Most were threatened with arrest in the event that they continued distribution of the Guardian. And others (addressed by the Yonkers police as "fucking punks") were threatened with physical assault ["bash[ing] their heads in"] because they were handing out "these fucking newspapers" (Tr. 303).

Moreover the swift and mean-spirited suppression of the Guardian, the confiscation of its "propaganda boxes" and the commencement of prosecutions against its distributors were not engaged in randomly. Four separate City departments/offices were involved in this coordinated First Amendment attack: General Services Administration, Public Works Department, Police Department, and the Mayor's Office.

Mayor Amicone was aware of the situation and even called Liszewski to complain about two "more" Guardian propaganda boxes that had been placed at the Will Library. The Deputy Mayor, Mr. Regan, knew about the suppression efforts and complimented the City Hall custodian (Robert Stanley) for doing a "fine" job in seizing one newsrack box belonging to the Guardian.

The Commissioner of Public Works actively orchestrated the confiscation of Guardian newsracks through his Public Works Coordinator (Greco), the Manager of Public Works (Mason), and departmental subordinates including alertmen.

The Police Commissioner was kept in the loop by Charles Gardner, the First Deputy Chief of Police. Gardner in turn directed officers in the Fourth Precinct, where City Hall is located, to enforce against distributors of the Guardian the patently unconstitutional Code Section 100-35. And, of course, numerous Police Officers

(Madaffari, Ahearn, Barahona, Wood, Galinski, Alaimo, their partners, and even a K-9 officer) as directed by their Sergeants flooded into public areas and issued both summonses, threats of arrest and in two cases threats of beatings to stop the Guardian's dissemination.

Against this compelling factual background no particular degree of insight is required to conclude that Defendants' confiscatory and retaliatory conduct was motivated entirely by the Guardian's "fucking" content and its perception in City Hall as a propaganda machine.

That conduct was self-evidently engaged in in a calculated violation of the First Amendment without benefit of any objective time/place and/or manner limitations. National Counsel of Arab Americans & Act Now to Stop War and End Racism, *supra*; Id. at 6 ("To withstand constitutional scrutiny, [time, place, and manner'] restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression. Additionally, time, place and manner restrictions of speech in public fora are unconstitutional if they confer overly broad discretion on regulating officials"); Lusk, *supra* at 486 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"); Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 1999); Abel v. Town of Orangetown, 759 F. Supp. 161, 164-5 (1991)(Goettel, J.).

But for this Court's intervention and issuance of a temporary restraining order there can be no question but that the Guardian's rights of speech and freedom of the press

would have been completely snuffed out within the geographic boundaries of the City of Yonkers. Only issuance of a permanent injunction will fully vindicate those rights and guarantee that there will be no further trampling of the First Amendment by the City and its officials.

## Conclusion

Section 100-35 as applied and on its face should be declared unconstitutional in violation of the First Amendment. In that connection a permanent injunction should be granted forbidding Defendants from prospectively interfering with Plaintiffs' rights of free speech and freedom of the press, with an award of reasonable attorney's fees and costs.

Dated: White Plains, N.Y.
        December 17, 2007

                                LOVETT & GOULD, LLP
                                Attorneys for Plaintiff
                                By:
                                Jonathan Lovett (4854)
                                222 Bloomingdale Road
                                White Plains, N.Y. 10605
                                914-428-8401

23