UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE GUARDIAN NEWS, INC. and SELIM ZHERKA,<br><br>Plaintiffs,<br><br>-against-<br><br>PHILIP AMICONE, individually, EDMUND HARTNETT, individually, JOHN A. LISZEWSKI, individually, CITY OF YONKERS, New York, PAUL WOOD, individually, POLICE OFFICERS JOHN DOE'S #1 to # 20, Individually, and SANITATION WORKERS #1 to # 20,<br><br>Defendants. | **ECF Case**<br><br>07 Civ. 07078 (CLB) |

**DEFENDANTS' POST PERMANENT INJUNCTION HEARING
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THACHER PROFFITT & WOOD LLP
*Attorneys for Defendants*
50 Main Street
White Plains, New York  10606
(914) 421-4100

**CASE SUMMARY**.................................................................................................3

    I.   PLAINTIFFS' ATTORNEY NOTIFIED OF CITY CODE
          PROVISIONS (NEWSPAPER BOXES)..............................................3

    II.  CITY HALL METHODS..........................................................................3

          A.  Guardian Newspaper Boxes Placed *Inside* City Hall..................3

          B.  Distribution By Hand Of Newspaper By Guardian Employees
              *Inside* And Around City Hall And The Cacace Justice Center.....4

    III. STREETS - SUMMONSES FOR DISTRIBUTION BY HAND OF
           NEWSPAPER IN STREETS ..................................................................5

    IV. SIDEWALKS - REMOVAL OF NEWSPAPER BOXES
           HAPHAZARDLY PLACED IN RIGHTS-OF-WAY AND
           BLOCKING PEDESTRIAN TRAFFIC ................................................5

**PRELIMINARY STATEMENT** .........................................................................7

    A. Plaintiff's Claims Are Moot .........................................................................9

    B. Plaintiffs Have *Not* Met The Standard For A Permanent Injunction ...........11

**PROCEDURAL HISTORY**.................................................................................13

**STATEMENT OF THE RECORD** .....................................................................17

**PROPOSED FINDINGS OF FACT**....................................................................19

    A. Background......................................................................................................19

    B. The September 21, 2006 Edition Of The Newspaper ...................................19

    C. The October 5, 2006 Edition Of The Newspaper..........................................20

    D. The Guardian Files Suit Against The City Of Yonkers
       (May 2007) - Withdraws Same ..................................................................20

    E. The Distribution Of The Newspaper *Via* Newspaper Boxes
       (August 2006-July 2007)...............................................................................21

i

F.  The Distribution Of The Newspaper *Inside* City Hall
And On City Streets (July 2007-August 2007) ...........................................21

    (i)   *July 9, 2007 (City Hall)*..................................................23

    (ii)   *July 11, 2007 (City Hall)*................................................25

    (iii)  *July 12, 2007 (8 South Broadway)*...................................27

    (iv)  *July 17, 2007 (City Hall)*................................................28

    (v)   *July 31, 2007 (The Cacace Center)* ................................29

    (vi)  *August 1, 2007(City Hall)* ............................................31

    (vii) *August 2, 2007 - The Guardian Informs The City That
Six (6) Newspaper Boxes Have Been Removed* ..........................32

    (viii) *August 6, 2007(City Hall)*..............................................34

    (ix)  *August 7, 2007 - The Guardian Informs The City That
Five (5) Newspaper Boxes Have Been Removed* .........................35

    (x)   *August 9, 2007*..............................................................35

    (xi)  *August 9, 2007 Federal Court Filing*.............................36

    (xiii) *August 10, 2007 - The Guardian Informs The City That
Fifty-Six (56) Newspaper Boxes Have Been Removed* ................36

G.  The City Is Contacted About "Blue" Newspaper Boxes Blocking
Pedestrian Traffic............................................................................37

H.  August 21-23, 2007 .......................................................................39

**LEGAL STANDARDS** .........................................................................41

A. MOOTNESS.......................................................................................41

B. PERMANENT INJUNCTION .................................................................41

C. FIRST AMENDMENT ANALYSIS ..........................................................42

D. EQUAL PROTECTION - SELECTIVE ENFORCEMENT .......................44

E.  QUALIFIED IMMUNITY ........................................................................45

F.  POLICY/CUSTOM *(MONELL)*..........................................................46

**CONCLUSIONS OF LAW** ......................................................................47

      **Point I**

      THE RELIEF REQUESTED IN THE COMPLAINT IS MOOT...............47

      **Point II**

      ALL CLAIMS AGAINST MAYOR AMICONE AND POLICE
      COMMISSIONER HARTNETT SHOULD BE DISMISSED...................48

      **Point III**

      THE CITY'S ACTIONS *INSIDE* AND AROUND CITY HALL
      AND THE CACACE CENTER WERE PROPER AND DID NOT
      VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS.....................48

A.  The City's Actions Were Content Neutral ...................................................48

B.  The City May Prohibit The Placement Of Newspaper Boxes
    *Inside* City Hall ........................................................................50

C.  The City May Properly Restrict The Distribution Of The Newspaper
    By Hand *Inside* City Hall And On And Around The Steps Of City Hall
    And The Cacace Center ..............................................................54

D.  The City's Actions Were Narrowly Tailored ...............................................56

      **Point IV**

      THE CITY'S ACTIONS, ISSUING A LIMITED NUMBER OF
      SUMMONSES TO INDIVIDUALS DISTRIBUTING THE NEWSPAPER
      *IN THE STREET* AND REMOVING NEWSPAPER BOXES FOR
      SAFEKEEPING, WERE PROPER................................................58

A.  The City's Issuance Of Summonses And Removal Of Newspaper
    Boxes For Safekeeping Were Content Neutral .............................................58

B.  The City's Actions Were Narrowly Tailored ...............................................60

C.  The City's Actions Provided Ample Alternative Channels Of
Communication For The Guardian....................................................................62

**Point V**

PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS ...........................64

A.  Plaintiffs Fail To State A Claim Of Selective Enforcement In
Violation Of The Equal Protection Clause.....................................................64

1.  Plaintiffs Fail To Prove Selective Treatment .........................................64

2.  Plaintiffs Fail To Allege Or Prove Impermissible Considerations .........66

**Point VI**

THE DEFENDANTS ARE ENTITLED TO QUALIFIED
IMMUNITY ........................................................................................................68

**Point VII**

PLAINTIFFS HAVE FAILED TO STATE A CLAIM
PURSUANT TO 42 U.S.C.§ 1983 AGAINST THE
CITY/SANITATION WORKERS ...............................................................71

A.  Plaintiffs Fail To Meet The Standard Under *Monell*....................................71

B.  Plaintiffs Have Failed To Establish Municipal Liability
Under *Monell* ........................................................................................................73

**CONCLUSION**....................................................................................................75

Defendants Philip Amicone, Edmund Hartnett, John A. Liszewski, City of Yonkers (the "City"), Paul Wood, Police Officers John Doe's #1 to #20, individually and Sanitation Workers #1 to #20 (collectively, "Defendants"), by and through their attorneys, Thacher Proffitt & Wood LLP, respectfully submit this post-hearing proposed Findings of Fact and Conclusions of Law in opposition to the claims of Plaintiffs The Guardian News, Inc. (the "Guardian") and Selim Zherka ("Mr. Zherka"; the Guardian and Mr. Zherka are collectively referred to herein as "Plaintiffs") seeking a permanent injunction barring Defendants from: (1) confiscating any newspaper boxes[1] placed by the Guardian on city-owned property in the City of Yonkers (the "City") for distribution of The Westchester Guardian (the "Newspaper"); (2) confiscating any copies of the Newspaper intended to be distributed on city-owned premises within the City; (3) threatening employees of the Guardian with arrest/incarceration for distributing the Newspaper within the City; (4) threatening Mr. Zherka with arrest/incarceration for distributing the Newspaper within the City; (5) issuing to Guardian employees and Mr. Zherka appearance tickets charging them with violating the Yonkers City Charter (the "City Charter") for distributing the Newspaper; and (6) directing Defendants to

---

[1]     Plaintiffs mistakenly refer to its newspaper boxes as merely newsracks. Plaintiffs' newspaper boxes are far more substantial in size than wire newsracks.

forthwith return to Plaintiffs all of the confiscated newspaper boxes and

newspapers.[2]

---

[2]     Plaintiffs originally sought compensatory and punitive damages in their complaint dated August 9, 2007 against the Defendants.  However, Plaintiffs have withdrawn their damages claim in this action with prejudice.

## CASE SUMMARY

This case is <u>not</u> about Plaintiffs' First Amendment right to distribute its Newspaper, rather this case is about the specific <u>methods</u> utilized by Plaintiffs to distribute the Newspaper — the how and where Plaintiffs decided to distribute the Newspaper.

The relevant facts concerning certain specific <u>methods</u> Plaintiffs chose to distribute the Newspaper can be summarized as follows:

## I.   PLAINTIFFS' ATTORNEY NOTIFIED OF CITY CODE PROVISIONS (NEWSPAPER BOXES)

- In May 2007, the Yonkers City Corporation Counsel notified Plaintiffs' counsel, in writing, by facsimile, of Yonkers City Code Chapter 33 which regulates the placement of newspaper boxes in the City.

## II.   CITY HALL METHODS

### A.   Guardian Newspaper Boxes Placed Inside City Hall

- Guardian employees placed newspaper boxes <u>inside</u> City Hall.

- Guardian employees were directed that newspaper boxes are not permitted <u>inside</u> City Hall.

- No other newspaper boxes were/are placed <u>inside</u> City Hall.

- Guardian employees ignored directives that newspaper boxes are not permitted <u>inside</u> City Hall.

- Guardian newspaper boxes removed from <u>inside</u> City Hall.

<u>Reasonable Time, Place and Manner Alternative</u> – The Guardian is permitted to place the Newspaper for distribution on security desk <u>inside</u> City Hall, similar to all other newspapers/periodicals.

**B.    Distribution By Hand Of Newspaper By Guardian Employees _Inside_ and Around City Hall and the Cacace Justice Center**

- Guardian employees distributed the Newspaper by hand <u>inside</u> City Hall and near entrances to City Hall and Cacace Justice Center (which houses the City Courts and Yonkers Police Department).

- Guardian employees directed to cease distributing the Newspaper by hand <u>inside</u> City Hall and adjacent to entrances to City Hall and the Cacace Justice Center.

- Guardian employees ignored directives and, as a result, Guardian employees were issued summonses for distributing the Newspaper by hand <u>inside</u> City Hall and adjacent to entrances to City Hall and the Cacace Justice Center.

<u>Reasonable Time, Place and Manner Alternative</u> – Guardian employees are permitted to distribute the Newspaper, by hand, similar to other newspapers/periodicals, in other public places in the City (<u>e.g.</u> sidewalks, parks etc.).

4

## III.    STREETS - SUMMONSES FOR DISTRIBUTION BY HAND OF THE NEWSPAPER IN STREETS

- Guardian employees distributed the Newspaper by hand in the streets.

- A limited number of Guardian employees directed to cease distributing the Newspaper by hand in the streets in the City in violation of state and local law.

- Guardian employees issued summonses for distributing the Newspaper by hand in the streets after disobeying directives.

Reasonable Time, Place and Manner Alternative – Guardian employees are permitted to distribute the Newspaper, by hand, similar to all other newspapers/periodicals, in other public places in the City (e.g. sidewalks, parks etc.)

## IV.    SIDEWALKS - REMOVAL OF NEWSPAPER BOXES HAPHAZARDLY PLACED IN RIGHTS-OF-WAY AND BLOCKING PEDESTRIAN TRAFFIC

- Between June 6, 2007 and July 19, 2007, the Guardian purchased 128 new blue newspaper boxes.

- In mid-July to early August 2007, Plaintiffs' employees haphazardly placed additional new blue newspaper boxes on busy City sidewalks in City rights-of-way.

- Department of Public Works Employees removed the haphazardly placed blue newspaper boxes in City rights-of-ways.

- A total of 35 blue newspaper boxes were removed because they were blocking the rights-of-way and pedestrian traffic.

- The blue newspaper boxes were returned to the Guardian on August 23, 2007.

Reasonable Time, Place and Manner Alternative – Guardian employees are permitted to distribute the Newspaper in accordance with Yonkers City Code Chapter 33, similar to all other newspapers/periodicals.

In sum, in this case, the City regulated the distribution of the Newspaper including: (i) newspapers placed in newspaper boxes or distributed by hand inside and immediately around City Hall and the Cacace Justice Center (City Courthouse and Police Headquarters); (ii) newspapers distributed by hand in the streets; and (iii) newspapers distributed in newspaper boxes blocking pedestrian rights-of-way.

The City's specific/minimal restrictions on the distribution of periodicals/newspapers in the City are reasonable time, place and manner restrictions.

## PRELIMINARY STATEMENT

Parsing through the rhetoric of Plaintiffs' baseless allegations, this case is really about Mr. Zherka's attempt at sensationalism and political intimidation in an effort to bring attention to the Guardian and the Newspaper and to influence the 2007 Mayoral election in the City.  It is no secret that Mr. Zherka is not a fan of the City's current and future administration, including its now twice elected Mayor.  In fact, the Guardian and companies controlled by Mr. Zherka actually contributed substantial sums of money to a candidate who ran against the incumbent Mayor.

Plaintiffs allege that the City engaged in a "coordinated action" against the Guardian and its employees to suppress its First Amendment right; nothing could be further from the truth.   In fact, the only "coordinated action" was that orchestrated and staged by Mr. Zherka and his employees <u>after</u> Plaintiffs' attorney had been notified in May 2007 of the Yonkers City Code provisions that regulate the placement of newspaper boxes on City rights-of-way.[3]

As part of its staged blitzkrieg, in June-July 2007, despite a lack of evidence that there had been a spike in readership, the Guardian purchased 128 new Guardian newspaper boxes.  Thereafter, in and around mid-July to early August 2007, Mr. Zherka, with the assistance of Guardian employees, began to

---

[3]         In May 2007, the Guardian sued the City claiming that the Yonkers City Code violated the First Amendment because it prohibited the placement of newspaper boxes in the City.  The Yonkers Corporation Counsel forwarded Plaintiffs' counsel Yonkers City Code, Chapter 33, which permits, but regulates the placement of newspaper boxes in the City and requested that Plaintiffs' counsel dismiss the lawsuit filed against the City, which it did.

intentionally, improperly, illegally and haphazardly place numerous additional newspaper boxes throughout the City, including at City Hall, <u>where no newspaper boxes are permitted and no newspaper boxes were/are placed</u>, bringing undue attention to the Guardian and the placement of its newspaper boxes.  Mr. Zherka, with the assistance of Guardian employees, also began to intentionally and unsuitably distribute the Newspaper by hand, inside and around City Hall and the Cacace Justice Center (City Courthouse and Police Headquarters) blocking pedestrian traffic and causing potentially unsafe conditions.  Guardian employees also began to distribute the Newspaper in Yonkers City streets in violation of New York State Vehicle and Traffic Law § 1157 *et seq.* and the City Code, causing potentially dangerous traffic conditions.  Guardian employees were issued summonses for said activity pursuant to Yonkers City Code §§ 100-35 and 103.49.

In regulating the distribution of the Guardian, the City reasonably responded to the specific <u>methods</u> of distribution of the Newspaper inside and around City Hall and the Cacace Justice Center and in the City streets.[4]  The City also reasonably responded to the improper, haphazard proliferation of Guardian newspaper boxes which were placed in the City rights-of-way, cluttering many street corners and impeding pedestrian traffic.  The City removed the newspaper

---

[4]    It is reasonable for the federal government to prohibit the placement of newspaper boxes inside a federal courthouse and prohibit the distribution of a newspaper by hand within a certain perimeter of a federal courthouse.  The same should apply at City Hall.

boxes that were improperly placed within the City (leaving the properly placed ones) and shortly thereafter, returned them to Plaintiffs, who have since re-placed them as per this Court's September 21, 2007 Order.[5]

Mr. Zherka's "coordinated action" directly set the foundation for the City's reaction, resulting in the publicity and attention that Mr. Zherka desired to try to influence the 2007 City Mayoral election.

The City realizes Plaintiffs' fundamental right to publish and disseminate the Newspaper.  Importantly, however, this case is <u>not</u> about the Guardian's right to distribute the Newspaper in the City, but rather, is about the specific <u>methods</u> in which the Guardian chose to distribute the Newspaper.  The former is protected by the First Amendment.  The latter is not.

### A.    <u>Plaintiffs' Claims Are Moot</u>

Plaintiffs request for a permanent injunction is moot.  <u>Tawwab v. Metz</u>, 554 F.2d 22, 23 (2d. Cir. 1977) (complaint dismissed as moot because the challenged policy was changed precluding the alleged wrongful behavior from reoccurring).

On September 21, 2007, this Court issued an order, <u>suggested by and consented to by Defendants</u>, granting Plaintiffs a Temporary Restraining Order

---

[5]    On September 25, 2007, the City forwarded a letter to the Court and Plaintiffs' counsel <u>objecting</u> to the placement of two newspaper boxes adjacent to the entrances to City Hall and flush against the City Hall building.  The City <u>objects</u> to the placement of these newspaper boxes at these specific locations (<u>i.e.</u>, directly outside of City Hall) for safety concerns.  Despite the City's objections, the City has not removed these newspaper boxes pending this Court's direction.

("TRO").   In  issuing  the  TRO,  this  Court  granted,  in  large  part,  Plaintiffs'
requested relief.  This Court did:

(i)     limit the Guardian's distribution of the Newspaper in City Hall and on
City Hall steps to be in the same manner which other newspapers or periodicals are
distributed (i.e., no  newspaper  boxes  to  be  placed  inside  City  Hall  and  no
distribution of newspapers on City Hall steps);[6] and

(ii)    prohibit Guardian employees from distributing the Newspaper in the
street.

The fact that this Court has issued a TRO and Defendants have agreed to its
terms  and  conditions  makes  it  "absolutely  clear  that  the  allegedly  wrongful
behavior could not reasonably be expected to recur." Tawwab v. Metz, 554 F.2d at
24, (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199,
203  (1968)).[7]   In  order  for  the  alleged  wrongdoing  to  recur,  the  City  would
necessarily have to ignore and violate a federal court order.

It is the burden of Plaintiffs to show that there still remains some cognizable
danger that the alleged violations will occur again.   United States v. W.T. Grant
Co., 345 U.S. 629, 633 (1953).   Plaintiffs cannot meet this burden because the

---

[6]     All free newspapers and periodicals are permitted to be distributed inside City
Hall by placing them on the security desk at the north entrance to City Hall.

[7]     In fact, there have been no complaints from Plaintiffs that the City is taking any
steps to violate this Court's September 21, 2007 Order.

alleged violations will not occur again as per the Court's order and the City's consent. In fact, since the consent TRO, no alleged violations have occurred.

Accordingly, the Complaint should be dismissed as moot.

## B.  **Plaintiffs Have *Not* Met The Standard For A Permanent Injunction**

Plaintiffs have not met the standard for a permanent injunction. Specifically, Plaintiffs have failed to demonstrate that they have succeeded on the merits of their claims. Plaintiffs' rights were <u>not</u> violated by Defendants. Indeed, Defendants merely instituted limited reasonable time, place and manner restrictions on the placement of the Guardian's newspaper boxes throughout the City and on the dissemination of the Newspaper in the City by hand. In instituting reasonable time, place and manner restrictions on the specific <u>methods</u> of Plaintiffs distribution of the Newspaper, Defendants enforced provisions of the Yonkers City Code, which Plaintiffs have not challenged herein.[8] A permanent injunction will prevent Defendants from enforcing its laws and regulations compromising the health, safety and welfare of the residents of the City.

In addition, those of the Defendants sued in their individual capacities are entitled to qualified immunity against Plaintiffs' claims. Importantly, there was no evidence submitted at the Hearing linking any actions by employees of the City,

---

[8]    Notably, the Complaint fails to allege a facial challenge to any provision of the Yonkers City Code or any other rule or regulation.

relative to the Guardian, to Mayor Amicone or Police Commissioner Hartnett. Accordingly, any claims against Mayor Amicone and Police Commissioner Hartnett should be summarily dismissed.

Further, Plaintiffs have failed to establish the requisite municipal policy or custom in order to find the City and Sanitation Workers # 1 to # 20 liable.[9]

Finally, the Guardian's newspaper boxes are located throughout the City and Plaintiffs can distribute the Newspaper in the City, provided they comply with the Yonkers City Code and all other applicable state and federal laws. In fact, to this very day, the Guardian distributes the Newspaper throughout the City on a daily basis.

Accordingly, Plaintiffs' motion for a permanent injunction should be denied.

---

[9]     Sanitation Workers #1 to #20 are not sued in their individual capacities.

## <u>PROCEDURAL HISTORY</u>[10]

Plaintiffs commenced this action on August 9, 2007 (the "Complaint"). The Complaint sought: (i) $20 million in compensatory damages; (ii) $20 million in punitive damages; (iii) a permanent injunction enjoining Defendants from interfering with Plaintiffs' distribution/dissemination of the Newspaper within the City and/or City Hall; (iv) a declaration that Defendants' conduct violated Plaintiffs' rights guaranteed by the First and Fourteenth Amendments; and (v) an award of reasonable attorneys' fees. The Complaint also requested a trial by jury.

On or about on or about August 22, 2007, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction seeking an order barring Defendants from:

(1)    confiscating any newsracks placed by the Guardian on city-owned property in the City for distribution of the Newspaper;

(2)    confiscating any copies of the Newspaper intended to be distributed on city-owned premises within the City;

(3)    threatening employees of the Guardian with arrest/incarceration for distributing the Newspaper within the City;

(4)    threatening Zherka with arrest/incarceration for distributing the Newspaper within the City;

---

[10]    Citations herein take the following form "Tr. __" are to the pages of the hearing transcript; "PX ___" are to the Plaintiffs' exhibits and "DX___" are to Defendants' exhibits.

(5)    issuing to Guardian employees and Zherka appearance tickets charging them with violating the Yonkers City Charter for distributing the Newspaper; and

(6)    directing Defendants to forthwith return to Plaintiffs all of the confiscated newsracks and newspapers.

On or about August 28, 2007, Defendants filed and served an Answer and Affirmative Defenses requesting a trial by jury.

On or about September 20, 2007, Defendants filed opposition papers to Plaintiffs' motion for a temporary restraining order and preliminary injunction.

On or about September 21, 2007, the Court heard oral argument on Plaintiffs' motion for a temporary restraining order and preliminary injunction.

On September 21, 2007, the Court issued a temporary restraining order, consented to by Defendants, granting Plaintiffs' motion, in part, but limited the Guardian's distribution of the Newspaper inside City Hall and on City Hall steps to be in the same manner which other newspapers or periodicals are distributed and prohibited Guardian employees from distributing the Newspaper in the street. The Court also set up a procedure if the City believed that Guardian newspaper boxes placed on City sidewalks blocked pedestrian rights-of-way or were a safety/security hazard.

14

On September 21, 2007, the Court also scheduled a plenary trial before the Court on November 12, 2007 (rescheduled for November 13, 2007 due to the Court being closed on November 12, 2007 in observance of Veteran's Day) and consolidated the Complaint and the motion for a preliminary injunction under Federal Rule of Civil Procedure 65a(2).

In or about August/September 2007, ten related cases were filed against the City and its officials and employees:

1.   Guevara v. City of Yonkers, et al., (Docket No. 07 Civ. 6941);

2.   Smith v. City of Yonkers, et al., (Docket No. 07 Civ. 6946);

3.   Ayala v. City of Yonkers, et al., (Docket No. 07 Civ. 7080);

4.   Kllapija v. City of Yonkers, et al., (Docket No. 07 Civ. 7597);

5.   Gonzalez v. City of Yonkers, et al., (Docket No. 07 Civ. 7600);

6.   Dzikovic v. City of Yonkers, et al., (Docket No. 07 Civ. 7692);

7.   Sayegh v. City of Yonkers, et al., (Docket No. 07 Civ. 8048);

8.   Lukaj v. City of Yonkers, et al., (Docket No. 07 Civ. 8184);

9.   Ayala v. City of Yonkers, (Docket No. 07 Civ. 8186); and

10.  Zherka v. Amicone, (Docket No. 07 Civ. 9618) (collectively, the "Related Cases").

All Plaintiffs in the above-captioned matter are represented by Lovett & Gould, LLP, the same attorneys of record representing all plaintiffs in the Related Cases and all Defendants in the above-captioned matter are represented by Thacher

Proffitt & Wood, LLP, the same attorneys of record representing all defendants in the Related Cases.

In or about October, 2007, Defendants objected to a hearing/trial being conducted on November 13, 2007, wherein Defendants would waive their right to a trial by jury in the above-captioned matter or in the Related Cases.

On or about November 13, 2007, in furtherance of the Court's decision to hold an injunction hearing on November 13, 2007 (the "Hearing"), the parties entered into a Stipulation and Order (the "Stipulation") wherein, inter alia: (i) Plaintiffs withdrew, with prejudice, their damage claims in the above captioned matter (compensatory and punitive); and (ii) no decision in the above captioned matter would have any preclusive effect on the Related Cases.

On November 13, 2007, Defendants orally moved to dismiss the Complaint as moot.

On November 13, 2007, the Court denied Defendants' motion to dismiss.

On or about November 13, 2007, the Court commenced a permanent injunction hearing on the allegations set forth in the Complaint.

On or about November 14, 2007, Defendants filed and served a Pre-Hearing Proposed Findings of Fact and Conclusions of Law.

On or about November 14, 2007, the Court reserved decision on Defendants' oral motion to dismiss the claims asserted by Plaintiffs.

On or about November 14, 2007, the Court concluded the two day hearing on Plaintiffs' request for a permanent injunction.

## STATEMENT OF THE RECORD

The hearing of this action commenced on November 13, 2007 and lasted for two days. Plaintiffs presented 23 witnesses as part of their case in chief: (1) Selim Zherka, President and sole shareholder of the Guardian (Tr. 12 *et seq.* and Tr. 274 *et seq.*); (2) Edmund Fitzgerald, Law Case Investigator, City of Yonkers (Tr. 73 *et seq.*); (3) John Liszewski, Commissioner of Public Works (Tr. 88 *et seq.*); (4) Charles Gardner, First Deputy Chief, Yonkers Police Department (Tr. 120 *et seq.*); (5) P.O. Daniel Barahona, Yonkers Police Department (Tr. 137 *et seq.*); (6) Robert Greco, Public Works Coordinator, City of Yonkers (Tr. 147 *et seq.*); (7) P.O. Paul Wood, Yonkers Police Department (Tr. 155 *et seq.*); (8) David Simpson, Director of Communications, City of Yonkers (Tr. 189 *et seq.*); (9) David Mason, Manager of Public Works, City of Yonkers (Tr. 205 *et seq.*); (10) P.O. Joseph Galinski, Yonkers Police Department (Tr. 213 *et seq.*); (11) Robert Stanley, Custodian, City of Yonkers (Tr. 221 *et seq.*); (12) P.O. Richard Madaffari, Yonkers Police Department (Tr. 230 *et seq.*); (13) P.O. Eileen Ahearn, Yonkers Police Department (Tr. 235 *et seq.*); (14) Maribel Ayala, Secretary, ABCZ Corp. (Tr. 239 *et seq.*); (15) Steven Perez (Tr. 244 *et seq.*); (16) Michael Estrada (Tr. 248 *et seq.*); (17) Richard Guzman (Tr. 254 *et seq.*); (18) Dominca O'Neill, Manager, ABCZ Corp.

17

(Tr. 264 *et seq.*); (19) Jason Gonzalez (Tr. 299 *et seq.*); (20) Michael Guevera (Tr. 308 *et seq.*); (21) Muamer Kllapija (Tr. 317 *et seq.*); (22) Cesar Castillo (Tr. 324 *et seq.*); and (23) Cristan Salazar (Tr. 330 *et seq.*).

Defendants presented one witness: (1) P.O. Richard Alaimo, Yonkers Police Department (Tr. 283 *et seq.*).[11]

Over the course of the trial, the Court admitted 167 Exhibits (125 Plaintiffs' Exhibits and 42 Defendants' Exhibits).

---

[11]     The parties agreed at the hearing that rather than recalling witnesses called by Plaintiffs, the same witnesses, where applicable, would be utilized by Defendants' in their chief-in-point.

## <u>PROPOSED FINDINGS OF FACT</u>

**A.**    <u>Background</u>

1.    The Newspaper is a weekly political publication (distributed on Wednesday of each week) aimed at publishing opinions, editorials and statements about public officials, political candidates, police departments and local governments in Westchester County. Tr. at 12-13 and PX **1-8**.

2.    The Newspaper's owner/publisher is Mr. Zherka who is also an owner of strip/gentleman's clubs, night clubs and low income housing. Tr. at 12 and Tr. at 46.

3.    The Newspaper's Editor-In-Chief is Richard Blassberg. PX **1-8**, DX **N**, DX **P** and DX **Q**.

4.    The Newspaper was first published on August 17, 2006. Tr. at 12-13 and PX **1**.

5.    Every Wednesday, the Guardian distributes the Newspaper throughout the City *via* newspaper boxes. Tr. at 13, Tr. at 50 and Tr. at 53.

**B.**    <u>The September 21, 2006 Edition of the Newspaper</u>

6.    On September 21, 2006, the Newspaper ran a front page negative article on the Yonkers Police Department, including a photograph of a Yonkers Police Department badge with a red circle around it and line through it.  PX **1** at September 21, 2006 and DX **LL**.

19

7.    The article was highly critical of the Yonkers Police Department alleging police brutality. Tr. at 45, PX **1** at September 21, 2006 and DX **LL**.

**C.    The October 5, 2006 Edition of the Newspaper**

8.    On October 5, 2006, the Newspaper ran another front page negative article on the Yonkers Police Department alleging, <u>inter alia</u>, police brutality and corruption. Tr. at 45, PX **1** at October 5, 2006 and DX **MM**.

9.    No Guardian Newspaper boxes were confiscated in 2006. Tr. at 45.

**D.    The Guardian Files Suit Against the City of Yonkers (May 2007) - <u>Withdraws Same</u>**

10.    On or about May 14, 2007, the Guardian filed a lawsuit in the Federal District Court, Southern District of New York against the City alleging that the Yonkers City Code (the "City Code") completely banned the placement of newspaper boxes throughout the City in violation of the First Amendment (the "First Lawsuit"). DX **A**.

11.    The First Lawsuit is one of many lawsuits filed by the Guardian against municipalities in Westchester County. Tr. at 61, line 4-8.

12.    On or about May 24, 2007, the Yonkers Corporation Counsel, *via* Assistant Corporation Counsel, Raymond P. Schmidt, Esq., forwarded to Plaintiffs' counsel, by facsimile, a copy of Yonkers City Code Chapter 33 entitled "<u>Newsracks</u>". DX **A**.

13.     Mr. Schmidt requested that Plaintiffs' counsel review the law which permits the siting of newsracks and newspaper boxes in the City subject to certain regulations, including, prohibiting the placement of a newspaper box in such a manner as to endanger the safety of person or property or interfere with or impede the flow of pedestrian traffic. DX **A** and DX **GG**.

14.     Mr. Schmidt also requested that Plaintiffs' counsel consider withdrawing the First Lawsuit. DX **A**.

15.     Thereafter, Plaintiffs' counsel withdrew the First Lawsuit.

**E.     The Distribution Of The Newspaper *Via* Newspaper Boxes** <u>*(August 2006-July 2007)*</u>

16.     From August 17, 2006 to July 2007, the Guardian distributed the Newspaper *via* blue newspaper boxes located on sidewalks in various municipalities in Westchester County, including between 35-40 newspaper boxes in the City.[12] Tr. at 13.

17.     The Guardian does not maintain a list of locations of its blue newspaper boxes in the City. Tr. at 52.

**F.     The Distribution Of The Newspaper *Inside* City Hall** <u>**And On City Streets** *(July 2007-August 2007)*</u>

18.     Between June 6, 2007 and July 19, 2007, the Guardian purchased <u>128</u> new/additional blue newspaper boxes. DX **EE**.

---

[12]        All Guardian newspaper boxes are identical.

19.    In or about July 2007 through August 2007, the Guardian placed, in a haphazard manner, a myriad of these new/additional Guardian newspaper boxes in various locations in the City, including <u>inside</u> City Hall and on City sidewalks blocking pedestrian traffic/rights of way in violation of City Code Chapter 33.  Tr. 89-95, Tr. 100-101, Tr. at 113, Tr. at 133, Tr. at 151-152, Tr. at 208-210, Tr. 285-286, Tr. 296 and DX **PP**.

20.    A number of these new/additional newspaper boxes were placed in locations where other newspaper boxes were not located.  Tr. 89-95, Tr. 100-101, Tr. at 113, Tr. at 133, Tr. at 151-152, Tr. at 208-210, Tr. 285-286, Tr. 296 and DX **PP**.

21.    Beginning in approximately July 2007 to the present, the Guardian also retained a number of teenagers and other employees, paying them $8 an hour in cash, to distribute the Newspaper by hand: (i) in City Hall; (ii) at City Hall entrances and steps; (iii) at entrances near the Cacace Justice Center (the "Cacace Center"); (iv) on City streets; and (v) on City sidewalks.  Tr. at 23, Tr. at 56, Tr. at 57, Tr. at 59-60, Tr. at 139-140, Tr. at 143-144, Tr. at 156, Tr. at 158, Tr. at 165, Tr. at 214-217, Tr. at 230-234, Tr. at 236-237, Tr. at 239, Tr. at 242, Tr. at 245, Tr. at 248-249, Tr. at 255-257, Tr. at 260-261, Tr. at 265-266, Tr. at 270, Tr. at 299-300, Tr. at 305-306, Tr. at 308, Tr. at 309, Tr. at 312-314, Tr. at 323-328, Tr. at 330, Tr. at 333 and DX **B** to **L**.

22.    City Hall is the governmental hub of the City where the majority of City business is conducted.  City Hall houses the Office of the Yonkers City Mayor, the Office of the Yonkers City Council, the Office of the Yonkers City Corporation Counsel and other governmental offices.[13]

23.    The Cacace Center is the judicial hub of the City and houses the Yonkers City Court as well as the Yonkers City Police Headquarters.  Tr. at 139-140 and Tr. at 146.

24.    The Cacace Center also houses incarcerated prisoners awaiting court appearances.  In order to enter the Cacace Center, the public must enter through security and a magnetometer.[14]

(i)    *July 9, 2007 (City Hall)*

25.    On July 9, 2007, Mr. Zherka, pretending to be working for his boss at the Guardian, and Dominica O'Neill (*aka* Sunday) (hereinafter "Sunday"), came to City Hall with a blue Guardian newspaper box and attempted to place said newspaper box (with newspapers) inside City Hall near the north entrance. Tr. at 17, Tr. at 58-59, Tr. at 172-176, Tr. at 228-229 and Tr. at 271.

26.    Mr. Zherka did not identify himself and did not indicate that he was the owner/publisher of the Guardian.  Rather, Mr. Zherka, without giving his name,

---

[13]    We ask that the Court take judicial notice as to the facts set forth in ¶22.

[14]    We ask that the Court take judicial notice as to the facts set forth in ¶24.

indicated that he was an employee of the Guardian and was placing the Guardian newspaper box <u>inside</u> City Hall on behalf of his "boss". Tr. at 172-175 and Tr. at 228-229.

27.    Mr. Zherka was informed that no newspaper boxes are permitted <u>inside</u> City Hall. Tr. at 175, Tr. at 222-223 and Tr. at 226.[15]

28.    At all times, Mr. Zherka was permitted, and in fact, encouraged to place copies of the Newspaper on the police security desk at City Hall. Tr. at 40.

29.    Mr. Zherka admitted during the Hearing that on July 9, 2007, he did <u>not</u> tell the truth to the Police Officers assigned to City Hall falsely stating that he was at City Hall to place a newspaper box there at the direction of his boss. Tr. at 59.

30.    Mr. Zherka also informed P.O. Wood that: (i) he had to take a picture of the Guardian newspaper box; and (ii) P.O. Wood could throw the Guardian newspaper box away after he left. Tr. at 174-175.

31.    Ignoring P.O. Wood's direction, Mr. Zherka proceeded to leave City Hall and left the Guardian newspaper box <u>inside</u> City Hall near the north entrance with newspapers in it. Tr. at 174-175.

---

[15]    In the past, some free newspapers and <u>some</u> free periodicals were placed on a <u>wire</u> newsrack located inside City Hall near the east entrance used predominantly for City news. This wire newsrack was removed in July 2007 and has not been replaced.

32.    Sunday videotaped Mr. Zherka's interaction with P.O. Wood at City Hall and the placement of the Guardian newspaper box <u>inside</u> City Hall. Tr. at 174-175.

33.    Robert Stanley, the City Hall custodian removed the Guardian newspaper box from <u>inside</u> the north entrance to City Hall and placed it in a secure area on the 5th floor of City Hall for safekeeping. Tr. at 222-225.

34.    Mr. Stanley placed the newspapers that were in the newspaper box on the police security desk where other free publications are located. Tr. at 227.

35.    At no time did the contents of the newspaper play any role in P.O. Wood's or Mr. Stanley's actions in: (i) informing Mr. Zherka that newspaper boxes were not permitted in City Hall; (ii) removing the newspaper box from the 1st floor of City Hall and relocating it to the 5th floor for safekeeping; or (iii) placing the newspapers on the police desk with all other free publications. Tr. at 176 and Tr. at 229-230.

(ii)    *July 11, 2007 (City Hall)*

36.    On July 11, 2007, Mr. Zherka appeared at City Hall again with Sunday and two Guardian employees, Michael Guevera and Cesar Castillo. Tr. at 176.

37.    Sunday was again videotaping Mr. Zherka. Tr. at 176.

25

38.     Mr. Zherka instructed Mr. Guevera and Mr. Castillo to distribute the Newspaper by hand, <u>inside</u> City Hall. Tr. at 176.

39.     Mr. Castillo was stationed <u>inside</u> the north entrance to City Hall and Mr. Guevera was stationed <u>inside</u> the east entrance to City Hall. Tr. at 214-218 and Tr. at 314.

40.     Both Mr. Castillo and Mr. Guevera handed out the Newspaper directly in front of each respective entrance blocking pedestrian traffic. Tr. at 214-218, Tr. at 309, Tr. at 312-314, Tr. at 325, Tr. at 328, PX **81** and PX **82**.

41.     Mr. Castillo and Mr. Guevera were directed to cease distributing the Newspaper <u>inside</u> City Hall or they each would receive a summons. Tr. at 214-218 and Tr. at 310.

42.     Both Mr. Castillo and Mr. Guevera disobeyed the police officers' directions and were issued summonses for violations of the City Code. Tr. at 328, PX **81** and PX **82**.

43.     Neither P.O. Wood nor P.O. Galinski acted because of the content of the Newspaper.  Tr. at 178 and Tr. at 219.

44.     Prior to July 11, 2007, P.O. Galinski did not observe anyone attempting to handout newspapers/periodicals <u>inside</u> City Hall. Tr. at 220.

45.     On July 11, 2007, Mr. Castillo observed the Newspaper (the Guardian) on the police security desk at the north entrance to City Hall. Tr. at 328-329.

46.     Mr. Castillo handed out the Newspaper on numerous additional occasions in the City, on sidewalks, without incident. Tr. at 327-328.

### *(iii)    July 12, 2007 (8 South Broadway)*

47.     On July 12, 2007, P.O. Richard Alaimo observed Gene Smith, an employee of the Guardian ("Mr. Smith"), carry and place a blue newspaper box (a Guardian newspaper box) in front of a bus stop at 8 South Broadway in a heavily traveled (bus traffic and pedestrian traffic) area of Getty Square. Tr. at 284-287, Tr. at 296 and DX **D**.[16]

48.     No newspaper box was located in front of 8 South Broadway prior to Mr. Smith placing the Guardian newspaper box at said location. Tr. at 293.

49.     Before July 12, 2007, P.O. Alaimo did not receive any directive from any superior to remove any newspaper boxes. Tr. at 297.

---

[16]     The placement of a Guardian newspaper box at 8 South Broadway is but one example of the Guardian haphazardly placing newspaper boxes throughout the City in July and August 2007.

50.    The placement of a Guardian newspaper box in front of a bus stop at 8 South Broadway was an obstruction to pedestrian traffic and impeded individuals seeking to enter/exit the bus.[17]  Tr. at 284-287, Tr. at 296 and DX **D**.

51.    While P.O. Alaimo was attempting to determine whether Mr. Smith had a permit to place the newspaper box in front of 8 South Broadway, Mr. Smith made a telephone call and stated to P.O. Alaimo, "issue me a summons". Tr. at 286-287, Tr. at 295-296 and DX **D**.

52.    P.O. Alaimo directed Mr. Smith to remove the newspaper box, but he refused.  Tr. at 287-288 and DX **D**.

53.    Accordingly, P.O. Alaimo issued Mr. Smith a summons under Yonkers City Code § 103.94 "Obstructing Pedestrian Traffic". Tr. at 286-288 and DX **D**.

54.    P.O. Alaimo removed the newspaper box and vouchered it as evidence and prepared a police report of the incident. Tr. at 288 and DX **D**.

(iv)    *July 17, 2007 (City Hall)*

55.    On July 17, 2007, Mr. Zherka again appeared at City Hall (3rd time in 8 days) with Sunday who again was present with a videotape recorder. Tr. at 178-179 and DX **NN**.

---

[17]    Sometime after this incident, Deputy Chief Charles Gardner ("Chief Gardner") met P.O. Alaimo at 8 South Broadway.  At this meeting, P.O. Alaimo informed Chief Gardner of the exact location that Mr. Smith placed the blue newspaper box.  In Chief Gardner's opinion, Mr. Smith's placement of a newspaper box at this location was an obstruction to pedestrian traffic.  Tr. at 130-136 and Tr. at 298.

56.    Mr. Zherka was again directed by the police that he could <u>not</u> place newspaper boxes <u>inside</u> City Hall, but that he could leave copies of the Newspaper at the police security desk similar to all other newspapers and periodicals. Tr. at 178-179 and DX **NN**.

57.    Mr. Zherka, again disobeying P.O. Wood's directive, left a single blue Guardian newspaper box <u>inside</u> the north entrance to City Hall. Tr. at 178-179 and DX **NN**.

58.    The newspapers located in the newspaper box were removed and placed on the police security desk in City Hall and the newspaper box was vouchered for safekeeping. Tr. at 178-179 and DX **NN**.

59.    P.O. Wood never saw anyone steal or take the Newspaper from the police security desk at City Hall. Tr. at 179.[18]

(v)    *July 31, 2007 (The Cacace Center)*

60.    As part of the Guardian and Mr. Zherka's coordinated effort, on July 31, 2007, Mr. Zherka instructed Richard Guzman and Nicole Pacheco, employees of the Guardian, to distribute the Newspaper, by hand, in front of the Cacace

---

[18]    Mr. Zherka boldly asserts, <u>without any evidence</u>, that "they [the City] started confiscating my newspapers and my newspapers were not allowed on the counter." Tr. at 39-40. *First*, at the trial of this matter, not one witness testified that they ever saw anyone from the City throw away any Guardian Newspaper, a point conceded by Mr. Zherka. Tr. at 44. *Second*, this unsupported accusation is directly refuted by P.O. Wood, P.O. Galinski and Mr. Zherka's own testimony.  Indeed, Mr. Zherka stated "<u>YES</u>" when asked the following question during the Hearing: "[S]o at all times the Westchester Guardian could walk into City Hall and place your newspapers together with the other newspapers that were there for distribution on the desk?" Tr. at 40.

Center (Police Headquarters, City Courthouse with Detention Facilities). Tr. at 60 and Tr. at 255-257.

61.     *New York State Court Officers*, who have <u>no</u> affiliation with the City of Yonkers, directed Mr. Guzman and Ms. Pacheco to cease distributing the Newspaper in front of the Cacace Center for security reasons. Tr. at 60 and Tr. at 255.

62.     At the direction of Mr. Zherka, Mr. Guzman and Ms. Pacheco refused to comply with the *New York State Court Officer's* directives. Tr. at 60 and Tr. at 256.

63.     Indeed, Mr. Zherka stated "I instructed the Court Officers they can, it's free speech, it's guaranteed under the First Amendment." Tr. at 60.

64.     Thereafter, P.O. Daniel Barahona, after consulting with a Sergeant, directed Mr. Guzman and Ms. Pacheco to cease distributing the Newspaper in front of the Cacace Center.  Tr. at 139-140, Tr. 142-145 and Tr. at 256.

65.     Mr. Guzman and Ms. Pacheco ignored P.O. Barahona's directive and continued distributing the Newspaper in front of the Cacace Center. Tr. at 142-145 and Tr. at 256.

66.     P.O. Barahona again directed that Mr. Guzman and Ms. Pacheco cease distributing the Newspaper in front of the Cacace Center for safety and security reasons. Tr. at 142-145.

67.    Mr. Guzman and Ms. Pacheco again ignored P.O. Barahona's directive and continued distributing the Newspaper. Tr. at 145.

68.    P.O. Barahona issued Mr. Guzman and Ms. Pacheco summonses for distributing the Newspaper directly in front of the Cacace Center and directed Mr. Guzman and Ms. Pacheco to cease said activity. Tr. at 139-140, Tr. at 142-145 and PX **75** and PX **80**.

69.    After receiving their summonses, Mr. Guzman and Ms. Pacheco finally complied with P.O. Barahona's directive and left the Cacace Center with copies of the Newspaper. Tr. at 144.

70.    P.O. Barahona issued Mr. Guzman and Ms. Pacheco summonses for distributing the Newspaper at the Cacace Center and not because of the content of the Newspaper - in fact P.O. Barahona did not even know the content of the Newspaper. Tr. at 145 and PX **75** and PX **80**.

(vi)    *August 1, 2007 (City Hall)*

71.    On August 1, 2007, Mr. Zherka, Sunday and Ms. Maribel Ayala ("Ms. Ayala"), all Guardian employees, were distributing the Newspaper by hand <u>directly in front</u> of City Hall entrances and on City Hall steps (north and east entrances). Tr. at 24, Tr. at 55, Tr. at 160-163 and Tr. at 239-243.

72.    P.O. Wood directed Mr. Zherka, Sunday and Ms. Ayala to cease distributing the Newspaper, by hand, directly in front of City Hall entrances and City Hall steps. Tr. at 24, Tr. at 160-163, Tr. at 239-243 and Tr. at 265-273.

73.    True to form, Mr. Zherka, Sunday and Ms. Ayala refused to abide by P.O. Wood's directive and continued handing out the Newspaper at these specific locations. Tr. at 160-163, Tr. at 239-243 and Tr. at 265-273.

74.    These limited areas, directly in front of City Hall and the City Hall steps, often have motor vehicles drive past for City Hall business. Tr. at 251.

75.    P.O. Wood issued Mr. Zherka, Sunday and Ms. Ayala summonses for distributing the Newspaper directly in front of City Hall entrances and steps.[19] DX **G**, DX **H** and DX **I**.

    (vii)    _August 2, 2007_ - The Guardian Informs The City That Six
                         (6) Newspaper Boxes Have Been Removed

76.    On Wednesday, August 1, 2007, Mr. Smith delivered newspapers to Guardian newspaper boxes throughout the City. Tr. at 13, Tr. at 50, Tr. at 53 and DX **N**.

77.    On Thursday, August 2, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to John Liszewki, Commissioner of Public Works

---

[19]    Guardian employees are indeed permitted to distribute the Newspaper on the sidewalks. However, the specific locations where Mr. Zherka, Sunday and Ms. Ayala (and other Guardian employees) distributed the Newspaper, <u>directly in front of City Hall</u>, causes potential safety problems to those distributing the Newspaper and persons visiting City Hall and was the reason for P.O. Wood's directives and issuance of summonses.

for the City of Yonkers ("Commissioner Liszewski"), informing him that *only* <u>six (6)</u> Guardian newspaper boxes have been confiscated by the City (three (3) from City Hall, one (1) from the Cacace Center and two (2) from South Broadway). Tr. at 110-111 and DX **N**.

78.    This was the first time that the Guardian complained to the City, in writing, that the City removed any Guardian newspaper boxes. Tr. at 49-50, Tr. at 110-111 and DX **N**.

79.    On August 2, 2007, with no evidence to support his baseless and conclusory allegations, Mr. Zherka, with Sunday, appeared at City Hall complaining that his newspaper boxes were improperly removed from City Hall and that his newspapers on the police security desk were being thrown away. Tr. at 39-40, Tr. at 179 and DX **J**.

80.    Sunday was again videotaping Mr. Zherka. DX **J**.

81.    Mr. Zherka marched to the Mayor's office, and in a rant, demanded to see the Mayor. Tr. at 202-205 and DX **J**.

82.    Mr. Zherka refused to leave until he was able to see the Mayor. Tr. at 202-205 and DX **J**.

83.    City Hall staff instructed Mr. Zherka that he was <u>not</u> permitted to videotape inside the Mayor's office and that he would have to make an appointment to see the Mayor. Tr. at 202-205 and DX **J**.

33

84.    Mr. Zherka would not leave claiming he had a First Amendment right to film the Mayor's office and stated that he was being thrown out of the Mayor's office. Tr. at 202-205 and DX **J**.

85.    The facts demonstrate that P.O. Wood instructed Mr. Zherka to leave the Mayor's office. Tr. at 202-205 and DX **J**.

86.    Mr. Zherka eventually left City Hall. Tr. at 202-205 and DX **J**.[20]

(viii)    *August 6, 2007 (City Hall)*

87.    As part of his coordinated effort to manufacture a civil rights case, Mr. Zherka, Sunday, Richard Guzman and Michael Estrada, all employees of the Guardian, again distributed the Newspaper by hand <u>directly in front</u> of City Hall entrances and City Hall steps (north and east entrances). Tr. at 166, Tr. at 249-252, Tr. at 257, Tr. at 260, Tr. at 262-263 and DX **K**.

88.    P.O. Wood directed Mr. Zherka, Sunday, Mr. Guzman and Mr. Estrada to cease distributing the Newspaper by hand <u>directly in front</u> of City Hall entrances and City Hall steps. Tr. at 166, Tr. at 249-252, Tr. at 257, Tr. at 260, Tr. at 262-263 and DX **K**.

89.    Mr. Zherka, Sunday, Mr. Guzman and Mr. Estrada refused to comply with P.O. Wood's directive and continued handing out the Newspaper at these

---

[20]    Anyone seeking to videotape at City Hall must first obtain a permit from the City. The City does have an exemption for the press. However, prior to filming in the Mayor's office, the press must first obtain permission to do so. Tr. at 204-205.

specific locations. Tr. at 166, Tr. at 249-252, Tr. at 257, Tr. at 260, Tr. at 262-263 and DX **K**.

90.    P.O. Wood issued Mr. Zherka, Sunday, Mr. Guzman and Mr. Estrada summonses for distributing the Newspaper directly in front of City Hall entrances and steps. Tr. at 166, Tr. at 249-252, Tr. at 257, Tr. at 260, Tr. at 262-263 and DX **K**.

91.    On August 6, 2007, the Newspaper was again on the police security desk at City Hall available for the public to pick up and read. Tr. at 264.

    ix)    _August 7, 2007_ — The Guardian Informs The City That Five (5) Newspaper Boxes Have Been Removed

92.    On Tuesday, August 7, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to Commissioner Liszewki informing him that five (5) additional Guardian newspaper boxes have been removed from City sidewalks by the City (a total of (11) eleven). Tr. at 51 and DX **P**.

93.    Prior to August 7, 2007, the only Guardian newspaper boxes that had been removed from City sidewalks were those set forth in Mr. Blassberg's August 2, 2007 letter. Tr. at 50-51, DX **N** and DX **P**.

    (x)    _August 9, 2007_

94.    On August 9, 2007, Guardian employees (Mr. Kllapija and Mr. Salazar) handed out the Newspaper <u>in the middle of the street</u> at the corner of Yonkers and Central Avenue. Tr. at 230-238 and DX **L**.

35

95.     These Guardian employees were directed by various police officers to cease distributing the Newspaper in the street for safety reasons. Tr. at 230-238 and DX **L**.

96.     These Guardian employees refused, disobeying police directives. Tr. at 230-238 and DX **L**.

97.     Mr. Kllapija and Mr. Salazar, Guardian employees, were issued summonses for distributing the Newspaper in the street. Tr. at 230-238 and DX **L**.[21]

98.     These were the only two summonses issued to individuals distributing the Newspaper in the street.

(xi)    *August 9, 2007* - Federal Court Filing

99.     On August 9, 2007, Plaintiffs filed the instant lawsuit against the City and its employees.

(xii)   *August 10, 2007* - The Guardian Informs The City That Fifty-Six (56) Newspaper Boxes Have Been Removed

100.    On Friday, August 10, 2007, Richard Blassberg, Editor-In-Chief of the Guardian, forwarded a letter to Commissioner Liszewki informing him that

---

[21]    Mr. Kllapija and Mr. Salazar were issued summonses for violating City Code § 100-35. It is respectfully submitted that they were also violating N.Y. Vehicle and Traffic Law § 1157 *et seq*.

fifty-six (56) Guardian newspaper boxes have been confiscated by the City. Tr. 52 and DX **Q**.[22]

## G.    The City Is Contacted About "Blue" Newspaper Boxes Blocking Pedestrian Traffic

101.    In or about July-August 2007, Commissioner Liszewski's office received a telephone call from a Yonkers City resident complaining about the placement of new blue newspaper boxes throughout the City blocking pedestrian traffic. Tr. at 89-90, Tr. at 92 and Tr. at 100, lines 4-5.

102.    In or about early August 2007, Commissioner Liszewski was contacted by one of the secretaries working in the Mayor's office informing him that complaints from Yonkers City residents had been received about the placement of new blue newspaper boxes blocking pedestrian traffic throughout the City. Tr. at 92-93.

103.    The Mayor's Chief of Staff, Lisa Mrijaj, informed Commissioner Liszewski while he was gaining information from the Mayor's office about the proliferation of blue boxes on City sidewalks, that she observed two new blue newspaper boxes on sidewalks on Bronx River Road blocking pedestrian traffic. Tr. at 94-96.

---

[22]    The Court finds that Mr. Blassberg learned of the removal of 56 boxes when Mr. Smith went to deliver the Newspaper to the newspaper boxes on Thursday, August 9, 2007. Prior to August 9, 2007, all but 11 newspaper boxes were present on City sidewalks throughout the City.

104.    After learning this information, Commissioner Liszewski directed that his employees investigate the situation and remove any blue boxes that were "blocking the right of way" for safety concerns. Tr. at 93-94, Tr. at 97-101, Tr. at 108-110, Tr. at 151-152, DX **R** and DX **S**.

105.    Commissioner Liszewski directed only blue newspaper boxes to be removed because: "they were new blue boxes which had recently placed on sidewalks in the rights-of-way.  So when they went out and looked for them, in some cases there were no other boxes around.  They picked up those boxes." Tr. at 100, line 3-6, Tr. at 151-152 and Tr. at 207-208 and DX **GG**.

106.    Commissioner Liszewski did not know that these newspaper boxes were Guardian newspaper boxes before directing that blue newspaper boxes blocking the rights-of-way be removed. Tr. at 89 and Tr. at 102.

107.    On August 11, 2007, Commissioner Liszewski called the DPW Operations Division and directed to "remove blue boxes blocking the right of way." Tr. at 108-109, DX **R** and DX **S**.

108.    Commissioner Liszewski did not direct any blue boxes to be removed because of their content. Tr. at 110, line 12-20, DX **R** and DX **S**.

109.    Commissioner Liszewski observed a blue newspaper box blocking public access on South Broadway. Tr. at 113.

110.    David Mason, Manager of Public Works, observed two blue newspaper boxes blocking pedestrian rights-of-way on Bronx River Road. Tr. at 209-210.

111.    In or about early August 2007, employees of the City Department of Public Works (the "DPW"), removed 35 blue newspaper boxes on City sidewalks blocking the rights-of-way. Tr. at 211, DX **Y** and DX **Z**.

112.    DPW stored these 35 blue newspaper boxes in the DPW facility at 255 Lake Avenue. Tr. at 211, DX **Y** and DX **Z**.

113.    In approximately 2001, Commissioner Liszewski directed that purple newspaper boxes be removed from City streets that were blocking pedestrian traffic. Tr. at 114.

**H.    August 21-23, 2007**

114.    On or about August 21, 2007, the City's special counsel forwarded a letter to Plaintiffs' counsel informing him that 33 Guardian newspaper boxes were being stored by the City and that a Guardian representative should contact Commissioner Liszewski to retrieve these boxes.[23] DX **W**.

115.    The August 21, 2007 letter also instructed Plaintiffs' counsel that the placement of Guardian newspaper boxes must comply with the City Code. DX **W**.

---

[23]    DPW actually stored 35 newspaper boxes, not 33. Plaintiffs' counsel was also informed on numerous occasions that the Yonkers Police Department was in possession of three additional Guardian newspaper boxes and that they were available to be picked up at any time. Tr. at 211, DX **Y** and DX **Z**.

116.   On or about August 21, 2007, Chief Gardner also issued an order to "All Commands" stating that, <u>inter alia</u>: (i) no summons is to be issued to anyone for distributing newspapers on the sidewalk; and (ii) anyone distributing newspapers in the street should be ordered to cease said activity, and if they refuse, to issue them a summons for Failure to Obey a Police Officer. DX **V**.

117.  On August 23, 2007, Mr. Zherka picked up the 35 Guardian newspaper boxes from the City DPW facility at 255 Lake Street in good condition. Tr. at 85 and DX **Y**.[24]

118.  On August 23, 2007, a Yonkers City Corporation Counsel Investigator observed a number of Guardian newspaper boxes on sidewalks throughout the City. DX **CC**.

---

[24]   When Mr. Zherka picked up the Newspaper boxes he lied to a DPW employee. Indeed, Mr. Zherka indicated that he was not videotaping, when he in fact was videotaping.  PX **125**.

## LEGAL STANDARDS

### A.  MOOTNESS

A claim becomes moot when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." <u>Tawwab v. Metz</u>, 554 F.2d 22, 24 (quoting <u>United States v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. at 203).  A statement by the government "that it does not intend to violate the claimed rights of the plaintiff can suffice to make the case moot."  <u>Becket v. Marks</u>, 358 F.Supp. 1180, 1184, (S.D.N.Y. 1973), (citing <u>Cherry v. Postmaster General</u>, 332 F.Supp. 785 (S.D.N.Y. 1971), <u>aff'd</u> 460 F.2d 1063 (2d. Cir. 1972)).

Point I in the Conclusions of Law, <u>infra</u>, addresses this legal standard in this case and demonstrates why the instant matter is moot.

### B.  PERMANENT INJUNCTION

Plaintiffs request a permanent injunction enjoining Defendants from violating their First and Fourteenth Amendment Rights.  In order for an injunction to be made on a permanent basis, as the Plaintiffs are requesting here, an even greater showing is necessary than for a preliminary injunction.  <u>See</u> <u>Bobrowsky v. Curran</u>, 333 F.Supp.2d 159, 162 (S.D.N.Y. 2004).  Specifically, to obtain a permanent injunction, a plaintiff must actually succeed on the merits of the case. <u>See</u> <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 (1987); <u>Lusk v.</u>

Village of Cold Spring, 418 F.Supp.2d 314, 318 (S.D.N.Y. 2005), rev'd in part on

different grounds, 475 F.3d 480 (2d Cir. 2007).

In order for a party to meet the first prong of the standard, the "potential

injury … justify [ing] the granting of injunctive relief … must be irreparable; that

is, it must be the kind of injury for which an award of money cannot compensate."

Sperry Int'l Trade, Inc. v. Government of Israel, 670 F.2d 8, 12 (2d Cir. 1982).

Most courts have held that in seeking to obtain a preliminary injunction,

irreparable injury is shown when an alleged deprivation of a constitutional right is

involved.   Beyond that, in order to prevail on their request for a permanent

injunction, the Plaintiffs must actually succeed on the merits of their First

Amendment and/or Fourteenth Amendment claims alleged against the Defendants.

See Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996).

As will be demonstrated in the Conclusions of Law, infra, the legal barriers

to the Plaintiffs' constitutional claims preclude the consideration of a permanent

injunction, warranting dismissal of this action.

## C.   **FIRST AMENDMENT ANALYSIS**

Although the right of access to a public forum (such as sidewalks and parks)

for the exercise of free speech is fundamental, that right is not limitless or absolute.

See Central American Refugee Center-Carecen v. City of Glen Cove, 753 F.Supp.

437, 440 (E.D.N.Y. 1990) (an ordinance prohibiting solicitation of employment

from a vehicle or by a pedestrian on a public street did not violate plaintiffs' First Amendment right of free expression); Frisby v. Schultz, 487 U.S. 474, 479-80 (1988); Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799 (1985) ("[e]ven protected speech is not equally permissible in all places and at all times.").

It is well settled that the First Amendment does not guarantee unlimited access to government property for expressive activity.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992).

Further, it is well established that "reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests." Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir. 1980); Olivieri v. Ward, 766 F.2d 690, 693 (2d Cir. 1985) (police department's plan to close a sidewalk in front of a cathedral during demonstrator's scheduled march was a reasonable time, place and manner restriction) (emphasis added).

In the instant matter, the City may regulate the placement of newspapers boxes and the distribution of the Newspaper by hand on and inside public property within the City, provided that the regulation is: (1) content-neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leaves open ample alternative channels for communication. Olivieri v. Ward, 766 F.2d at 693 (2d Cir. 1985).

Points II, III, IV, VI and VII in the Conclusions of Law, <u>infra</u>, sets forth why there is no First Amendment violation in the instant case.

## D.  **<u>EQUAL PROTECTION - SELECTIVE ENFORCEMENT</u>**

Plaintiffs' allegations can only be interpreted as a selective enforcement argument.  Plaintiffs contend that the City and its officials and employees treated its publication, critical of the City, unfairly and differently than it treated publications favorable to the City.  (Complaint ¶¶ 17, 18).

In order to establish a violation of equal protection based on selective enforcement, a plaintiff must show: (1) that plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure the plaintiff.  <u>Freedom Holdings, Inc. v. Spitzer</u>, 357 F.3d 205, 234 (2d Cir. 2004) (quoting <u>Lisa's Party City, Inc. v. Town of Henrietta</u>, 185 F.3d 12, 16 (2d Cir. 1999)).  A plaintiff's allegations must satisfy both prongs.  <u>Harlen Assocs. v. Incorporated Village of Mineola</u>, 273 F.3d 494 (2d Cir. 2001).  To prevail on an equal protection/selective enforcement claim, a plaintiff must prove intentional discrimination.  <u>Kelly v. Rice</u>, 375 F.Supp.2d 203, 210 (S.D.N.Y. 2005).

Point V, VI and VII in the Conclusions of Law, <u>infra</u>, demonstrates why there is no Equal Protection violation in the instant case.

## E.    <u>QUALIFIED IMMUNITY</u>

"Qualified immunity protects government officials from civil liability when performing discretionary duties insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."    <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 148 (2d Cir. 2006).    Put another way, a government official has qualified immunity for actions that were "objectively reasonable."    <u>Day v. Morgenthau</u>, 909 F.2d 75, 78 (2d Cir. 1990).

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages arising from claims brought against them in their individual capacities.    <u>Trask v. Franco</u>, 446 F.3d 1036 (10th Cir. 2006).    The threshold inquiry is whether plaintiff's version of the facts shows that the conduct violated a constitutional right.    <u>Demoret</u>.    If a plaintiff is unable to demonstrate the threshold inquiry, the analysis stops.    <u>Id.</u>

If the initial threshold is met, the inquiry turns to whether the right was clearly established.    <u>Demoret</u>.    Government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe that their actions were lawful at the time.    <u>Id.</u>

Point VI in the Conclusions of Law, <u>infra</u>, demonstrates why Defendants are entitled to qualified immunity in the instant case.

## F.    POLICY/CUSTOM (*MONELL*)

Under the principles announced in <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694 (1978), a municipality may be liable on a section 1983 claim only "when execution of a government's policy or custom … inflicts the injury …"

In <u>Batista v. Rodriguez</u>, the Second Circuit construed <u>Monell</u> to require that a section 1983 plaintiff plead and prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." 702 F.2d 393, 397 (2d Cir. 1983). Subsequently, the Second Circuit elaborated that, although the rule "does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." <u>DeCarlo v. Fry</u>, 141 F.3d 56, 61 (2d Cir. 1998) (citation omitted).

Point VII in the Conclusions of Law, <u>infra</u>, demonstrates why Plaintiffs <u>Monell</u> claim should be dismissed.

## CONCLUSIONS OF LAW

### Point I

### THE RELIEF REQUESTED IN THE COMPLAINT IS MOOT

The Court finds that because this Court has issued a TRO and the municipal Defendants have agreed to its terms and conditions, it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Tawwab v. Metz, 554 F.2d at 24 (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. at 203).  Specifically, the Court finds that in order for the alleged wrongdoing to reoccur, the City would necessarily have to ignore and violate a federal court order.  A statement by the government "that it does not intend to violate the claimed rights of the plaintiff can suffice to make the case moot." Becket v. Marks, 358 F.Supp. 1180, 1184, (S.D.N.Y. 1973), (citing Cherry v. Postmaster General, 332 F.Supp. 785 (S.D.N.Y. 1971), aff'd 460 F.2d 1063 (2d. Cir. 1972)).

It is the burden of Plaintiffs to show that there still remains some cognizable danger that the alleged violations will occur again.  United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).  Plaintiffs cannot meet this burden because the alleged violations will not occur again.

Accordingly, the Complaint is dismissed as moot.

## Point II

## ALL CLAIMS AGAINST MAYOR AMICONE AND POLICE COMMISSIONER HARTNETT SHOULD BE DISMISSED

The Court finds that there are no factual allegations supporting any claims against Mayor Amicone or Police Commissioner Hartnett.  Accordingly, all claims against Mayor Amicone and Police Commissioner Hartnett are dismissed as a matter of fact and law.

## Point III

## THE CITY'S ACTIONS *INSIDE* AND AROUND CITY HALL AND THE CACACE CENTER WERE PROPER AND DID NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS

### A.    The City's Actions Were Content Neutral

The principal inquiry for determining whether a law is content based is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  Ward v. Rock Against Racism, 491 U.S. 781 (1989); Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d. Cir.2005), cert. denied, 546 U.S. 815 (2005).

The Court finds that the limited actions of the Defendants — the removal of newspaper boxes from inside City Hall and the issuance of a limited number of summonses to Guardian employees distributing the Newspaper inside and around City Hall and the Cacace Center — were content neutral.

48

The Court finds that there are no facts to demonstrate that any of the Defendants engaged in any activity because of the content of the Newspaper. Indeed, as far back as September 2006, the Newspaper was critical of the City and its police department, with no action taken by the City or any of the Defendants. Moreover, there is no evidence that any action was taken at the direction of the Mayor, the Mayor's Office or the Police Commissioner. To the contrary, the undisputed facts demonstrate that certain police officers acted to ensure the health, safety and welfare of the residents of the City.

Plaintiffs' argument that the Defendants' actions were content based because the City only issued summonses and removed newspaper boxes when the Newspaper was critical of the City and the Mayor in July 2007, is unavailing. Indeed, Plaintiffs' coordinated effort created the very scenario that caused the Defendants to remove boxes and issue summonses by placing newspaper boxes inside City Hall and distributing the Newspaper inside and around City Hall and the Cacace Justice Center. The Court's determination may be different if Defendants actually permitted newspaper boxes inside City Hall for other newspapers/periodicals or permitted other newspapers/periodicals to distribute their respective newspapers/periodicals inside and adjacent to City Hall and the Cacace Center. The facts, however, do not support such a conclusion; rather no

newspaper boxes are permitted in City Hall and no publication is permitted to distribute by hand and directly in front of City Hall and the Cacace Center.[25]

Accordingly, the court finds that Defendants' actions were content neutral.

**B.    The City May Prohibit The Placement
Of Newspaper Boxes *Inside* City Hall**

Plaintiffs contend that they should be able to place newspaper boxes <u>inside</u> City Hall. Plaintiffs, however, ignore the City's ability and right to restrict such placement both as a reasonable time, place and manner restriction and because of safety and security reasons.

The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." <u>Gannett Satellite Information Network, Inc. v. Metropolitan Transp. Auth.</u>, 745 F.2d 767, 772 (2d Cir. 1984) (quoting <u>Heffron v. International Soc'y for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 647 (1981)). Accordingly, a newspaper publisher does not have the unfettered ability to distribute its newspaper where, when and how it chooses. <u>City of Lakewood v. Plain Dealer Pub. Co.</u>, 486 U.S. 750 (1988) (White, J., dissenting) (quoting <u>Breard v. City of Alexandria</u>, 341 U.S. 622, 642 (1955)).

---

[25]    There was evidence produced at the Hearing that a wire newsrack, <u>not</u> a newspaper box, was located inside City Hall. This fact is irrelevant. *First*, a newsrack and a newspaper box are not equivalent. *Second*, since July 2007, no wire newsracks (like newspaper boxes) are permitted inside City Hall. Indeed, all free newspapers and periodicals are placed on the security desk at the north entrance of City Hall.

In <u>Gannett Satellite Information Network, Inc.</u>, the Second Circuit held that the Metropolitan Transportation Authority (the "MTA") could restrict Gannett's right to distribute its newspapers through newspapers in MTA stations. It discussed the restriction of such right as follows:

> [t]he extent to which MTA may restrict Gannett's right to depends upon how the station's public areas are characterized for the purposes of First Amendment analysis. Public property is divided into three categories for this analysis, each of which is governed by different First Amendment standards. 'At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. A second category consists of public property which the state has opened for use by the public as a place for expressive activity. <u>The third is '[p]ublic property which is not by tradition or designation a forum for public communication</u>.'

<u>Gannett Satellite Information Network, Inc.</u>, 745 F.2d at 772-773 (internal citations omitted) (quoting <u>Perry Education Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45-46 (1983) (emphasis added)).

The Second Circuit determined that the public areas of the MTA stations were in the <u>third category</u>, which could "still serve as a forum for First Amendment expression if the expression is appropriate for the property and is not 'incompatible with the normal activity of a particular place at a particular time.'" <u>Gannett Satellite Information Network, Inc.</u>, 745 F.2d at 773 (internal citations omitted)

(quoting Grayned v. City of Rockford, 408 U.S. 104, 1116 (1972)).  The Second

Circuit held that:

> [e]ven though MTA stations are appropriate forums for
> newspaper sales, MTA may impose reasonable time,
> place and manner restrictions on newspaper placement.
> '[R]estrictions of this kind are valid provided that they
> are justified without reference to the content of the
> regulated speech, that they are narrowly tailored to serve
> a significant governmental interest, and that they leave
> open ample alternative channels, for communication of
> the information.'

Gannett Satellite Information Network, Inc., 745 F.2d at 773 (internal citations

omitted) (quoting Perry Education Ass'n, 460 U.S. at 49 (emphasis added)).

In Jacobsen v. United States Postal Service, 993 F.2d 649 (9th Cir. 1993), the

court held that the government could move a newspaper box for public safety

reasons.

In the instant matter, the Court finds that City Hall is similar to the MTA

stations at issue in Gannett Satellite Information Network, Inc.  Indeed, City Hall is

public property which is not, by tradition or designation, a forum for public

communication.   City Hall does not serve as a forum for *unlimited* First

Amendment expression through the placement of newspaper boxes because such

boxes are incompatible with the normal activity of City Hall at a particular time.

Id.

Specifically, as set forth, <u>supra</u>, the facts demonstrate that newspaper boxes could present potential safety and security concerns.  The Court finds that the Defendants' prohibition of <u>all</u> newspaper boxes inside City Hall, the governmental hub of the City of Yonkers, while providing, reasonable alternatives for the dissemination of news *via* the placement of newspapers inside City Hall on the police security desk, including the Newspaper, is a reasonable time, place and manner restriction.  Such *limited* prohibition on the placement of newspaper boxes inside City Hall is reasonable and rational and based upon significant governmental interests to ensure that the health, safety and welfare of the residents of the City are not compromised.  The Court finds that the removal of the Guardian's newspaper boxes from City Hall and placing the Newspaper on the police security desk, therefore, was entirely proper.

Even assuming <u>arguendo</u> that City Hall is an appropriate forum for First Amendment expression through newspaper boxes, Defendants may impose reasonable time, place and manner restrictions on their placement.  <u>Gannett Satellite Information Network, Inc.</u>  The City has imposed such content neutral restrictions by permitting all newspapers and similar material to be left <u>inside</u> City Hall at the police security desk, rather than inside a newspaper box.  Moreover, the Guardian can place newspaper boxes (and in fact does to this day) on sidewalks throughout the City, including in close proximity to City Hall.  <u>See Heffron v. Int'l</u>

Soc. For Krishna Consciousness, 452 U.S. at 654-655.  This amply allows the Guardian alternative means to distribute the Newspaper without the safety and security concerns associated with newspaper boxes inside City Hall.

**C.    The City May Properly Restrict The Distribution Of**
**The Newspaper By Hand *Inside* City Hall And On**
**And Around The Steps Of City Hall And The Cacace Center**

"Content-neutral time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication."  City of Renton, 475 U.S. at 47.  Moreover, the First Amendment does not guarantee to the Plaintiffs "access to every or even the best channels or locations for their expression." Carew-Reid, 903 F.2d at 914 (citing Members of City Council of Los Angeles v Taxpayers for Vincent, 466 U.S. 789, 804 (1984)); Concerned Jewish Youth v. McGuire, 621 F.2d 471, 476 (2d Cir. 1980) (the city policy restrictions "impose only a minimal inhibition on the ability of [plaintiff] to communicate its ideas" in light of the many alternative channels available).

In this case, Defendants restricted by hand distribution of all newspapers inside City Hall, on the steps of City Hall and the immediate surrounding areas (in close proximity to steps and entrances) and in the immediate surrounding area of the Cacace Center.  This is a very limited restriction on the Guardian's ability to distribute the Newspaper.  The Court finds that this limited restriction is content

neutral, is narrowly tailored and provides ample alternative channels for the Guardian to distribute the Newspaper, to wit, virtually every other public forum throughout the City.

The Court finds that City Hall and its steps and in front of the Cacace Center are but two buildings and two limited areas, in an otherwise vast City which provides many alternative opportunities for the Guardian to distribute the Newspaper — which the Guardian takes advantage of daily to this very day. In fact, the only other restriction on the distribution of the Newspaper or any periodical by hand in the City is on the City's streets (i.e., in traffic). Indeed, as set forth supra, there was ample testimony at the Hearing wherein numerous employees of the Guardian testified that when they distributed the Newspaper on sidewalks in the City (traditional public forums) they were permitted to do so. These actions speak volumes.

Underlying the City's determination to limit the distribution of items such as the Newspaper on the steps of City Hall and the Cacace Center and the immediate surrounding areas is to avoid interruption with governmental business, to avoid safety concerns and to avoid potential security risks. As such, these limited regulations "… serve[s] purposes unrelated to the content of expression" and therefore "is deemed neutral even if it has an incidental effect on some speakers or

messages but not others." Housing Works, Inc. v. Kerik, 283 F.3d 471, 487 (2d Cir. 2002) (quoting Rock Against Racism, 491 U.S. at 791).

The Court finds that Defendants limiting the distribution of all newspapers, including the Newspaper, inside City Hall, on the steps of City Hall and in front of the Cacace Center, and the immediate surrounding areas, is a permissible reasonable time, place and manner restriction on publishers', including the Guardian's, First Amendment rights.

Finally, but not in anyway to be diminished as trivial, Mr. Zherka and Sunday were repeatedly videotaping City Hall and the Cacace Center. Videotaping public buildings pose serious public safety issues.    While the videotaping in this case may have been to bolster Plaintiffs' case, videotaping public buildings for any reason poses real security and safety concerns for law enforcement officials and should not be condoned.

### D.    The City's Actions Were Narrowly Tailored

The requirement of narrow tailoring of a regulation is met if the regulation promotes a substantial government interest that would be achieved less effectively without the regulation.    Ward v. Rock Against Racism, 491 U.S. 781 (1989). "Furthermore, if the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns

some less-restrictive alternative to the regulation." Carew-Reid v. Metropolitan Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990).

The Supreme Court has recognized the strong interest of state and local governments in preserving the quality of community life. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Mastrovincenzo v. City of New York, 435 F.3d 78, 99 (2d Cir. 2006) (New York City's licensing requirements for street vendors was a valid, content-neutral speech restriction because, inter alia, it aimed to keep the public streets free of congestion for the convenience and safety of its citizens); United for Peace and Justice v. City of New York, 243 F.Supp.2d 19, 26 (S.D.N.Y. 2003) ("Any event involving a large number of people presents a risk to safety and security. This risk can be reduced to a reasonable one through planning, security measures and policing").

The City's reasonable time, place and manner restrictions are narrowly tailored to achieve that goal. Indeed, the Guardian's newspapers were not prohibited from City Hall; rather, only newspaper boxes were prohibited.

<u>**Point IV**</u>

**THE CITY'S ACTIONS, ISSUING A LIMITED NUMBER OF SUMMONSES TO INDIVIDUALS DISTRIBUTING THE NEWSPAPER *IN THE STREET* AND REMOVING NEWSPAPER BOXES FOR <u>SAFEKEEPING, WERE PROPER</u>**

**A.    The City's Issuance Of Summonses And Removal Of <u>Newspaper Boxes For Safekeeping Were Content Neutral</u>**

As an initial matter, Plaintiffs fail to facially challenge any City regulation or ordinance, nor do they reference any such regulation and ordinance in the Complaint.  At most, the alleged actions of the City and its officials and employees attempt to merely regulate "the places where some speech may occur."  <u>Hill v. Colorado,</u> 530 U.S. 703, 719-720 (2000); <u>see also</u> <u>Housing Works, Inc</u>.[26]

The Court finds that the limited actions of Defendants — the removal of newspaper boxes haphazardly placed throughout the City blocking the City's rights-of-way and the issuance of two summonses to Guardian employees distributing the Newspaper in City streets and <u>not</u> on the sidewalks, in violation of both the City Code and New York State's Vehicle and Traffic Law — were content neutral.  In fact, any allegation to the contrary is belied by the actual facts of this case.

As stated earlier, as far back as September 2006, the Newspaper began publishing articles critical of the City and its police department with no action

---

[26]    As set forth throughout this submission, Plaintiffs continue to place newspaper boxes and distribute the Newspaper daily in various areas throughout the City to this very day.

taken by the City.  If the City's actions were improperly motivated and content based, the City would have removed newspapers boxes from City sidewalks in September or October, 2006.  However, Guardian newspaper boxes were not removed (and subsequently returned to Plaintiffs and placed back on City property) until nearly a year later in August 2007.

While a limited number of newspaper boxes were removed from City Hall in mid July 2007, the first newspaper box was not removed from a City sidewalk until July 12, 2007 when Mr. Smith placed a newspaper box, blocking pedestrian traffic, at a busy bus stop in Getty Square.  Importantly, other than this isolated incident on July 12, 2007, newspaper boxes were not removed from City sidewalks until early August 2007.  See DX **N**, DX **P** and DX **Q**.  This is so even though negative stories were run about the City and the Mayor in September/October 2006 and July 5-12, 2007.

The Court concludes that if newspaper boxes were removed from City streets on a large scale in July 2007, Mr. Smith would have informed Mr. Zherka of same and a letter would have been written to the City complaining about the removal of newspaper boxes in early-mid July 2007.  This, however, did not occur. The first letter complaining about the removal of Guardian newspaper boxes was not forwarded to the City until August 2, 2007, nearly one month after the Guardian again published negative articles about the City and Mayor Amicone and

this letter concerned only 6 boxes (including, 3 from City Hall and 1 from the Cacace Center).  <u>See</u> Exhibit **N**.

Moreover, the facts demonstrate that the Guardian newspaper boxes were removed only after Mr. Zherka himself brought undue attention to his publication and the scrutiny of the Yonkers Police Department and the Department of Public Works cluttering the City with additional newspaper boxes and parading around the City and City Hall videotaping City employees.  The Court finds that Guardian newspaper boxes, in mid July to early August, were placed haphazardly throughout the City, potentially blocking pedestrian traffic and were removed for safety concerns.  Plaintiff failed to establish anything to the contrary.

Finally, the Court finds that Guardian employees were directed not to hand out the Newspaper in the street for safety reasons, not because of the content of the Newspaper.

Accordingly, the Court finds that the facts demonstrate that Defendants' removal of newspaper boxes and issuance of a limited number of summonses to Guardian employees were content neutral.

**B**.    <u>**The City's Actions Were Narrowly Tailored**</u>

At the Hearing, it was established that summonses were only issued to a very limited number of Guardian employees who (i) distributed the Newspaper <u>inside</u> City Hall and on or immediately around the steps of City Hall and

immediately outside the Cacace Center; (ii) distributed the Newspaper in the City streets and not on the sidewalks; and (iii) installed a newspaper box in front of a bus stop.   In addition, as instructed by Commissioner Liszewski, Guardian newspaper boxes that were removed and subsequently returned to Plaintiffs were only those impermissibly and potentially dangerously blocking the City's rights-of-way.   These actions are narrowly tailored to ensure the safety of the residents of the Village.  Importantly, no Guardian employee was arrested for any conduct.

By requesting the Court to permanently enjoin Defendants from "interfering" with Plaintiffs' distribution and/or dissemination of the Newspaper within the City, Plaintiffs are essentially contending that they should be able to place newspaper boxes and distribute the Newspaper anywhere they please within the City.  The Court finds that such contention is contrary to law.

In Jacobsen v. United States Postal Service, 993 F.2d 649 (9th Cir. 1993), the Ninth Circuit held that (1) newspaper boxes could be removed from municipal sidewalks that were public fora for safety reasons; and (2) ingress-egress sidewalks on federal land outside post offices were nonpublic fora from which newspapers could be removed.   The Ninth Circuit determined that there was adequate justification for moving plaintiff's newspaper, which was situated in the middle of the sidewalk, to an area out of the way of foot traffic.  Id.  The court reasoned that

there was heavy traffic in that area at various times during the day and a person could have bumped into it rather easily.

Newspaper boxes were removed and returned which were haphazardly placed throughout the City in mid-July and early August, blocking City rights-of-way and pedestrian traffic in violation of City Code § 33-4B.

Summonses were issued to Guardian employees (other than the before mentioned summonses issued inside City Hall, directly outside City Hall and the Cacace Center) for those employees who impermissibly and potentially dangerously distributed the Newspaper on City streets and not on the sidewalks. These isolated actions were narrowly tailored, reasonable and rational, and based on the City's interest to ensure that the health, safety and welfare of the residents of the City (as well as the employees themselves) were not compromised.

Accordingly, the facts demonstrate that the City's removal of newspaper boxes and issuance of summonses to Guardian employees were narrowly tailored.

## C.     The City's Actions Provided Ample Alternative Channels Of Communication For The Guardian

Defendants' actions in restricting (i) the placement of newspaper boxes to prevent the blocking of City rights-of-ways; and (ii) the distribution of the Newspaper inside and around City Hall and the Cacace Center and in the street, undoubtedly leave Plaintiffs with ample alternative channels to disburse the Newspaper.

The best evidence of this is that despite Plaintiffs' claims that they are being "chilled" in their exercise of their First Amendment rights, Guardian newspaper boxes, to this very day, are on the public sidewalks throughout the City and Guardian employees distribute the Newspaper daily, to this very day, throughout the City. Indeed, the evidence demonstrates that tens of thousands copies of the Newspaper (if not more) have been distributed in the City. The City did no more than necessary to promote its governmental interests in keeping rights-of-way unobstructed (and City Hall/Cacace Center/streets safe), and the City's efforts to accomplish these goals left open ample alternative channels for the Plaintiffs.

The First Amendment does not preclude the City's efforts to regulate the Newspaper's distribution, be it by hand or in newspaper boxes, to ensure public safety for its residents and to ensure free and unobstructed rights-of-way. In furtherance of these interests, the City has taken limited action (removing newspaper boxes improperly placed in rights-of-way and returning them to the Plaintiffs, and issuing limited summonses) aimed at controlling the placement of newspaper boxes and the distribution of the Newspaper throughout the City.

Again, the City is not attempting to prevent Plaintiffs' right to distribute the Newspaper (an admitted right protected by the First Amendment) rather the City is merely properly regulating the method of the distribution, i.e., the placement of

newspaper boxes so as to not block rights-of-way and prohibiting the distribution of the Newspaper on City streets (a right not protected by the First Amendment).

### Point V

### PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS

**A.    Plaintiffs Fail To State A Claim Of Selective
       Enforcement In Violation Of The Equal Protection Clause**

**1.    Plaintiffs Fail to Prove Selective Treatment**

To support their selective enforcement claim, Plaintiffs are required to allege and prove through factual instances that they were similarly situated to persons of a different group, but were nonetheless treated differently.    See Neilson v. D'Angelis, 409 F.3d 100 (2d Cir. 2005); Latrieste Restaurant v. Village of Port Chester, 188 F.3d 65, 69 (2d Cir. 1999).    The test for determining whether persons similarly situated were selectively treated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent.    Lisa's Party City, 185 F.3d at 16.    Because selective enforcement implies that a selection has taken place, conclusory allegations of selective enforcement are insufficient to state a claim.    See Johnson ex rel. Johnson v. Columbia University, 2003 WL 22743675, at *2 (S.D.N.Y. 2003) (citing Albert v. Carovano, 851 F.2d 561, 573 (2d Cir. 1988)).    Indeed, "mere failure to prosecute other offenders is not a basis for a finding of denial of equal protection."    LeClair v. Saunders, 627 F.2d 606, 611 (2d Cir. 1980).    The Second Circuit has clearly established that "equal

protection does not require that all evils of the same genus be eradicated or none at all." <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 684 (2d Cir. 1995) (citing <u>LeClair</u>, 627 F.2d at 608).

The Court finds that Plaintiffs' claim of selective enforcement fails as it <u>cannot</u> meet the threshold requirement of differential treatment.

*First*, during the Hearing, Plaintiffs mistakenly equate a wire newsrack with a newspaper box. They are not the same. A wire newsrack is simply an open wire rack in which no door or enclosure is present. A newspaper box is what the name implies — an enclosed structure closed on all four sides. For obvious security reasons, especially post September 11, 2001, all newspaper boxes, and now newsracks, are properly banned <u>inside</u> City Hall. This is not selective treatment because Defendants applied this to <u>all</u> newspaper boxes and newsracks.

*Second*, as set forth <u>supra</u>, the Newspaper is allowed to be left at the police security desk in City Hall. This is indeed the same and equal treatment, and not selective, that is afforded other periodicals and newspapers that wish to be disseminated inside City Hall.

*Third*, Plaintiffs' allegation that summonses were selectively issued only as and against employees of the Guardian News for distributing the Newspaper does not save Plaintiffs' claim. In order for Plaintiffs' selective enforcement claim to meet the legal standard, Plaintiffs need to allege that other persons distributing

newspapers or other periodicals in violation of the City Code, or in the street, or on the steps of City Hall, or immediately outside the Cacace Center, were not issued summonses. Plaintiffs did not allege this or submit any facts supporting this claim during the Hearing.

*Finally*, Commissioner Liszeski testified that in the past the DPW employees removed newspaper boxes (non-Guardian) from the sidewalks in the City that were blocking pedestrian traffic. This is what occurred here.

Accordingly, Plaintiffs' Fourteenth Amendment claim, brought as a selective enforcement claim, must fail because no evidence was submitted supporting any claim that Defendants treated Plaintiffs differently than similarly situated persons.

### 2.    Plaintiffs Fail To Allege Or Prove Impermissible Considerations

Even if Plaintiffs have sufficiently proved the first prong of a selective enforcement claim, which they do not, Plaintiffs' equal protection claim would still fail because Plaintiffs have not demonstrated that Defendants' treatment of Plaintiffs was motivated by "impermissible considerations." Lisa's Party City, 185 F.3d at 16-17. The second prong of the analysis for selective enforcement requires proof of impermissible motivation for disparate treatment. Bizzaro v. Miranda, 394 F.3d 82, 87-88 (2d Cir. 2005). A plaintiff advancing a selective enforcement claim "must demonstrate that a discriminatory purpose was a 'motivating factor' in

66

the government decision." Estate of Rosenbaum by Plotkin v. City of New York, 975 F.Supp. 206, 223 (E.D.N.Y. 1997) (quoting Village of Arlington Heights. v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265 (1977)).   To show a discriminatory purpose, it is not enough that a decision-maker chose a course of action in spite of its adverse effects on a group.  See Personal Adm'r of Mass. v. Feeney, 442 U.S. 256, 278-79 (1979) (foreseeable impact on protected class is not enough to prove intent to discriminate); Southside Fair Hous. Committee v. City of New York, 928 F.2d 1336, 1352 (2d Cir. 1991) (awareness of disparate impact does not prove discriminatory intent); Overhoff v. Ginsburg Dev., LLC, 143 F.Supp.2d 379 (S.D.N.Y. 2001).

Plaintiffs fail to submit any evidence whatsoever that establishes that the City and its officials and employees were motivated by invidious discriminatory practices, rather than by the best interests of the community.  What the evidence establishes is that the City, and its officials and employees were motivated, if at all, by legitimate and lawful considerations, i.e., to ensure the safety, health and general welfare of its residents.

Plaintiffs have failed to meet either prong necessary to prove its selective enforcement equal protection claim.  Accordingly, Plaintiffs' Equal Protection claim must be dismissed.

## Point VI

## THE DEFENDANTS ARE ENTITLED
## TO QUALIFIED IMMUNITY

Plaintiffs sued most of Defendants in their individual capacities.[27] The Court finds that the Defendants sued in their individual capacities, however, are entitled to qualified immunity with respect to Plaintiffs' claims against them.

Qualified immunity:

> protects government officials from civil liability when performing discretionary duties 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'

Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Kerman v. City of New York, 374 F.3d 93 (2d Cir. 1994)).

In order to determine whether qualified immunity applies "the threshold inquiry is whether the plaintiff's version of the facts 'show[s] the officer's conduct violated a constitutional right.'" Demoret, 451 F.3d at 148 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). If a plaintiff is unable to demonstrate the threshold inquiry, the analysis stops. Demoret.

If the initial threshold is met, the inquiry turns to whether the right was clearly established. Demoret. A defendant is:

---

[27]    All claims against Mayor Amicone and Commissioner Hartnett have already been dismissed for lack of evidence.

> entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law.  In other words, government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time.

Id. at 148-149 (internal citations omitted).

The Court holds that that Defendants sued in their individual capacities are entitled to qualified immunity because, as discussed above, Plaintiffs have not demonstrated that Defendants violated their constitutional rights.  Moreover, the Court finds that Defendants' actions were objectively reasonable.

*First*, it was objectively reasonable for P.O. Wood and P.O. Galinski to exclude the placement of newspaper boxes <u>inside</u> City Hall and provide an alternative means for the distribution of free newspapers *via* the placement of same on the City Hall police security desk.

*Second*, it was objectively reasonable for police officers to prohibit the distribution of newspapers by hand (i) <u>inside</u> City Hall and the immediate surrounding areas of City Hall and the Cacace Center and (ii) in the street.  These locations are very specific and were singled out to protect the health, safety and welfare of the citizens of the City and motorists.  Notably, there was not one single person issued a summons for handing out the Newspaper on the sidewalk.  In fact,

numerous witnesses testified that they were permitted to hand out the Newspaper on sidewalks.

*Third*, Commissioner Liszewski's directive to remove newspaper boxes blocking pedestrian rights-of-way was objectively reasonable. Moreover, the City returned the newspaper boxes two weeks later again instructing the Guardian on its local law, City Code Chapter 33-4.

*Fourth*, assuming Sanitation Workers #1 to #20 are sued in their individual capacities, it was objectively reasonable to remove newspaper boxes that were blocking pedestrian traffic and rights-of-way as requested by their superiors — Commissioner Liszewski. The City acted reasonably in removing the newspaper boxes, holding them for safekeeping and returning them to the Guardian two weeks later.[28] In addition, the fact that one or two newspaper boxes may have been removed by DPW employees that may not have been blocking the rights-of-way does not negate the Court's finding of qualified immunity.

*Finally*, Defendants were acting under their authority in enforcing the Yonkers City Code, which was at the time was and still is in effect. Notably, in this case, Plaintiffs have not challenged the constitutionality of the City Code. It,

---

[28]    Plaintiffs argue that the City could have simply moved the newspaper boxes. This, however, was not an option for the City. The City could not have simply moved the newspaper boxes because if they did so, the chains would necessarily have been cut and the newspaper boxes placed, <u>unsecured</u>, on the sidewalk. This could have potentially led to the newspaper boxes being stolen or blown over, creating a safety concern and hazard. The City, on the other hand, placed the newspaper boxes in a secure location and immediately notified the Guardian of the location of the newspaper boxes.

therefore, was objectively reasonable for Defendants to believe that their actions were lawful at the time.

Accordingly, all Defendants sued in their individual capacities are entitled to qualified immunity.

### Point VII

### PLAINTIFFS HAVE FAILED TO STATE A CLAIM PURSUANT TO 42 U.S.C. § 1983 AGAINST THE CITY/SANITATION WORKERS

**A.    Plaintiffs Fail to Meet the Standard Under *Monell***

As a threshold requirement, the first inquiry is whether a plaintiff has indeed been deprived of a constitutional right.  Baker v. McCollan, 443 U.S. 137, 140 (1979).  "If there has been no such deprivation, the state of mind of the defendant is wholly immaterial."  Id.  As shown by the foregoing, Plaintiffs have failed to establish that Defendants has violated either the Plaintiffs' First Amendment or Fourteenth Amendment Constitutional rights.  Therefore, Plaintiffs' claims must fail and the action must be dismissed in its entirety.

To state a claim under 42 U.S.C. § 1983, a complaint must aver that a person acting under color of state law committed acts that deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States. See Parratt v. Taylor, 451 U.S. 527, 535 (1984), overruled by Daniels v. Williams, 474 U.S. 327 (1986) (on other grounds).  The City and Sanitation Workers # 1 to #20 can be held liable only if it is shown that the alleged unconstitutional action

was taken pursuant to an officially adopted policy or custom.  <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690-91 (1978).

To establish the existence of a municipal policy or custom, the plaintiff must prove: (1) the existence of a formal policy officially endorsed by the municipality; (2) a failure by policymakers to properly train or supervise their subordinates as to display a deliberate indifference to the rights of those within its jurisdiction; (3) actions taken or decisions made by municipal officials with final decision making authority; or (4) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials. <u>See</u> <u>Prowisor v. Bon-Ton, Inc.</u>, 426 F.Supp.2d 165 (S.D.N.Y. 2006); <u>Maneely v. City of Newburgh</u>, 256 F. Supp.2d 204, 212 (S.D.N.Y. 2003).

Even assuming <u>arguendo</u> that Plaintiffs have alleged incidents of unconstitutional activity and that they established the existence of a constitutional violation in this matter, which they have not, Plaintiffs must demonstrate "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989), <u>abrogated by</u> <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) (on other grounds).  Plaintiffs must show that the municipal policy was the "moving force behind the constitutional violation." <u>Id</u>. at 389.  Conclusory allegations of a pattern or policy of

unconstitutional behavior are insufficient to assert or prove a § 1983 claim.  Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir. 1998).

As shown herein, the facts are devoid of the existence of a municipal policy or custom such as would satisfy Plaintiffs' burden.  Indeed, the City's officials merely directed subordinates to: (i) remove blue boxes blocking the right of way in violation of Yonkers City Code § 33-4B; and (ii) issue summonses to individuals handing out newspapers in the street and direct said individuals to cease said activity.  These directives, assuming they qualify as a City policy, are not violative of the First Amendment, but rather, reasonable time, place and manner restrictions.

Accordingly, Plaintiffs have failed to state a claim against the City and Sanitation Workers # 1 to #20.

## B.    Plaintiffs Have Failed To Establish Municipal Liability Under *Monell*

Plaintiffs have failed to demonstrate by a preponderance of the evidence that the City had any custom, policy or practice implicating Monell.  The only act of the City that could possibly be alleged to have directly affected Plaintiffs were phone calls to the DPW Facility directing sanitation workers to remove Guardian newspaper boxes "blocking the right of way."  These phone calls were not an official City policy implicating Monell.  Rather, they were a directive to deal with a specific potential safety hazard.

The mere fact that the City removed Guardian newspaper boxes improperly placed in the City rights-of-way (and returned them to the Guardian shortly thereafter) does not possibly amount to a policy sufficient to satisfy Plaintiffs' burden under Monell.

It could also hardly be argued that a City policy existed in issuing summonses. Indeed, only fourteen summonses were issued to Guardian employees by Police Officers with no evidence of any directive from Commissioner Hartnett or First Deputy Chief Gardner. The Guardian employees also readily admit to distributing the Newspaper on a daily basis throughout the City. Accordingly, the facts simply do not support a claim under Monell regarding the issuance of summonses.

Finally, there is no evidence that any policy exists implicating Monell concerning the removal of newspaper boxes from inside City Hall. The evidence demonstrates that newspaper boxes are not permitted inside City Hall because of safety and security reasons. Even if evidence exists that this is an official policy of the City implicating Monell, the prohibition of newspaper boxes from inside City Hall and placing the Newspaper on the security desk is a reasonable time, place and manner restriction.

Accordingly, Plaintiffs' claims against the City and Sanitation Workers # 1 to #20 should be dismissed in their entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully requested that the Court dismiss Plaintiffs' Complaint seeking a permanent injunction and grant Defendants reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Dated: White Plains, New York
        December 19, 2007

                            Respectfully Submitted,

                            THACHER PROFFITT & WOOD LLP


                            By:      s/ Kevin J. Plunkett
                                 Kevin J. Plunkett
                                 Darius P. Chafizadeh
                                 *Attorney for Defendants*
                                 50 Main Street
                                 White Plains, New York 10606
                                 (914) 421-4100

Of Counsel:
Andrew B. Zinman