UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE GUARDIAN NEWS, INC. and SELIM
ZHERKA,

                              Plaintiffs,

                                                            07 Civ. 7078 (CLB)

              - against -                                   *Memorandum and Order*

PHILIP AMICONE, individually,
EDMUND HARTNETT, individually,
JOHN A. LISZEWSKI, individually,
CITY OF YONKERS, New York,
PAUL WOOD, individually, POLICE
OFFICERS JOHN DOE'S #1 to #20,
individually, and SANITATION WORKERS
#1 to #20,

                              Defendants.
------------------------------------------------------------x
Brieant, J.

        The Court makes the following findings of fact and conclusions of law following a bench

trial before the Court, held pursuant to Fed. R. Civ. Pro. § 65(a)(2).  The matter was tried to the

Court, without a jury, on November 13 and 14, 2007.  Decision was reserved, and post trial

submissions have been received and considered.


                              **Findings of Fact**

        The Westchester Guardian (the "Guardian") is a regularly conducted weekly publication

that is distributed free throughout Westchester County and elsewhere.  Plaintiff Selim Zherka is

the president and owner of the Guardian.  The Guardian is a publication aimed at voicing

opinions and statements about local governments and political issues throughout Westchester

County, including within the City of Yonkers.  The Guardian began publication in August 2006,

and has distributed its paper every Wednesday throughout Yonkers, *via* blue metal newspaper boxes.  Mr. Zherka testified that there are approximately thirty-five to forty Guardian boxes placed throughout Yonkers and that he helped with the placement of all the boxes.

In late September and early October 2006, the Guardian ran front page articles that were highly critical of the Yonkers Police Department.  In essence, the articles alleged police brutality and corruption.  There were no problems with distribution during this time.  Beginning with the July 5, 2007 edition, the Guardian began running negative front page articles which portrayed the incumbent administration of the City of Yonkers, its police department and Defendant Mayor Philip Amicone, in particular in a bad light.  It was around this time that Mr. Zherka contends the newspapers, as well as the blue boxes from which they were distributed, "began disappearing throughout Yonkers" (Tr. at 16).  Mr. Zherka testified and I find that as a result, he installed replacement boxes and hired some teenagers to help him distribute copies of the Guardian by hand at various locations throughout the Yonkers, including at and around:  Yonkers City Hall, the Cacace Justice Center and at Yonkers Avenue near the Central Avenue intersection. Yonkers City Hall houses the Offices of the Yonkers City Mayor, the Yonkers City Council and the Yonkers City Corporation Counsel.  The Cacace Justice Center houses the Yonkers City Court as well as the Yonkers City Police Headquarters.

There are two entrances to Yonkers City Hall; the north and east entrances.  There are stairs leading up to City Hall at the east entrance.  There are no stairs leading to the north entrance doorway.  There is a police desk inside City Hall close to the north entrance.  This

police desk has, and currently does, allow newspapers and publications to be placed for regular dissemination. On re-direct examination, Mr. Zherka testified and I find that no identification is needed when entering Yonkers City Hall, and there are no metal detectors or weapons inspections, although the police officers patrolling the building are armed.  On cross-examination, Mr. Zherka testified that the police officers told him that he could place his papers on the police desk for free dissemination, and that he did so regularly, along with other free publications which were distributed in the same way.

In early July 2007, Mr. Zherka sent one of the teenagers in his employ, Richard Guzman, to City Hall to place copies of the Guardian on the police desk.  The next day, Zherka went to City Hall and observed that Guardian papers were not among the other publications placed on the police desk for public access.  Plaintiff Zherka's testimony expressed a belief that, although the police officers in City Hall were encouraging him to leave the Guardian on the police desk for distribution, Plaintiffs' papers were, in fact, confiscated.  Plaintiff testified that he would place bundles of seventy-five (75) Guardian Newspapers on the police desk, and hour later, they would all be gone.  Mr. Zherka testified that he then went back to his office to retrieve a newspaper box, which he brought back to Yonkers City Hall.  Mr Zherka was accompanied back to City Hall by one of his employees, Dominica O'Neil.  Mr. Zherka testified that he asked the police officer at the police desk where the Guardian papers were, to which the police officer said he didn't know.  On cross-examination, Mr. Zherka testified that after returning with the news box, he lied to the police officer in City Hall, telling him that he was there installing the news box for "his boss".  The police officer on duty, Officer Paul Wood, testified that Mr. Zherka said

3

that his boss wanted to know the boxes were delivered, so he needed to take pictures of the boxes within City Hall.  Mr. Zherka then attempted to place the news box in City Hall.  While he was doing so, a "janitor" told him that he could not leave the news box there, but Mr. Zherka left the box there anyway.

The next day or a few days later, Mr. Zherka testified that he returned to City Hall and discovered that the box he had left was not there.  Mr. Zherka saw that there was a small wire news rack in the stairway of the City Hall building with various publications in it, including "City of Vision" and "Home News and Times".  Upon discovering that his news box was no longer where he left it, Mr. Zherka installed another news box across from the wire rack that was already in the City Hall building.  Mr. Zherka testified that the installation of this box did not impede pedestrian traffic.  Mr. Zherka returned to City Hall a few days later, and again found that his newly installed box was no longer where he had placed it.  This time, Mr. Zherka installed a "desk top wire rack, smaller than what was there" across from the wire rack in the stairway, and placed Guardian papers on that wire rack.  Upon returning to City Hall in the following days, Mr. Zherka testified that he found his wire rack, with all the papers scattered behind a sign within the building.  On cross-examination, Mr. Zherka testified that he never saw any newspaper boxes in City Hall, however, he did see the wire news rack that was used to distribute city publications.  Plaintiff further testified that this wire rack had no specific publication name designated to it and it was not removed from City Hall until late August of 2007.

4

Plaintiff testified that this time, he insisted on speaking with Mayor Amicone. Plaintiff, accompanied by Ms. O'Neill videotaping, walked into the Mayor's office demanding to see the Mayor because they "wanted to find out what was happening to their racks and paper". After the Mayor's secretary told them that the Mayor was "not in", David Simpson and Deputy Mayor William Regan told them to leave, which they eventually did.

Plaintiff Zherka testified, and I find that around this time, Guardian news boxes continued disappearing throughout the City of Yonkers, including boxes positioned in the parking lot of the Cacace Justice Center. Plaintiff testified that he attempted further communication with City Hall to find out what was going on, but the only response that he received was "We didn't take them. Maybe someone doesn't like you."

On August 9, 2007, Plaintiff was distributing the Guardian News outside of City Hall when a Yonkers police office, in uniform, told him that no papers were allowed on the property and asked him to stop. Plaintiff received a summons for violation of Yonkers City Code 100-35. The police officer told Plaintiff that he would be arrested if he continued to distribute the Guardian on the steps of City Hall or in the street.

Plaintiff Zherka received a second summons outside of City Hall on August 6, 2007, from the same police officer. While he was walking up the stairs to City Hall, but before he had distributed any papers, the police officer approached him and said "You know I have to give you a summons." Plaintiff has appeared in City Court several times due to these summons.

5

On August 2, 2007, Richard Blassberg, editor-in-chief of The Westchester Guardian, sent a letter to Yonkers Commissioner John A. Liszewski, with copies to Mayor Amicone and Police Commissioner Edmund Hartnett, informing them of Plaintiffs' belief that six Guardian News distribution boxes were confiscated from the area around City Hall and the Cacace Justice Center. The letter requested correspondence detailing where the boxes where being held and when a Guardian employee could retrieve them.

On August 7, 2007, Mr Blassberg sent another letter explaining that since that date of the last correspondence, five additional Guardian boxes were confiscated. These boxes were located on various street corners throughout the city of Yonkers. Again, Mr. Blassberg asked for information on the whereabouts and procedures for picking up the boxes. On August 10, 2007, Mr. Blassberg wrote a third letter claiming that a total of fifty-six (56) Guardian boxes had been removed, many of which had been in place for over one year, without justifiable purpose, and demanded immediate return of all confiscated boxes.

On August 21, 2007, approximately twenty days after the first letter sent on Plaintiffs' behalf, counsel for the Defendants wrote to Plaintiffs' counsel advising "that the City of Yonkers is in possession of approximately 33 'newsracks' which we believe belong to your client". The letter continues that the "newsracks" were removed because they were not in compliance with City regulations and that in order for Plaintiff to retrieve the "newsracks", he must contact Commissioner Liszewski, as well as submit proper identification to the City.

On August 23, 2007, Mr. Zherka went to pick up the thirty-five (35) confiscated Guardian news boxes, located at the Department of Public Works ("DPW") location at Lake Street, in Yonkers. Plaintiff testified that he videotaped Eddie Mayor, a DPW employee, while asking him questions, even though he told Mr. Mayor that he was not recording the conversation. Mr. Mayor was not called as a witness. Plaintiff provided the video tape, which showed that many of the boxes were scratched and dented and some of the windows would not open. Some of the boxes still had Guardian papers in them with dates spanning from mid-July through mid-August.

There was never a due process hearing held by the City or any defendant in relation to the news boxes that were taken off the City streets and brought to DPW and no administrative appeal was taken as to the seizure of the Guardian news boxes. No evidence was presented establishing that the Defendants had sent any notification to The Westchester Guardian alerting that such boxes were in violation of City Code, or giving an opportunity for the Plaintiffs to correct any such violation prior to the removal of the news boxes. Yonkers City Code § 33-5 requires such notification and a three day window for distributors to correct any violation prior to the Corporation Counsel directing the removal of such news boxes by the Department of Public Works.

On cross-examination, Plaintiff Zherka testified that he knew every location of every Guardian News box within the City of Yonkers but that he had no list of the boxes and their locations. He also testified that when installing many of the boxes in August 2006, he was

unaware of the 1979 Yonkers Code Ordinance that regulates news boxes on the City's streets and did not become aware of this regulation until the commencement of this lawsuit.

During his direct examination, Edmond Fitzgerald, Yonkers Corporation Counsel's Law Case Investigator for sixteen years, testified, and I find, that during August and September of 2007, he took pictures of the Guardian News boxes at the direction of Frank Rubino.  Mr. Fitzgerald testified that he was asked to photograph the "blue news boxes" and he did not remember photographing any other news boxes other than Guardian boxes.  He further testified that he was not asked to photograph any Guardian boxes in 2006, the year prior.  These photos taken were among the various exhibits provided to the Court.  Mr. Fitzgerald testified that none of the Guardian boxes that he photographed were in the middle of the sidewalk.  Mr. Fitzgerald also took pictures of the Guardian boxes that were confiscated and brought to the DPW location at Lake Street and examined the serial numbers of these boxes to make sure that none were missing.

On direct examination, John Liszewski testified and I find that he is the Commissioner of Public Works for the City of Yonkers.  Prior to 2006, he gave no direction to remove any Guardian News boxes.  However, in July or August of 2007, he gave orders to remove "any blue box" that was blocking the right of way.  Mr. Liszewski conceded that the only boxes seized turned out to be Guardian boxes.  He testified that he gave such orders as a result of an email he received on August 13, 2007 from Steven Sasson, the Director of Downtown Business Improvement District.  The email stated that "There are numerous newspaper boxes chained to

8

polls [sic] in the downtown and find it hard to believe that they are done with permission from the city. Is there a way to check or have them removed. I have already found two....They are for the Westchester Guardian. I am also having one of my Rangers assess the entire BID area to identify others. They are brand new, which is why it caught my attention...."

Mr. Liszewski also conceded that he received a complaint from the Mayor's office that the Mayor's Chief of Staff, Lisa M., saw blue boxes in two locations on Bronx River Road that were "impeding her walk". He testified that Lisa said that the boxes were not there and then they appeared. Mr. Liszewski testified that he asked her whose boxes they were, and she didn't mention, nor did he ask her the location of the boxes on the sidewalk. Mr. Liszewski gave a work order to Robert Greco, a maintenance mechanic, to "remove blue newspaper boxes blocking right of way". Mr. Lisewski also testified to a "radio log" recording made when a person called regarding "blue boxes", although he doesn't remember who the call was from, only that it was from someone credible. Mr. Lisewski testified that he never saw the blue boxes on Bronx River Road. He further testified that no officers that he dispatched with removal orders, ever came back to ask exactly which blue boxes were to be removed. The Commissioner testified that that was because they could tell that the boxes to be removed were new. When shown a picture of a Guardian box chained to a bus stop that was siezed, the Commissioner admitted that the bus stop, as well as the street light fixture next to the bus stop also impedes pedestrian traffic. (Pl. Ex. 123).

The Commissioner also testified that on a Friday in July or August 2007, at 5:00 pm, he

9

spoke to Mayor Amicone.  During that conversation, Mr. Liszewski testified that the Mayor said

that there were two more of those blue boxes on Central Avenue by the Will Library.  Liszewski

did not recall exactly what language was used or if "Guardian" was mentioned.  The

Commissioner testified that, although the Library is not owned by the City, he sent someone over

to check for a "public safety hazard".  He testified that there was no documentation of a public

hazard but did not remember if the boxes at the Library were seized by his department or

removed by the Library.  On cross-examination, Mr. Liszewski contended that no order was

based on content of the paper, and no one ever discussed the content of the paper with him.


On direct examination, Charles Gardner testified that he is, and has been the First Deputy

Chief of the Yonkers Police Department for three years.  He testified that no news racks were

seized during 2006.  On July 17, 2007, he learned from either Mr. Rubino or Mr. Precari of the

Yonkers Corporation Counsel that people were distributing printed materials inside City Hall in

violation of Yonkers City Code § 100-35.  As a result, Chief Gardner contacted the Fourth

Precinct, which sent a supervisor over to City Hall with the instruction to contact Corporation

Counsel before issuing summonses. Two summonses were issued on that day, both for violation

of Section 100-35.


Chief Gardner testified that at the time of issuing the summonses, he was somewhat

familiar with Article 33 of the Yonkers Code on news racks, although he was not aware that a

permit was not required.  He testified that he has read that section since that time.  He further

testified that he read the last sentence of section 100-35 to mean that there were no exceptions

allowed for distribution of printed material on public property.

Although he testified that he read Section 100-35 to provide no situation where printed material could be distributed without a permit on public property, on August 21, 2007, Chief Gardner issued an All Commands memo on the subject of Distribution of Newspapers on Public Sidewalks and Roadways. The first point was that "NO Summons shall be issued for the distribution of newspapers on public sidewalks, as long as the people involved do not encumber or obstruct the public sidewalk". The second point stated:

> In accordance with the provisions of Sections 1156 and 1157 of the N.Y.S. Vehicle and traffic Law, no person shall walk along or upon a public roadway in order to distribute newspapers or solicit vehicle occupants to take their newspapers. Police Officers shall direct any persons doing so to return to the sidewalk for their own safety and that of the passing motorists. Any persons willfully failing to comply with such direction or order shall be given a City Ordinance Summons for a violation of Yonkers City Code Section 109-48, Obedience to Police.

 (Pl. Ex. 87). No witness was issued a summons for violation of Section 109-48, however, Maumer Kllapija was issued a summons for violating Section 100-35 of the Yonkers City Code for distributing newspapers in the street after being advised by a Police Officer to stop because a City permit was required for that type of distribution.

Daniel Barahona, a Yonkers Police Officer, testified on direct examination that prior to reading section 100-35 he issued summonses to people handing out the Guardian. He testified that he was told by Officer Perrotta of the third precinct to issue summonses under this section to anyone handing out newspapers on public property. Officer Barahona testified that he issued a summonses to Richard Guzman for handing out issues of the Westchester Guardian "to

passersby in front of the courthouse" approximately seventy-five (75) feet from the entrance. Barahona testified that he asked Guzman if he had a permit because Officer Perrotta told him that the statute so required.

That same day, Barahona issued a summons to Nicole Pacheco because she was handing out newspapers. He asked her for a permit, but denied that he ever said anything to her about "jail time". He further testified that he told Nicole and Richard to stop handing out the newspapers but they refused to leave until they were issued summonses, at which time they immediately left and took the papers with them. On cross-examination, Barahona testified that he did not know the contents of the newspaper at the time he issued the two summonses.

Officer Barahona contended that Richard and Nicole were blocking pedestrian traffic of the people going to and from the courthouse, however on cross-examination, he testified that the sidewalk at that location is approximately four to five feet wide. On re-direct, Officer Barahona testified that he did not issue any summons for blocking pedestrian traffic. Both summonses issued by Barahona were issued for violation of 100-35, and read "defendant distributing newspapers on public property without proper permits." The last sentence of section 100-35 concerning distribution by hand contains no provision requiring obtaining a permit.

On direct examination, Robert Greco testified that he is the Public Works Coordinator for the City. In this position, he is involved with parades, special events that take place within the City, as well as constituent complaints. On August 10, 2007, he learned from Commissioner

Liszewski that there was a Guardian news box on the step of the Will Library that needed to be removed.  Mr. Greco testified that he does not know whether the Will Library is owned by the City of Yonkers. He further testified that although the Commissioner described the box as "blue box", everyone is the Department "knew that they were Guardian news rack boxes".  Greco called Dave Mason, Manager of the Street Cleaning Department to remove the box.

The next day, August 11, 2007, the Commissioner called Greco and told him to remove boxes on Yonkers Avenue blocking traffic.  Mr. Greco called in this order and did not personally see any news boxes blocking the right of way.  He testified that he had no knowledge that the boxes removed were blocking the right of way. The order he called in was to remove any blue boxes that were blocking the right of way.  Mr. Greco testified that all of the Guardian news boxes he knew of were chained to existing fixtures on the sidewalk. Mr. Greco also testified that he did not follow up on his directive.

Police Officer Paul Wood testified that he has been a Yonkers Police Officer for twenty-two years.  Officer Wood testified that he issued seven or eight summonses pursuant to Yonkers City Code after July 2007, to various people for handing out newspapers approximately eighteen feet from both entrances of City Hall.  Prior to issuing those summonses, Officer Wood spoke to Sergeant McCormick of the Fourth Precinct who alerted Wood to the existence of Section 100-35.  Officer Wood never issued a summons for violation of that section prior to that date.

On July 11, 2007 P.O. Wood issued a summons to Cesar Castillo for violating Section

13

100-35 by "handing out printed matter inside City Hall to passer bys", near the north doorway.

On August 1, 2007, P.O. Wood testified that he issued a summons to Dominica O'Neil for

handing out the Guardian approximately eighteen feet from the doorway for City Hall.  Also on

August 1, 2007, P.O. Wood issued a summons to Maribel Ayala for handing out Guardian papers

on the north side of city hall approximately eighteen feet from the doorway.  He testified that he

showed her the city ordinance and told her if she left then, he wouldn't give her a summons.

P.O. Wood also issued a summons to Selim Zherka on August 1, 2007, for handing out

newspapers approximately eighteen feet from City Hall entrance. On August 6, 2007, P.O. Wood

issued another summons to Dominica O'Neil for handing out Guardian Newspapers. He testified

that this time, she was standing at the bottom of the steps leading up to City Hall, but not on the

steps.  He did not ask her if she had a permit.  He testified that he also showed Ms. O'Neil a

copy of the ordinance and gave her an opportunity to leave, but did not mention jail time. On that

day, Officer Wood also issued another summons to Mr. Zherka for handing out Guardian

Newspapers approximately eighteen feet from the entrance of City Hall. Officer Wood testified

that he asked if Mr. Zherka had a permit, showed him section 100-35 and told Mr. Zherka that

his conduct was illegal.  Mr. Zherka replied that Section 100-35 was unconstitutional, to which

Officer Wood replied "its not for them to decide" and that he had to issue a ticket. P.O. Wood

testified that there was a "Standing Order" to write such summonses.


On August 6, 2007, P.O. Wood also issued summonses to Michael Estrada and Richard

Guzman, both for violating Section 100-35 by distributing the Westchester Guardian News

papers approximately eighteen feet from the entrance of City Hall.

14

P.O. Wood testified that although he knew about the paper, he did not issue any of the summonses because of the content of the paper, and no one ever told him to remove the paper or issue summonses because of its content.  He testified that he never saw anyone steal or take the Guardian Newspapers off the police desk. He also testified that the security desk post was a "mobile post" and there were times when the desk was uncovered.  P.O. Wood testified that he saw Plaintiff put at most 25 to 50 papers once a week on the desk and then later, once a day, and although he wasn't there all the time, the bundles placed on the desk never disappeared.

P.O. Wood testified that the security measures at City Hall vary depending on who someone is, how they are known and where within the building they are going. He testified that unknown persons are required to produce identification and that some people are required to sign into a book at the police desk.  He further testified that the presence of Guardian news boxes in City Hall pose a  "9-11 security risk" and terrorist threat, because anything could be put in the boxes and be out of sight.  P.O. Wood testified that there were two Guardian boxes on the East and North side of City Hall leaning up against the building and that he would look inside the boxes and pick up the papers a number of times during the week, but never turned the boxes over or reported these "inspections".  P.O. Wood testified that no one told him of the "perceived threat" of news boxes within City Hall.

On July 9, 2007, P.O. Wood testified that Mr. Zherka entered City Hall with a Guardian news box and told Officer Wood that he had to show his "boss" that he delivered the boxes and so needed to take pictures of the boxes within City Hall.  P.O. Wood testified that no boxes were

15

allowed in City Hall prior to that date, although periodicals were always allowed on the police

desk.  On redirect, P.O. Wood conceded that there was no written policy forbidding news racks

in City Hall, nor did he ask anyone if they were forbidden.


David Simpson testified, and I find, that he is the Director of Communications for the

City of Yonkers for two years and that his job entails dealing with the media and fielding

reporters' questions about the City and its administration and policies.  In late August of 2007,

when reporters from Channel 12 News and the Gannett newspaper asked Mr. Simpson questions

about the Guardian Newspaper, he testified, "I interjected my opinion that the Westchester

Guardian was not a newspaper".  When asked whether he had ever spoken with Mayor Amicone

about the Guardian or anything contained in it, Mr. Simpson responded "Of course" and

recounted the first occasion, stating, "the Mayor had related a story to me in which he [sic] a

conversation with the mayor of Mount Vernon, Ernie Davis, in which Ernie Davis jokingly

asked him over the telephone: Which one are you, dumb or dumber? Referring to one of the

headlines in the Guardian. It was a joking matter.".  Mr. Simpson also testified that over the

course of several months from August 2007, he had several conversations with the Deputy

Mayor about the Guardian and its distribution practices.


After the initiation of the lawsuit by Plaintiffs which was filed on August 9, 2007,  Mr.

Simpson testified that he told Tracy Everson of Channel 12 news that the Guardian news racks

were propaganda machines.  He testified, " I regarded the Westchester Guardian as a piece of

political propaganda. So the box was a propaganda machine to me.".  Plaintiffs' counsel then asked "Did you regard the Guardian as a propaganda machine that opposed your incumbent administration including the mayor" to which Mr. Simpson responded, "It was clear that they opposed the mayor.".

A headline on an edition of the Guardian dated July 5, 2007 read "Amicone Sells Out Families of Yonkers...Embraces Giulio Cavallo; Brings in Nick Spano Mob".  The front page headline of the July 9, 2007 Guardian read "A Tale of Two Cities", beneath which read "Dumb and Dumber" referring expressly to Mayor Amicone of Yonkers and Mayor Davis of Mount Vernon.  The August 2, 2007 Guardian edition headline read "Phil Amicone A Huge Flop! Fails to Deal With Police Brutality".

Mr. Simpson testified that he spoke to Commissioner Liszewski during late August 2007, after he had received inquiries from the press, and asked if the City "confiscated any Westchester Guardian News boxes" and where the boxes were taken. He also testified that he spoke to the Deputy Mayor several times regarding the Guardian News and its distribution during and after August 2007.

Mr. Simpson's understanding of the City's policy on news boxes is that they are permitted unless they impede rights of way. He testified that he was told about the regulation governing newsracks in late August of 2007.  Additionally, he testified that he was unaware of any written policy concerning news boxes within City Hall.  He testified that it was the

17

administration's responsibility to draft policy for the building. At the time of his testimony, Mr. Simpson stated that he had not read Section 100-35.

On cross-examination, Mr. Simpson testified that in late summer or early fall of 2007, after news broke about the City taking thirty-five Guardian news boxes off the street, Mr. Zherka appeared in the Mayor's office unannounced, with a female shooting live video and demanding to see the Mayor. While recounting the incident that transpired in the Mayor's office with Mr. Zherka, Mr. Simpson testified that he came from his office to give the Mayor's receptionist some assistance and "asked Mr. Zherka to have his associate turn off the video camera, that filming wasn't permitted, that he should leave, the mayor was unavailable" at which point Mr. Simpson called a police officer to escort Mr. Zherka out. When questioned by Plaintiffs' counsel concerning the permit requirements within City Hall, the testimony was:

> Q. Who says a permit is required to use a video camera in the Mayor's Office or the area of the secretary?
> A. It's a commonly known policy at City Hall. We require permits for any kind of filming in City Hall building.
> Q. That's in writing?
> A. I believe that policy is in writing in the Yonkers' Film Office.
> Q. You've never seen it?
> A. I may have seen it, I may not have. But I recall there is a policy. There's a film office that governs the shooting and permitting of filming inside City Hall.
> Q. It applies to the entirety of City Hall?
> A. Yes. We issue permits all the time for commercials, film shoots in the courtroom.
> Q. And when News 12 brings a camera crew in, they're allowed to photograph anything they want with a camera without a permit, isn't that so?
> A. Yes. But they're different.
> Q. They're different because what?
> A. Because they're the news media.
> Q. I see. So the policy distinguishes between the press and

nonpress for the purposes of a permit?
A. With the press –
Q. You say there's a distinction in the policy.
A. I don't know.
Q. You just say there's a permit requirement when you want to,
right?
A. No.

On re-cross examination by Defendants' counsel the testimony was:

Q. Are there appointments necessary to meet with the mayor.
A. Always.
Q. Does that go for anybody in the press or in the public?
A. Yes. I've been in City Hall for two years now and I've seen
hundreds of news cameras come into the Mayor's Office, and not
one of them was ever turned on without first calling to set up an
appointment to see the mayor at a specific time.

On direct examination, David Mason testified that he has lived in Yonkers for six years

and has been the Manager of Public Works for the City for two years. In that capacity, he is

responsible for supervising the City's sidewalk and street maintenance departments.  During the

summer of 2007, his office was at 255 Lake Avenue. He testified that he never directed any

department employees to pick up blue news racks on the City streets during 2006, nor at any

time before July 2007.  After July 2007, Mr. Mason received a call from Robert Greco, who told

him to have his men pick up "the free blue newspaper boxes".  Mr. Greco did not explain what

was meant by "right of way" and Mr. Mason testified that he did not personally see any boxes

blocking the right of way, but that witnesses told him that there were certain boxes blocking

pedestrians ability to walk.  These boxes were chained to poles, and in addition to the boxes,

Mr. Mason conceded that the poles also blocked the pedestrian rights of way.  Mr. Mason

testified that he never saw any other blue boxes other than the Guardian and that all of the boxes

removed were Guardian.  Mr. Mason testified that a total of thirty-five Guardian News boxes

were brought to the Lake Street DPW.

Joe Galinski, a Yonkers Police Officer testified that he did not issue a summons for violation of Section 100-35 until July 11, 2007, when he issued a summons to Michael Guevara for "distributing by hand printed material (The Westchester Guardian) inside a public place (Yonkers City Hall)". He testified that it is his understanding that police officers must ask persons distributing printed material whether they had a permit for doing so.

Robert Stanley testified that he is a Custodian for City Hall. During July or August of 2007, he removed a Guardian News box positioned next to the police desk against a wall in City Hall. He testified that no one told him to do so, but he removed the box because "there is absolutely no other, as far as vending machines, there's absolutely no other machines inside City Hall". He testified that he had a discussion with Mr. Zherka about placing the box within City Hall and told Mr. Zherka to go to the Mayor's office to ask his permission. Mr. Zherka said that he was following his boss' order and leaving the box. Mr. Stanley testified that he did not speak to his supervisor prior to removing the box, or write anything up, but that after he put the box in storage, he notified the Deputy Mayor, Mr. Regan, who said it was fine. Mr. Stanley testified that he had no responsibility to report to Mr. Regan, that he has never reported to him at another time, but did so this time because his immediate supervisor was not there. He testified he removed the papers that were inside the news box and placed them on the police desk and that he did not know the content of the paper.

Richard Madaffari testified that he has been a Yonkers Police Officer for nine years. On August 9, 2007, he issued a summons for violation of Section 100-35 to Cristian Salazar for "distributing newspapers without a City of Yonkers permit". He testified that he believes that Section 100-35 requires a permit in order to distribute papers. He also testified that Mr. Salazar was walking in the street and in and out of traffic while handing the newspapers to cars, but he did nott issue the summons because Mr. Salazar was in the street. Mr. Madaffari testified that he issued another summons to a different person handing out newspapers. He testified that he told the person that he could hand out papers on the sidewalk, but not in the street. However, he then testified that he believes that Section 100-35 requires a person to have a permit before they can distribute papers. Officer Madaffari also testified that Sergeant Ralph Garosa held a "roll call" with approximately eight to ten police officers to discuss issuing summonses only to persons handing out papers in the street. He testified that nothing was said about sidewalks and parks and that the officers were to read the section of the City Code after the roll call.

Eileen Ahearn testified that she has been a Yonkers Police Officer for sixteen years. On August 9, 2007, she issued a summons to Maumer Kllapija for violation of 100-35. She did not recall ever issuing a summons for violation of this section prior to this date. The summons reads that P.O. Ahearn observed Mr. Kllapjia "walking into the roadway approaching vehicles handing out newspapers. [Mr. Kllapija] was advised...at 2:00 pm this date that a permit issued by the City of Yonkers was required and to cease his actions". P.O. Ahearn testified that Mr. Kllajipa's actions, attempting to distribute newspapers to motorists, caused a hazardous condition. However, P.O. Ahearn did not issue a summons for a violation of Yonkers City Code Section

109-48, Obedience to Police.

Maribel Ayala testified, and I find, that she is employed by Mr. Zherka as a secretary in one of his corporations, and that on one occasion during the summer of 2007, she handed out copies of the Westchester Guardian Newspaper approximately fifty (50) feet in front of the doorway of City Hall, on the ground level. While doing so, a uniformed police officer approached her, issued her a summons and told her if she did not stop distributing the papers, she would be arrested. Ms. Ayala testified that she stopped distributing the paper because she did not want to be arrested.

Steven Perez, a teenager employed by Mr. Zherka, testified, and I find, that in July 2007, while handing out copies of the Guardian near City Hall, two police officers told him to stop handing out papers because "it wasn't allowed on the property". Mr. Perez obeyed the directive and proceeded to the Yonkers Raceway.

While distributing papers at the Yonkers Raceway, Mr. Perez testified that a Police Officer assigned to the Police Canine Unit approached him and another individual and threatened them, specifically stating "I'm going to bash your heads in if you guys don't stop handing out newspapers". Mr. Perez testified that the Officer then took five bundles of newspapers and put them in the police truck and said "punks better stop handing out papers". Mr. Perez also testified that each bundle contained 150 newspapers, while many other witnesses testified that a bundle contains 75 papers.

Michael Estrada, a teenager employed by Mr. Zherka, testified that he distributed papers at Yonkers City Hall once on August 6, 2007. He testified that he was distributing copies of the Guardian on the east side of City Hall at the bottom of the stairs that lead up to the door.  He was approached by two uniformed police officers who told Mr. Estrada to get off City Hall grounds or be arrested or given a summons.  After he was issued a summons for violating Section 100-35, he stopped distributing the papers because he did not want to get arrested. On cross-examination, Mr. Estrada testified that he was not aware that anyone had received summons before that day for distributing papers.

Richard Guzman, a teenager employed by Mr. Zherka, testified, and I find, that he handed out the Guardian in Yonkers on two occasions. The first time was in July 2007 at the Cacace Justice Center, approximately ten feet inside the building. He testified that he then moved approximately twenty feet outside of the building, on the sidewalk and continued distributing the paper to passers by when a police officer approached him and told him that he had to stop because he didn't have a permit.  Mr. Guzman continued to distribute the papers and received a summons for violation of Section 100-35.  The police officers told Mr. Guzman that if he did not stop distributing, he would be arrested, so he stopped.

The second occasion was in August 2007 near City Hall.  Mr. Guzman testified that he was handing out papers approximately ten feet from the door on the  north side of City Hall when a Police Officer told him to stop or he would be issued a summons.  The Officer also said that Guzman "was a pawn in the game Sammy was playing".  The Officer then gave Mr.

Guzman a summons and told him he would be arrested if he did not stop distributing. On cross-examination, Mr. Guzman stated that he continued to distribute papers after receiving a summons because he had a right to hand out free papers - "It's part of the First Amendment".

Dominica O'Neill testified that she has been employed by Mr. Zherka for approximately thirteen years and that she currently manages buildings that he owns. She testified, and I find, that during the summer of 2007, she handed out the Guardian in Yonkers on two occasions. On the first occasion, she was walking back and forth in front of City Hall, when Police Officer Wood approached her and advised her that she could not hand out the newspaper on public property and if she did not stop, he would arrest her. The Officer issued her a summons for violating Section 100-35, after which Ms. O'Neill stopped distributing the paper in order to avoid arrest.

Ms. O'Neill received a second summons on August 6, 2007 as she was walking up the steps to City Hall with Mr. Zherka. Before either of them attempted to hand out a copy of the Guardian, Police Officer Wood approached them and said "You know I'm going to have to write you a summons". After issuing the summons, P.O. Wood walked Ms. O'Neill and Mr. Zherka down the steps and they left, in order to avoid arrest.

Mr. Zherka was recalled and produced a video taped that he surreptitiously recorded at the Yonkers DPW on August 23, 2007, while picking up the seized Guardian News boxes. The video shows that many of the boxes were in dented and scratched condition and many of the

24

windows would not open properly.  Some boxes contained copies of the paper.

Richard Alaimo testified that he has been a Yonkers Police Officer for fourteen years. He is assigned to patrol Getty Square. On July 12, 2007 while on duty, he witnessed Gene Smith place a "blue box" on the corner of New Main Street and South Broadway, near a bus stop, that P.O. Alaimo testified was the busiest bus stop in Getty Square.  P.O. Alaimo told Mr. Smith that he could not leave the box at that location because it was unsafe.  Mr. Smith was on the phone, got off the call and told Alaimo "just issue me the summons", which Alaimo did.

Jason Gonzalez, a teenager employed by Mr. Zherka, testified, and I find, that he handed out the Guardian on Yonkers Avenue in Yonkers during the summer of 2007 and had two encounters with police. The first incident occurred when he was handing out papers with Steven Perez. An Officer approached him and advised him to stop handing out papers in the street, however, Mr. Gonzalez testified that he was not in the street. The police officer said that he would get a summons and, if he didn't stop, would be arrested. Mr. Gonzalez testified that the Police Officer wrote the summons, but never gave it to him.

The second incident occurred at the same location when a Police Officer from the Canine Unit approached Mr. Gonzalez and Mr. Perez and cursed at them saying "You need to stop handing out these fucking newspapers" after which the Officer confiscated four bundles of papers, each containing seventy-five copies of the newspaper.  Mr. Gonzalez then testified that the Officer taunted, "try to take them", after which he pulled down on his black gloves and

threatened "I'm going to bash your heads in".  Mr. Gonzalez testified that he didn't hand out

anymore newspapers cause he didn't want to get arrested or threatened.  He also testified that he

was not instructed to get summonses.


Michael Guevara, a teenager employer by Mr. Zherka, testified that he was handing out

newspapers by the east side steps, inside City Hall.  While he was outside, walking back to his

spot up the stairs, a man with brown hair and a mustache, wearing a brown jacket and brown

pants approached him and said "Would you like to get booked for handing out newspapers?",

while flashing a gold badge.  Mr. Guevara testified that while he was at City Court for a

summons that he received that same day, he saw the same man who flashed the badge "settling

tickets", and identified him as Assistant Corporation Counsel Lawrence Porcari. On redirect

examination  he testified that after the man flashed the badge, he continued to hand out papers

outside, down the steps until he received a summons.  The summons for Michael Guevara states

that he was distributing The Westchester Guardian by hand, inside a public place, City Hall, in

violation of Section 100-35.


Muamer Kllipija, a teenager employed by Mr. Zherka, testified that during the summer

of 2007, he observed (and recorded on his camera phone) employees of the City's Department of

Public Works removing a Guardian News box at the Yonkers Raceway, on Yonkers Avenue.  He

observed the workers cutting the chain that the box was affixed with and placing the box in a

truck with the corporate seal of the City of Yonkers on the passenger side door.  As he was

taking the pictures, he testified that the employees told him "Stop taking pictures, you guys are

going to lose. It's not worth it what you guys are doing. So can you please stop fucking taking pictures."  Mr. Kllipija was issued a summons that day by P.O. Ahearn for handing out newspapers in the street.  On cross-examination, Mr. Kllipija testified that P.O. Ahearn warned him earlier to stop walking in the street and handing out newspapers, but that he was not in the street on either occasion.

Ceasar Castillo, a teenager employed by Mr. Zherka, testified that he handed out the Guardian all over Westchester, but received a summons for handing out the Guardian inside City Hall near the police desk.  After received the summons, he went home because he did not want to get arrested.

Cristian Salazar, a teenager employer by Mr. Zherka, testified that he handed out the Guardian twice on Yonkers Avenue.  On one of those occasions, Police Officer Madaffari issued him a ticket and told him "next time, you're getting arrested".  Mr. Salazar stopped handing out the Guardian because the P.O. told him to and because he did not get arrested.  The summons was issued for "distributing newspapers without a City of Yonkers permit" in violation of Section 100-35. There was no discussion by the P.O. that Mr. Salazar was in the street and Mr. Salazar testified that he never stepped into the street to distribute the papers, but handed them out from the sidewalk.

**Discussion**

The standard for a permanent injunction is essentially the same as for a preliminary

injunction with the exception that the plaintiff must show actual success on the merits rather than a likelihood. *Amoco Prod. Co. V. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). Thus, in this case, Plaintiffs must establish: (1) irreparable harm and (2) success on the merits.

Plaintiffs assert, and I find that the actions of the Defendants violated Plaintiffs' First Amendment right of free speech. The First Amendment provides: "Congress shall make no law...abridging the freedom of speech..." *U.S. Const. Amend. 1*. "Freedom of speech and freedom of the press...are among the fundamental personal rights which are protected...from invasion by state action." *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938). "It is also well settled that municipal ordinances adopted under state authority constitute state action." *Id*. It is clear that "the deprivation of constitutional rights...causes irreparable harm." *See,* e.g., *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury"); 11A Charles A. Wright, Arthur R. Miller and Mary Kane, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ("when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"). Plaintiffs have met the first prong of the test. *See Rodriguez ex rel. Rodriques v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999).

As to the second prong, Defendants do not dispute that Plaintiffs' distribution of the Guardian through newsboxes, as well as in-person distribution, on the streets of Yonkers are protected speech within the meaning of the First Amendment. *See Martin v. City of Struthers*, 319 U.S. 141 (1943).

The Supreme Court has classified government-owed property into three categories – "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802 (1985). Traditional public fora, such as city streets and sidewalks, are places that have "immemorially been held in trust for the use of the public and … have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 651 (1981) (citing *Hague v. CIO*, 307 U.S. 496, 515 (1939)). The streets and sidewalks of the city of Yonkers, including the streets and sidewalks in front of and surrounding Yonkers City Hall and the Cacace Justice Center, are paradigmatic examples of such fora. *See Housing Works, Inc. v. Kerik*, 283 F.3d 471, 478 (2d Cir. 2002) ("City Hall Plaza is a public forum as defined by the Supreme Court: a place which by long tradition or by government fiat has been devoted to assembly and debate." (internal citations and quotes omitted)).

"Designated public fora are areas not traditionally open to assembly and debate that the pertinent government authorities have intentionally opened for public discourse." *International Society for Krishna Consciousness v. Lee*, 925 F.2d 576, 580 (1991). Yonkers City Hall is home to the City Administrative Offices, and is open to the public at large. Citizens are free to enter City Hall at all times of operation for various purposes. A citizen may enter City Hall through either entrance, and at times and need not even show identification to gain entrance and go about their business. One notable activity conducted at City Hall are meetings of the various city zoning and planning boards. These meetings are open for all to attend and take part in. The

Cacace Justice Center, which houses the Yonkers City Police Department as well as the City Courts, is open to the public, after inspection by metal detectors. Based on the evidence, it is clear that these two government owned properties are designated public forums for purposes of First Amendment analysis.

Although freedom of speech is protected in these fora, "the First Amendment does not guarantee an absolute right to anyone to express their views any place, at any time, and in any way that they want." *Heffron*, 452 U.S. at 647; *see also Burson v. Freeman*, 504 U.S. 191, 197 (1992) (the protection afforded in such fora is not absolute, because "expressive activity, even in quintessential public forum, may interfere with other important activities for which the property is used."). Governments may impose reasonable restrictions on the time place or manner of protected speech in both traditional and designated public forums to further significant government interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "The well-established tests for assessing the validity of such a restriction require that it (1) be content-neutral, (2) be narrowly tailored to meet a significant government interest, and (3) leave open ample alternative means of communication." *Olivieri v. Ward*, 801 F.2d 602, 605 (2d Cir. 1986).

*Yonkers News rack regulation and Judge Knapp's Decision*

In 1979, in an opinion written by Judge Knapp, the Court analyzed portions of the Yonkers City Code regulating newspaper racks or boxes throughout the City. *Westchester Rockland Newspapers v. City of Yonkers*, 5 Media L. Rep. 1777 (1979). In that case,

Westchester Rockland Newspapers, joined by *amici curiae* The New York Times Company and the New York News, moved for preliminary injunction to prohibit Yonkers from enforcing the ordinance.  The Court found that the ordinance did not comply with due process and granted the Plaintiff's motion for preliminary injunction.  The Court found that Section 5 of the Ordinance, which set forth the procedural provisions for enforcement of the Ordinance, violated due process because the provisions did not give the distributor of the newspaper the right to examine the evidence upon which the Yonkers Corporation Counsel relied in establishing that the particular news rack, or box, violated the ordinance, or an opportunity to test such evidence by cross-examination.  Nor did the Ordinance provide any procedure for making a more adequate record before a Board of Review.  The Court granted Plaintiff a preliminary injunction based on these reasons, after which the City amended Section 33-5, to provide the distributor of the news rack found to violate the ordinance, the right to examine the evidence relied upon by the Corporation Counsel in finding the violation, as well as the right to cross-examine any witnesses who may have appeared.  Although the Court based its decision on the section of the 1979 Ordinance outlining the procedural provisions for enforcement of the Ordinance, Judge Knapp, at the behest of the parties, briefly commented on other provisions of the Ordinance.  No appeal was taken from his decision.

The Ordinance, which was passed in 1979, was not much different than the current regulation.  The Ordinance when first passed was divided into five sections.  The current Ordinance is made up of six provisions.  The first section states that the Ordinance is an exercise of police power to promote aesthetics, as well as pedestrian and vehicle safety.  The second

provision is a definition section. These provisions were not amended after the 1979 decision.

The third section contains substantive regulations of news racks on public sidewalks or roadways and provides dimensional requirements for the racks, limits advertisement displayed on the racks, regulates the operation of coin-return mechanisms, outlines the information to be provided visibly on the rack, states that each rack must be maintained in "neat and clean condition and in good repair", and that no rack shall interfere with snow or debris removal. This section was unaffected by the 1979 decision. The Court did, however, mention that the expense associated with the provision requiring that each rack be equipped with a coin return may have the effect of chilling speech, however the Court asserted that such analysis was unavailable upon the record before it.

The fourth provision provided additional regulations for news racks including that no such rack will be placed or maintained to interfere with the safety of persons or property or impede the flow of pedestrian or vehicular traffic. The next section of provision four provided that "no newsrack shall be chained, bolted, or otherwise affixed or attached to any fixture...unless that fixture is owned by the distributor". The Court stated that this provision was "the most controversial substantive regulation," and stated, in *dicta*, that such prohibition seemed "wholly arbitrary". *Westchester Rockland Newspapers*, 5 Media L. Rep. 1777, *10. The Court held that "implementation of this provision could approach a total ban upon the placement of newsracks," an unconstitutional result. *Id.* at *10, n. 9. Thus, in December of 1979, the City amended this section to read:

> C. No newsrack shall be affixed or attached to any fixture or other property owned or maintained by the City of Yonkers, which property is not

suitable for such attachment, including but not limited to aluminum streetlighting poles, traffic signal equipment and poles erected for the placement of traffic regulatory signs. No newsrack shall be affixed or attached to any other fixture upon, in or over any public sidewalk or roadway unless that fixture is owned by the distributor or by a person who has consented to such attachment in a writing filed in the office of the City Engineer of Yonkers. Further, no newsrack shall be affixed or attached to any fixture upon, in or over any public sidewalk or roadway unless the attachment is rigid and secure and prevents the newsrack from swiveling, turning or otherwise moving while so attached and such newsrack, as so attached, does not violate any other provision of this chapter. [Amended 12-11-1979 by L.L. No. 14-1979; 8-25-1981 by L.L. No. 12-1981]

Yonkers City Code § 33-4(1)(C).  The next part of section 4 detailed eleven restrictions on the

location of newsracks in relation to certain public buildings and property.  The original 1979

Ordinance stated that:

> No newsrack shall be placed, installed, used or maintained:
> (1)Within three (3) feet of any marked crosswalk,.
> (2)Within twelve (12) feet of the curb return of any unmarked crosswalk.
> (3)Within fifteen (15) feet of any fire hydrant,
> (4)Within five (5) feet of any fire or police call box, fire alarm or other emergency communication device, including but not limited to public telephones,
> (5)Within five (5) feet of any driveway, public or private,
> (6)Within fifty (50) feet of any fire or police station,
> (7)Within three (3) feet ahead or fifteen (15) feet to the rear of any designated bus stop, taxi stand or place marked for handicapped parking,
> (8)Within three (3) feet of any bus bench or shelter,
> (9)At any location whereby the clearance space for the passage of pedestrians is reduced to six (6) feet or less,
> (10)within five (5) feet of any public park or property held in trust by the City for the board of education, Library or Museum,
> (11) Within one hundred (100) feet of any other newsrack on the same side of the street in the same block which contains the same issue or edition of the same newspaper or news periodical.

*Westchester Rockland Newspapers*, 5 Media L. Rep. 1777, *3.  The Court, in *dicta*, expressed

skepticism concerning the last provision - banning the placement of racks in close proximity to

parks, libraries, museums and schools - and in December of 1979, the City removed  this provision from the Ordinance, however kept the rest of the section without change.

The current Ordinance contains a sixth section recognizing that the First Amendment prohibits the banning of news racks and states that the Ordinance is not to be construed as a sanction of news racks.  This section also sets forth that nothing in the Ordinance is to be construed as the City's acquiescence in the placement of the racks and limits the liability of the City for such placement.

*News rack Ordinance may be Constitutional on its face, but not as applied to Plaintiffs*

Judge Knapp found that "there [was] no contention [] that the Ordinance is designed for the purpose of favoring one publication or message over another, or that decisions under the Ordinance would be based on anything other than content-neutral criteria".  *Westchester Rockland Newspapers*, 5 Media L. Rep. 1777, *8-9.  However, Judge Knapp also noted,  "[o]f course if the City should ever try to subvert the Ordinance to some improper purpose, a different question would be presented."  *Id.* at *9, n.6.  That different question clearly is presented by the facts before this Court today.

*Ordinance as-applied to the Guardian is Content Based*

"A major criterion for a valid time, place and manner restriction is that the restriction 'may not be based on either the content or subject matter of speech.'" *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 648 (1981)(quoting *Consolidated Edison Co.*

*v. Public Service Comm'n*, 447 U.S. 530, 535 (1980)("We have emphasized that time, place, and manner regulations must be applicable to all speech irrespective of content. Governmental action that regulates speech on the basis of its subject matter slips from the neutrality of time, place, and circumstance into a concern about content." (internal quotations omitted)). Additionally, "government-imposed restrictions on time, place, or manner of speech in a public forum will fail the neutrality requirement if they confer overly broad discretion on the regulating officials." *Housing Works, Inc v. Kerik*, 283 F.3d 471 (2d Cir. 2002).

The ordinance, on its face, applies even handedly to all who wish to distribute, however, it is clear that, as to Plaintiffs, the Yonkers City Ordinance was applied based on the content of speech, and official disagreement with the messages conveyed. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1981). The evidence presented at trial establishes that during the summer of 2007, the City's administration was very familiar with the Guardian News boxes. In fact, many of the witnesses that worked for the City testified that when orders or instructions to remove newspaper boxes blocking pedestrian rights of way were given, often all that was said to describe the boxes to be removed was the "blue boxes" or the "blue free news boxes". Commissioner Liszewski of Public Works for the City testified that Mayor Amicone personally called him and said that "there were two more of those blue boxes" at the Will Library. Commissioner Liszewski testified that he knew what the Mayor was talking about, and on August 10, 2007, sent an order to Robert Greco to remove the boxes. The Commissioner gave this order even though he testified that the City of Yonkers did not own the Will Library. Robert

Greco testified that when Commissioner Liszewski gave him the order all he was told was that it was a blue box.  Mr. Greco testified that "We all knew what they were".

Ever since 1979, other newspapers and periodicals have maintained boxes identical to those used by the Guardian in the streets and sidewalks, attached to poles and fixtures throughout the City of Yonkers.  The evidence has shown that The Guardian was not the only "free" or "blue" newspaper box throughout the streets of Yonkers, however it was the only publication that had its boxes seized by City officials throughout the summer of 2007.

The testimony of David Simpson, Yonkers City Director of Communications, lends additional, if not conclusive proof of the City's content based animus and the hostile attitude toward the Guardian publication.  On cross-examination, Mr. Simpson testified that when Mr. Zherka appeared in the Mayor's office unannounced, with a female shooting live video and demanding to see the Mayor, he told Mr. Zherka that "filming wasn't permitted".  On redirect examination, Mr. Simpson testified that a permit is required to use video recording devices in City Hall.  He testified that this is a "common policy" for all of City Hall, which he believes is in writing in the Yonkers film office.  However, Mr. Simpson testified that news cameras - such as News 12 - are allowed to photograph anything they want with a camera without a permit because "they're different.... they're the news media".  When asked whether the policy distinguishes between press and nonpress, Mr. Simpson responded "I don't know".  On re-cross examination, Mr. Simpson testified that everyone who wishes to meet with the Mayor needs an appointment

and that none of the cameras brought into such a meeting were ever turned on before such a meeting.

Mr. Simpson gratuitously expressed his opinion that the Guardian is "not a newspaper", merely a channel for "propaganda", and therefore does not share the same privileges that other Westchester publications and news sources would receive at City Hall, or throughout the City streets. He repeatedly interjected this opinion to reporters, presumably with the intention that such opinion would be transmitted to the public at large. His testimony regarding the incident in the Mayor's Office establishes that Mr. Simpson's opinion that the Guardian is "not a newspaper" has been put into practice. The Yonkers' City Administration distinguishes between "the news media" and the Guardian; the latter is not included in the same category. All the evidence shows that this opinion was commonly held by policy makers in the entire City of Yonkers administration. First Amendment principles prevent this conduct on the part of government officials.

It is evident that the City does not disclaim the statements expressed by Mr. Simpson. Neither Mayor Amicone, the Deputy Mayor, nor any other high ranking official testified at trial to the contrary. As a named Defendant, Mayor Amicone's decision not to testify necessarily leads to an inference that he may have been offended by the numerous negative front page articles run against him by the Guardian during the summer of 2007 when he was seeking reelection. Some of these articles depicted Mayor Amicone as "Dumb"; other issues claimed corruption within the Yonkers administration. With the November 2007 Mayoral election just

months away, and Mayor Amicone's re-election pending, it is a fair inference that the response

of the City was motivated largely by the abusive content of the Guardian.  Under familiar First

Amendment principles, this is simply not permitted.


In *Westchester Rockland Newspapers*, Judge Knapp found that both the Newspapers and

the City of Yonkers understood that newsracks are an important means of getting newspapers to

readers.  The Court noted that "newsracks further the interest, central to the First Amendment, in

securing 'the widest possible dissemination of ideas.'" *Westchester Rockland Newspapers*, 5

Media L. Rep. 1777, *11, n.10 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964)

(internal citations omitted).  "Newsracks may be the only means for reaching some readers: i.e.,

those with unusual working hours or those living in places where it is not economically feasible

to maintain newsstands and who do not wish the added expensive of home delivery."  *Id.* at n.10.

"Thus regulation of newsracks...will indirectly determine who will be able to obtain newspapers

of their choice." *Id*.  This consideration alone is enough to warrant scrutinizing analysis of action

taken under the Yonkers ordinance.  Furthermore, the evidence adduced at trial supports the

contention that the Ordinance was applied in this case in order to restrict Plaintiff's speech due

to its content.


Although Yonkers City Code § 33 is deemed constitutional on its face, as a reasonable

regulation of the City's police power to ensure the health and safety of the City, it is clear that

the Ordinance was unconstitutionally applied against Plaintiffs in order to restrict their right to

38

free speech guaranteed by the First Amendment based on content.  Accordingly, Plaintiffs are entitled

to a permanent injunction to protect their First Amendment rights and those of the public.


Thus, the Court concludes that Guardian Newsboxes are permitted throughout the City of Yonkers, as long as those of other newspapers are permitted and the boxes are in compliance with the provisions of Section 33 of the Yonkers City Code.  Since Defendants have not provided any written policy concerning the placement of news boxes around the outside of Yonkers City Hall or the Cacace Justice Center, and the Ordinance does not distinguish these sidewalks from other City sidewalks, newspaper boxes, including Guardian boxes, are permitted at these locations.  For any violation that the City alleges against any news box placed on the City sidewalks, the procedures outlined in Section 33-5 must be followed by the City prior to removal of any such news box.


Although there is no written policy addressing whether news boxes or vending machines are permitted within the City Hall building, the testimony of multiple witnesses establishes that it has been customary to place free periodicals on top of a police desk within City Hall for distribution.  No news boxes have ever been in City Hall, save for a wire news rack that was located at a staircase.  This wire news rack was removed during August of 2007; action likely taken to support the City's argument that news boxes are not permitted.  Although Defendants claim that the dissemination practice for publications is equal for all publications within City

Hall, at the very least, the wire news rack originally present in City Hall should be restored to the *status quo ante*.

The City raises an issue that the presence of news boxes within City Hall may pose a potential security risk - presumably that a bomb can be hidden within the box. The Court reserves to the City the opportunity, after notice and a hearing, to amend, or potentially create, an ordinance regulating the safety aspect of the presence and placement of news boxes within the City Hall building.

*Selective Enforcement*

In order to establish a violation of equal protection based on selective enforcement, a plaintiff must show: (1) that, compared with others similarly situation, plaintiff was treated selectively, and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights of malicious or bad faith intent to injure the plaintiff. *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999).

The Defendants have presented evidence, in the form of witnesses and exhibits, establishing that the police desk at City Hall is used for the distribution of all publications, including the Guardian. The City has at all times permitted publications to be placed on the police desk for dissemination. Many witnesses testified that while Plaintiff attempted to install various news boxes throughout City Hall, the Police Officers and staff at City Hall informed them that the appropriate place for his newspapers was the police desk. Although Plaintiff

asserts that every time he placed copies of the Guardian on the desk in City Hall, the papers would instantly disappear, he has presented little evidence for this contention, short of his accusations.

An email dated October 1, 2007, from Police Chief Gardner to Sal DiMaggio (Pl. Ex. 122) describes an incident that transpired at City Hall on September 27, 2007, where Mr. Zherka approached the police desk and asked the police officer on duty, P.O. Trevino, why many Guardian Newspapers were in the garbage outside the City Hall entrance.  P.O. Trevino advised that he did not know why the papers were in the garbage and suggested that perhaps people discarded them after having read them.  P.O. Trevino then overheard Mr. Zherka telling his companion that he needed to install a video camera, then took the remaining newspapers and left the building.

The evidence has shown, and I conclude, that the Guardian news boxes throughout the City were selectively removed, while other news boxes of other papers in the same and similar locations were not affected.  Although Plaintiff has not presented any direct evidence that the Guardian was treated selectively within City Hall, the totality of the evidence leads to such an inference.

*Yonkers section 100-35 – Unconstitutional on its face and as applied*

The Plaintiff, members of his staff, as well as numerous teenagers hired by Plaintiff in the summer of 2007, were issued summonses for violations of Section 100-35 of the Yonkers City Code. The Code provides in relevant part:

**Advertising and bill distribution.**

> No person shall post any bill, placard, notice or other paper upon any structure, tree, rock, article or thing within any park or public place or paint or fix thereon in any way any advertisement, notice or exhortation, except under permit and in strict conformity therewith. *No person shall distribute, hand out or cast about any card, circular, pamphlet or printed matter within any park or upon any public place.* (emphasis added)

Yonkers City Code § 100-35 Article VI, of which Section 100-35 is a part, was adopted on June 22, 1920, and it appears that no amendments to the sections of that article have been made since.

In a letter addressed to this Court on January 3, 2008, Defendants maintain that since Plaintiffs pretrial papers only assert an as-applied challenge to Section 100-35, the Court should not entertain the facial challenge asserted by Plaintiffs during trial and in Plaintiffs' post-trial submissions. Alternatively, Defendants requested that they be permitted to brief the issue of a facial challenge to the ordinance. The Court finds it difficult to believe that after two days of trial, over twenty witnesses and many exhibits, including all the summonses issued, that Defendants did not understand the nature of the challenge to Section 100-35. No purpose will be served by further delay or additional briefings.

It is clear that the First Amendment protects distribution as well as publication. *Lovell v. Griffin*, 303 U.S. 444, 452 (1938). "The right of freedom of speech and press has broad scope.

The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943).  However, "the peace, good order and comfort of the community may imperatively require the regulation of the time, place, and manner of distribution." *Id.* (citing *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940).

After 80 years of First Amendment case precedent, this Court would be astonished to find that Defendants do not believe that in-hand distribution of printed material on public City sidewalks is a Constitutionally protected activity.  *See, e.g.*, *Marsh v. Alabama*, 326 U.S. 501 (1946) ("Neither a state nor a municipality can completely bar the distribution of literature containing religious or political ideas on its street, sidewalks and public places or make the right to distribute dependent on a flat license tax or permit to be issued by an official who could deny it at will." (citing *Lovell v. Griffin*, 303 U.S. 444 (1938); *Hague v. C.I.O.*, 307 U.S. 496(19); *Schneider v. State*, 308 U.S. 147; *Murdock v. Pennsylvania*, 319 U.S. 105)).  "A ban on handbilling [] would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise...[and thus] a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it.  *Vincent v. Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007).

The City administration "cannot curtail the liberty of press...consistently with the purposes of the Constitutional guarantees, and a [city] statute, as the one here involved, which

enforces such action by criminally punishing those who attempt to distribute [] literature clearly violates the First and Fourteenth Amendments to the Constitution. *Marsh v. Alabama*, 326 U.S. 501 (1946).  The testimony of the various Yonkers law enforcement officials demonstrates that those issuing the summons pursuant to Section 100-35 did not know how to apply that provision. Some of the officers testified that a permit is required in order to distribute papers, or avoid receiving a summons, others testified that there were no exceptions to the Ordinance, however these same officers issued summonses that stated that the activity was done "without a City of Yonkers permit".  The Officers clearly had not read Section 100-35 prior to issuing summonses pursuant to that Section.  The evidence leads to the inference that the Yonkers Police were operating on an Order to issue summonses to any person handing out Guardian Newspapers throughout the City.

The Court concludes that the last sentence of Section 100-35, is unconstitutional, as a complete ban on the right to distribute, a protected activity. However, because the right to distribute is not absolute, reasonable time, place and manner provisions are permitted in order to regulate health and safety.

This Court finds that Plaintiffs have the right to distribute their newspaper, by hand, on the sidewalks throughout the City of Yonkers, including the sidewalks in front of Yonkers City Hall and the Cacace Justice Center, provided that no person blocks the entire sidewalk nor stands in street traffic while distributing.  Distributors may hand newspapers to motorists that are stopped in the street, as long as the distributors remain on the sidewalk while handing the papers

44

to the motorists. Furthermore, as there are no policies or Ordinances pertaining to handbilling and distribution within City Hall, the Court finds no reason why this activity should not be permitted.  However, the Court reserves to the City the opportunity, after notice and a hearing, to amend, or potentially create, an ordinance regulating by-hand distribution of printed material within the City Hall building.


*Conclusion*

The Court grants the Plaintiffs' requested equitable relief and Orders the parties to settle, on five (5) days notice, a proposed Injunction Order, the terms of which to be in accordance with this decision.  The final judgment to be entered in this case shall be limited to injunctive relief, against future violation and for dismissal of all pending charges against The Guardian or its news agents and return of property (See *Marsh v. Alabama*, supra); claims for money damages against the individual actors having been withdrawn.


Plaintiffs are prevailing parties and may recover a reasonable attorney's fee.  The Plaintiffs' lodestar shall be served and filed within ten (10) days, and provision made for an award in the judgment.


X


X


X


45

Dated: White Plains, New York
     March 3, 2008

                                          Charles L. Brieant, U.S.D.J.